**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF INDIANA**
**INDIANAPOLIS DIVISION**

PURE DEVELOPMENT, INC.,
PURE HOLDINGS, INC.,
and DREW SANDERS,

      Plaintiffs,

    v.

CANOPY 5, LLC, CHRIS SEGER,
ADAM SEGER, BRIAN PALMER,
and MAGIC TRIC I, LLC,

      Defendants.

Case No. 1:25-cv-1301-SEB-TAB

**PURE DEVELOPMENT, INC.'s BRIEF IN SUPPORT**
**OF ITS MOTION FOR PRELIMINARY INJUNCTION**

Plaintiff Pure Development, Inc. respectfully submits this brief in support of its

motion for a preliminary injunction against defendants Canopy 5, LLC, Chris Seger,

Adam Seger, and Brian Palmer.

**INTRODUCTION**

Earlier this year in an Indiana state court proceeding, Chris Seger sought to dissolve

the real estate development enterprise—consisting of Pure Holdings, Inc., Pure

Development Capital, Inc., and Pure Development, Inc.—that he and Drew Sanders had

built together as partners. As part of his request, Seger also sought approval to launch a

new company, without Sanders, that would assume control of Pure Development, Inc.'s

operations. Although its May 12, 2025 order dissolved the Pure companies (an order

1

since stayed by the Indiana Court of Appeals), the state court rejected as "inequitable" Seger's proposal to transfer Pure Development, Inc.'s operations to a new company without Sanders. Undeterred, Seger set about doing that anyway.

Within days of the trial court's order, Chris Seger and two Pure Development, Inc. employees (Chris's brother, Adam, and Brian Palmer) launched their new company, Canopy 5. But none of them actually left Pure Development, Inc.—not for another 41 days, anyway. In the meantime, the three began operating Canopy 5 out of Pure Development, Inc.'s office, using Pure Development ,Inc.'s assets, resources, business information, and even its employees. They took steps to divert business out of Pure Development, Inc. and into Canopy 5. And their marketing materials mispresented Pure Development, Inc.'s customers, projects, office, and employees as Canopy 5's customers, projects, office, and employees.

Although the full extent of their conduct is not yet known, the facts already uncovered warrant injunctive relief preventing them from continuing to operate their new enterprise in violation of federal and state law governing trade secrets, unfair competition, fiduciary duties, and contracts.

**STATEMENT OF FACTS**

**A.     Chris Seger sought an Indiana state court's blessing to start a new company, Canopy 5, that would assume Pure Development, Inc.'s operations.**

1.      In 2012, Chris Seger and Drew Sanders went into business together to form Pure Development, Inc., a real estate development company located in Indianapolis. [Sanders Decl., ¶2.]

2.      On July 1, 2019, Seger and Sanders formed Pure Holdings, Inc., with each of them owning 50 percent of the company. At that time, they transferred their ownership interests in Pure Development, Inc. to Pure Holdings, Inc., and Pure Development, Inc. became a wholly owned subsidiary of Pure Holdings, Inc. [*Id.*, ¶3.]

3.      Pure Development, Inc. has grown into a multimillion-dollar company, completing more than 20 projects throughout the United States. [*Id.*, ¶4.]

4.      On April 8, 2024, Chris Seger presented Sanders a buyout offer that would remove Sanders from Pure. [*Id.*, ¶5.]

5.      After Sanders declined the offer, Seger filed an action in Indiana state court (the "State Court Case") to dissolve Pure Holdings, Inc. and Pure Development Capital, Inc. (an entity that Chris Seger and Sanders formed to hold capital and guaranty loans). [*Id.*, ¶6.]

6.      As part of a dissolution "Remedy Plan" that he presented in the State Court Case, Chris Seger asked permission to start a new company (already called Canopy 5,

even before it was officially organized) that would assume control of all of Pure Development, Inc.'s assets, customers, business pipeline, and employees. [*Id.*, ¶7.]

**B.      The Indiana state court rejected Chris Seger's Canopy 5 plan as "inequitable."**

7.      On May 12, 2025, the state court granted Seger's dissolution request and included Pure Development, Inc. in its dissolution order. But the state court specifically rejected Seger's Canopy 5 "Remedy Plan" as "inequitable." [*Id.*, ¶8; *id.*, Ex. 1 at 46.]

8.      As the state court put it, "Seger's Proposed Remedy Plan, Canopy 5, would engage in the same business as Pure Development, just without Sanders." [*Id.*, Ex. 1 at 30.] Although that plan "could certainly be successful in completing Pure Development's current projects," the state court explained, "this success is far outweighed by the inequitable results to Sanders through the adoption of the plan." [*Id.*, Ex. 1 at 46.]

9.      The state court instead believed it should appoint a receiver to independently oversee Pure Development, Inc.'s business pipeline until it was exhausted. [*Id.*, Ex. 1 at p. 43.] The court contemplated that a receiver would "not simply . . . immediately wind-up the three entities in the ordinary sense." [*Id.*] Rather, the court explained, the receiver would oversee Pure Development, Inc.'s business pipeline through to completion— even if that took "years from now." [*Id.*]

10.      The Indiana Court of Appeals stayed the trial court's dissolution order on June 23, 2025, and no receiver has been appointed. [*Id.*, ¶9; *id.*, Ex. 2.]

**C.** **Chris Seger, Adam Seger, and Brian Palmer launched Canopy 5 anyway, using and marketing Pure Development Inc.'s employees, office, and resources as their own.**

11. Despite the state court rejecting his Canopy 5 "Remedy Plan," Chris Seger—along with his brother Adam Seger and their fellow Pure Development, Inc. employee Brian Palmer—founded Canopy 5 three days later. [*Id.*, ¶10; *id.*, Ex. 3.]

12. While all three were still affiliated with Pure Development, Inc., they then began marketing Canopy 5. [*Id.*, ¶11.] A May 30, 2025 press release identified Chris Seger as Canopy 5's Chief Executive Officer. [*Id.*, ¶12; *id.*, Ex. 4.] It also claimed that Chris Seger, Adam Seger, and Brian Palmer would ensure that "all ongoing projects [of Pure Development, Inc.] are completed and [Pure Development, Inc.'s] clients are fully supported, upholding the same integrity that defines their new venture." [*Id.*]

13. On June 5, 2025, Chris Seger, Adam Seger, and Brian Palmer were profiled in an *Indianapolis Business Journal* story, with the three touting their launch of Canopy 5. [*Id.*, ¶13; *id.*, Ex. 5.] The picture of the three of them that accompanied the story was taken in Pure Development, Inc.'s office. [*Id.*] The *IBJ* story concluded by noting that "[m]ore information about Canopy 5's efforts to build its development pipeline—and efforts to inherit Pure's projects—is expected to be made public in the coming weeks." [*Id.*] At the time, Chris Seger, Adam Seger, and Brian Palmer were all still affiliated with Pure Development, Inc. [*Id.*, ¶14.]

14. The same afternoon, on June 5, 2025, Adam Seger emailed Ryan Westervelt at Cross Harbor Capital—one of Pure Development's capital partners—about an industrial speculative opportunity in New Albany, Ohio. [*Id.*, ¶15; *id.*, Ex. 6.] Adam Seger did so using an email address associated with the domain "canopy5.com," and he copied Pure Development, Inc. employees Jesse Sadowy (Pure Development, Inc.'s Chief Financial Officer) and Chase Willis at their Gmail email addresses. [*Id.*]

15. In his June 5, 2025 email to Westervelt, Adam Seger stated that a term sheet Cross Harbor Capital Partners had already delivered to Pure Development, Inc. should be changed to "remove mention of Pure Development from the term sheet." [*Id.*] Adam Seger then went on to propose terms for joint venture capital on behalf of Canopy 5. [*Id.*]

16. Adam Seger's email signature block used a Canopy 5 logo, and it stated that his Canopy 5 business address was 1351 Roosevelt Ave. #100 in Indianapolis—Pure Development, Inc.'s office address. [*Id.*]

17. Westervelt's response to Adam Seger's email congratulated Seger "on the launch of Canopy 5" and asked that Seger provide an organizational chart for Canopy 5 that "show[s] us the broader bench supporting Canopy 5, essentially confirming which members (if not all) of the former Pure team are involved." [*Id.*]

18. On June 10, 2025, Chris Seger provided Drew Sanders a letter from the Indiana Economic Development Corporation. [*Id.*, ¶16; *id.*, Ex. 7.]

19. Pure Development, Inc. has served as the developer for the IEDC on the development of the LEAP Lebanon Innovation District in Lebanon, Indiana. But, in its June 10, 2025 letter, the IEDC requested that its contracts with Pure Development, Inc. be assigned to a "Related Entity": Canopy 5. [*Id.*, ¶17; *id.*, Ex. 7.]

20. The IEDC's June 10, 2025 letter attached a series of contracts between the IEDC and Pure Development, Inc. that had been prepared in April 2025 (after the close of evidence in the State Court Case, but before the state trial court's May 12, 2025 order) and apparently negotiated by Chris Seger. [*Id.*, ¶18; *id.*, Ex. 7.]

21. In the IEDC contracts, Chris Seger—purportedly on Pure Development, Inc.'s behalf—had included a term that allowed for the assignment of Pure Development, Inc.'s contracts with the IEDC to "an entity under the direction of [Chris Seger] and employing [Pure Development, Inc. employee] Michael Watts." [*Id.*, Ex. 7.]

22. In its June 10, 2025 letter, the IEDC stated that, if Pure Development, Inc. would not assign the contracts to Canopy 5, then the IEDC would "simply terminate the Agreements." [*Id.*]

23. On June 16, 2025, after Sanders would not consent to the assignment of the IEDC contracts to Canopy 5, the IEDC issued a notice of termination of its contracts with Pure Development, Inc., effective July 10, 2025. [*Id.*, ¶19; *id.*, Ex. 8.]

24. On June 10, 2025, Sanders learned that Canopy 5's website (https://www.canopy5.com) had gone live. [*Id.*, ¶20.]

25. In a version of Canopy 5's website accessible on June 10, 2025, Canopy 5 identified its business address as 1351 Roosevelt Ave., Indianapolis, Indiana, which is Pure Development, Inc.'s business address. [*Id.*, ¶21; *id.*, Ex. 9.]

26. On its website, Canopy 5 has touted Pure Development, Inc. projects as Canopy 5's own projects. [*Id.*, ¶22.]

27. For example, on its "Build-to-Suit" page (https://www.canopy5.com/build-to-suit/), Canopy 5 passes off as its own work the following projects: Sierra Nevada Corporation in Dayton, Ohio; Saint Gobain in Worchester, Mass.; Amazon WKN4 in Union, Ohio; Amazon WKN3 in Texarkana; Amazon WKN2 in Fort Smith; Amazon LUK2 in Union, Ohio; Amazon DDT-9 in Canton, Mich.; Wayfair in South Elgin, Ill.; Skjodt Barrett in Lebanon, Ind.; SEP Headquarters in Westfield, Ind.; Regal Beloit in McAllen, Tex.; Mondelez in Montgomery, N.Y.; KAR Headquarters in Carmel, Ind.; GE Aviation in Lafayette, Ind.; GE Aviation in Ellisville, Miss.; and GE Aviation in Hookset, New Hampshire. [*Id.*, ¶23; *id.*, Ex. 10.] Each of these projects represents work done by Pure Development, not Canopy 5. [*Id.*, ¶24.]

28. On its "Speculative" page (https://www.canopy5.com/speculative/), Canopy 5 passes off as its own work the following projects: 450 Pittsburgh in Reno, Nev.; 1600 Peru in Reno, Nev.; 455 Denmark in Reno, Nev.; 500 Denmark in Reno, Nev.; Pure at Pinnacle One in Laredo, Tex.; Franklin Business Park in Franklin, Ind.; Elevate Industrial in Reno, Nev.; Coastal Crossroads in Charleston, S.C.; Camp Hall in

Charleston, S.C.; and Ascent Industrial Park in Dayton, Ohio. [*Id.*, ¶25; *id.* Ex. 11.] Each of these projects represents work done by Pure Development, not Canopy 5. [*Id.*, ¶26.]

29.     On its "Mixed Use" page (https://www.canopy5.com/mixed-use/), Canopy 5 passes off as its own work the following projects: Century Apartments in Lafayette, Ind.; North Mass District in Indianapolis, Ind.; Midtown Carmel in Carmel, Ind.; LEAP District in Lebanon, Ind.; and Fox Park in Denver, Colo. [*Id.*, ¶27; *id.*, Ex. 12.] Each of these projects represents work done by Pure Development, not Canopy 5. [*Id.*, ¶28.]

30.     On its "About" page (https://www.canopy5.com/about/), Canopy 5 invites visitors to "Meet The Team." In addition to Chris Seger, Adam Seger, and Brian Palmer, Canopy 5's advertised "team" consists of: Jesse Sadowy, Jenna Barnett, Michael Watts, Jon Carpenter, Justin Lawhorn, Jody Sharp, Kyle Miller, Tyler Neese, Brian Tominov, Dom Cate, Jake Leatherman, Chase Willis, Katie Harp, and Kendra Brooks. [*Id.*, ¶29; *id.*, Ex. 13.]

31.     All but Jenna Barnett and Dom Cate are still Pure Development, Inc. employees, and all of them (including Barnett and Cate) were Pure Development, Inc. employees at the time Canopy 5's website first included them as part of Canopy 5's "team." [*Id.*, ¶30.]

32.     In agreements executed by Chris Seger as "Canopy 5 Chief Executive Officer" on or about June 10, 2025—again, while Chris Seger was still affiliated with Pure

Development, Inc.—Canopy 5 purported to hire Pure Development, Inc. employees as "independent contractors." [*Id.*, ¶31; *id.*, Ex. 14.]

33. The agreements between Canopy 5 and Pure Development, Inc.'s employees acknowledged that the employees owed Pure Development, Inc. fiduciary obligations. Yet, by those same agreements, Canopy 5 purported to hire Pure Development, Inc.'s employees for the purpose of "provid[ing] various development-related services to support Canopy 5's growth and objectives." [*Id.*, Ex. 14.]

34. The ultimate point of the agreements, as stated in their terms, was to leverage the expertise of Pure Development's employees "to drive new business opportunities for Canopy 5," rather than for Pure Development. [*Id.*]

35. In marketing materials published to Instagram, Canopy 5 has advertised Pure Development, Inc.'s office as its office. For example, the photo to the right (depicting Pure Development, Inc.'s office as Canopy 5's) was posted to Canopy 5's Instagram feed on June 5, 2025. [*Id.*, ¶¶32–33; *id.*, Ex. 15.]



36.    In videos filmed in Pure Development, Inc.'s office and posted to Canopy 5's Instagram feed, Canopy 5 similarly represents Pure Development, Inc.'s office as its own and also shows Pure Development, Inc. employees working in Pure Development, Inc.'s office. [*Id.*, ¶34; *id.*, Ex. 16.]



37.    In one of Canopy 5's advertising videos, Adam Seger is shown talking with a Pure Development employee whose computer screen shows a link to the folder directory "Pure" (third folder up from the bottom left). [*Id.*]



38.     In a video posted to Canopy 5's Instagram feed on June 23, 2025, Brian Palmer introduced himself as Canopy 5's Chief Operating Officer—while Palmer was still an employee of Pure Development. [*Id.*, ¶35; *id.*, Ex. 17.]



Brian Palmer
Chief Operating Officer

I'm Brian Palmer, the Chief Operating Officer of Canopy 5.

39.     Canopy 5 issued these marketing materials identifying Chris Seger, Adam Seger, and Brian Palmer as its founders at the same time all three were still affiliated with Pure Development, Inc.. [*Id.*, ¶36.]

40.     During at least the time Chris Seger, Adam Seger, and Brian Palmer were operating Canopy 5 while simultaneously employed by Pure Development, Inc.—if not through today—they have had access to and the ability to misuse Pure Development, Inc.'s trade secrets. [*Id.*, ¶37.]

41.     Those trade secrets include Pure Development, Inc.'s confidential dashboards showing current and prospective business opportunities; histories of projects won and lost; the terms of negotiated agreements such as contractor agreements, leases, development agreements, and loans; development modeling showing confidential fee figures, projected gains, and formulas; confidential proposals to clients; internal strategy documents; commission and listing agreements with brokers; purchase and sale agreements for land; third-party reports for which Pure Development, Inc. has paid, such as appraisals and environmental reports; design materials; employment information such as compensation structures and profit-sharing plans; internal financials; due diligence checklists; and templates for such documents as RFP responses. [*Id.*, ¶38.]

42.     Pure Development, Inc. has undertaken reasonable efforts to maintain the confidentiality of its trade secrets. For example, Pure Development, Inc. required written agreements from Adam Seger and Brian Palmer to maintain the confidentiality of Pure Development, Inc.'s business information. [*Id.*, ¶39; *id.*, Ex. 18 & Ex. 19.]

43.     And, in the State Court Case, Pure Development, Inc. sought and obtained orders excluding its confidential information from public access—including through an effort to close the court for the entirety of trial. The trial court denied that motion, opting instead to deal with confidentiality issues on a question-by-question and document-by-document basis. In support of that effort, Pure Development, Inc. CFO

Jesse Sadowy submitted an affidavit describing Pure Development, Inc.'s trade secrets and efforts to keep its business information confidential. [*Id.*, ¶40; *id.*, Ex. 20.]

**D.  More than 40 days after launching Canopy 5, Chris Seger, Adam Seger, and Brian Palmer resigned from Pure Development, Inc.**

44.  On June 25, 2025, Chris Seger emailed Sanders a notice that Seger had "resign[ed], effective immediately, from all employment, officer, director, and board member positions that [Seger] hold[s] in: Pure Development, Inc.; Pure Holdings, Inc.; and Pure Development Capital, Inc." [*Id.*, ¶41; *id.*, Ex. 21.]

45.  Chris Seger also purported to transfer any ownership in Pure Holdings, Inc., Pure Development Capital, Inc., and Pure Development, Inc. into "an irrevocable blind trust." [*Id.*, Ex. 21] Seger claimed in his letter that he "will not receive information about the Trust Property from the Trustee or provide the Trustee with advice or direction with respect to the Trust Property." [*Id.*]

46.  Following Chris Seger's resignation, and in accordance with the bylaws of Pure Development, Inc., Pure Holdings, Inc., and Pure Development Capital, Inc.: (a) Drew Sanders, as the sole remaining director of each company, appointed a second director (his wife) to fill the board vacancies left by Seger's resignation; (b) the boards of each company then amended the bylaws of each to require only one director; (c) Sanders's wife resigned from the boards of each company; and (d) Sanders, as the sole director, appointed himself to fill the officer roles in each company from which Chris Seger resigned. [*Id.*, ¶42; *id.*, Ex. 22.]

14

47. On June 26, 2025, both Adam Seger and Brian Palmer resigned their positions at Pure Development, Inc. [*Id.*, ¶43; *id.*, Ex. 23 & Ex. 24.]

48. Both Adam Seger and Brian Palmer's employment agreements include the following Section 6 (titled "Confidential Information") that states, in relevant part:

> Employee acknowledges that Company's services are highly specialized and that in the course of his/her employment with Company, he will occupy a position of trust and confidence and will have access to and may develop Confidential Information of actual or potential value to, or otherwise useful to, Company.

> \* \* \*

> Employee agrees to use Confidential Information solely in the course of Employee['s] duties as an employee of Company and in furtherance of Company's business. Employee hereby further agrees that the above-referenced information will be kept confidential at all times during and after his/her employment with Company and that he will not disclose or communicate to any third party any of the Confidential Information and will not make use of the Confidential Information on his/her own behalf or on the behalf of a third party. Employee further agrees that any unauthorized use or disclosure of the Confidential Information, or other violation or threatened violation of this Agreement could cause irreparable damage to Company and that, therefore, Company shall be entitled to an injunction prohibiting Employee from any such disclosure, attempted disclosure, violation or threatened violation.

> \* \* \*

> Employee agrees that all Confidential Information is and shall remain the exclusive property of Company. Employee agrees to return to Company on or before Employee's termination of employment with Company, for any reason, all Company property, information and documents, … and Employee agrees that he will not retain any copies, duplicates, reproductions or excerpts thereof.

[*Id.*, Ex. 18 at 3–4; *id.*, Ex. 19 at 3–4.]

15

49. Both Adam Seger and Brian Palmer's employment agreements include the following Section 9 (titled "Non-Solicitation") that states, in relevant part:

> [D]uring the term of Employee's employment and in the event Employee ceases to be employed by Company for any reason, then, in that event, Employee covenants and agrees that, for a period of eighteen (18) months from the date of termination, he/she shall not: (a) solicit or contact any client or prospective client of the Company or Other Pure Entity Projects worked on by Employee during the twelve (12) months preceding his/her date of termination for the purpose of providing business or commercial real estate development services of the type rendered by the Company or Other Pure Entity; and (b) solicit any Employee of the Company to leave the employ of the Company.

[*Id.*, Ex. 18 at 5; *id.*, Ex. 19 at 5.]

50. Almost immediately after filing this action, Drew Sanders discovered that Adam Seger had been working with an attorney, Michael Davis, to terminate a Pure Development, Inc. purchase and sale contract for land in McCarran, Nevada, and assign ownership of the land to an entity called Magic TRIC II QOZB, LLC. [*Id.*, ¶44; *id.*, Ex. 25.]

51. According to the Indiana Secretary of State's website, Chris Seger had Magic TRIC II QOZB, LLC organized on June 17, 2025. [*Id.*, ¶45; *id.*, Ex. 26.]

52. This would not be the first time Chris Seger and Adam Seger worked together to divert a Pure Development, Inc. business opportunity to an LLC owned by only Chris Seger. After the close of evidence in the State Court Case, Drew Sanders learned that the two had pulled off the same scheme in relation to another property in Nevada known as the "Reno (Nest)" site. [*Id.*, ¶46.]

53.     Pure Development, Inc. first identified the opportunity to own and develop the Reno (Nest) site as an industrial speculative site in September 2023. And, until late March 2025, Drew Sanders understood that all activities connected to the Reno (Nest) site were in connection with Pure Development, Inc.'s business. [*Id.*, ¶47.]

54.     On October 7, 2024, Adam Seger purported to sign—on behalf of Pure Development, Inc.—a binding Purchase and Sale Contract with Emerald City Empire entitling Pure Development, Inc. to purchase the Reno (Nest) site for $10,950,548. [*Id.*, ¶48; *id.*, Ex. 27.]

55.     At 9:06 p.m. on October 7, 2024, Chris Seger formed a new Indiana limited liability company: Magic TRIC I, LLC. [*Id.*, ¶49; *id.*, Ex. 28.]

56.     Two days later, on October 9, 2024, Adam Seger signed another purchase and sale agreement for the same Reno (Nest) parcel—except, in this version, Pure Development, Inc. was removed as "Purchaser" and replaced by Chris Seger's new company, "Magic TRIC I, LLC." Adam Seger signed on behalf of Magic TRIC I, LLC. [*Id.*, ¶50; *id.*, Ex. 29.]

57.     On March 4, 2025, Magic TRIC I, LLC officially acquired the parcel. [*Id.*, ¶51; *id.*, Ex. 30.]

58.     In the meantime, Chris and Adam Seger also switched the companies on a lease of that parcel to a Pure Development, Inc. client. On September 13, 2024, that client sent Pure Development, Inc. a letter of intent to lease a building at the Reno (Nest) site.

[*Id.*, ¶52; *id.*, Ex. 31.] Then, between September 13 and November 4, 2024, Adam Seger—

on behalf of Pure Development, Inc.—negotiated lease terms with that Pure

Development, Inc. client. [*Id.*, ¶53.] But on February 12, 2025, Pure Development, Inc.'s

client executed a lease with Chris Seger's company, Magic TRIC I, LLC. [*Id.*, ¶54; *id.*, Ex.

32.]

**ARGUMENT**

**1.      Decisional standard**

"A plaintiff seeking a preliminary injunction must establish that he is likely to

succeed on the merits, that he is likely to suffer irreparable harm in the absence of

preliminary relief, that the balance of equities tips in his favor, and that an injunction is

in the public interest." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). "The

two most important considerations are likelihood of success on the merits and

irreparable harm." *Bevis v. City of Naperville, Ill.*, 85 F.4th 1175, 1188 (7th Cir. 2023).

**2.      Likelihood of success on the merits**

An application for a preliminary injunction "need not show that [the movant]

definitely will win the case. . . . But it normally includes a demonstration of how the

applicant proposes to prove the key elements of its case." *Ill. Republican Party v. Pritzker*,

973 F.3d 760, 763 (7th Cir. 2020). By their conduct, the defendants have violated multiple

federal and state statutes, state common law, and contracts. This motion highlights only

three categories of claims that exemplify the breadth of defendants' wrongful conduct.

**2.1    Defend Trade Secrets Act and Indiana Uniform Trade Secrets Act**

Pure Development, Inc. has asserted claims against defendants under the Defend Trade Secrets Act, 18 U.S.C. § 1836(b), and the Indiana Uniform Trade Secrets Act, Ind. Code § 24-2-3-1 *et seq.* Both acts work to prevent the actual or threatened misappropriation of a company's trade secrets. 18 U.S.C. § 1836(b)(3)(A)(i) (a court may grant an injunction "to prevent any actual or threatened misappropriation"); I.C. § 24-2-3-3(a) ("Actual or threatened misappropriation may be enjoined.").

Under both the DTSA and Indiana's UTSA, a protectable trade secret consists of information that (1) derives independent economic value, actual or potential, from not being generally known to and not being readily ascertainable by proper means by others who can obtain economic value from its disclosure or use; and (2) is the subject of reasonable efforts to maintain its secrecy. 18 U.S.C. § 1839(3) (defining "trade secret"); I.C. § 24-2-3-2 (defining "trade secret"). As set forth above, Pure Development, Inc.'s real estate development business is built on trade secrets that it has taken reasonable steps to keep confidential—including most recently by seeking and obtaining court orders in the State Court Case denying public access to those materials.

In relevant part, the DTSA defines "misappropriation" as "(A) acquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means," or "(B) disclosure or use of a trade secret of another without express or implied consent by a person who --

(i) used improper means to acquire knowledge of the trade secret,

(ii) at the time of disclosure or use, knew or had reason to know that the knowledge of the trade secret was (I) derived from or through a person who had used improper means to acquire the trade secret; (II) acquired under circumstances giving rise to a duty to maintain the secrecy of the trade secret or limit the use of the trade secret; or (III) derived from or through a person who owed a duty to the person seeking relief to maintain the secrecy of the trade secret or limit the use of the trade secret."

18 U.S.C. § 1839(5) (defining "misappropriation"). With only immaterial differences, Indiana's UTSA defines misappropriation the same way. I.C. § 24-2-3-2 (defining "misappropriation").

Canopy 5, Chris Seger, Adam Seger, and Brian Palmer have each engaged in misappropriation of the trade secrets to which Chris Seger, Adam Seger, and Brian Palmer had access while affiliated with Pure Development, Inc. The only thing unusual about their manner of misappropriation is that they didn't bother to pilfer Pure Development, Inc.'s trade secrets in the dark of night—they simply opened up their new company *in* Pure Development, Inc.'s office, using Pure Development, Inc.'s computer systems, business information, and employees to launch their competing business. They did this for more than 40 days before Chris Seger, and then Adam Seger and Brian Palmer, finally resigned from Pure Development, Inc. There is no reason,

however, to believe that their use of Pure Development, Inc.'s trade secrets has ceased since their resignations. Indeed, their business Canopy 5 can fairly be described as being formed *entirely* from Pure Development, Inc.'s business.

**2.2    Lanham Act and common law unfair competition**

The Lanham Act prohibits persons, in connection with any services, from using in commerce any "false or misleading description of fact, or false or misleading representation of fact" that is "likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person." 15 U.S.C. § 1125(a)(1)(A). The Act similarly prohibits such statements or representations from appearing in "commercial advertising or promotion" that "misrepresents the nature, characteristics, qualities, or geographic origin" of a person's services or commercial activities. *Id.* § 1125(a)(1)(B). In launching their new company, defendants Canopy 5, LLC, Chris Seger, Adam Seger, and Brian Palmer have (a) misrepresented Pure Development, Inc.'s office as Canopy 5's office, (b) misrepresented Pure Development, Inc.'s employees as Canopy 5's employees, and (c) misrepresented Pure Development, Inc.'s past projects as Canopy 5's past projects.

Indiana common law likewise prohibits unfair competition. *Felsher v. Univ. of Evansville*, 755 N.E.2d 589, 598 (Ind. 2001). It encompasses efforts to pass off the business

of one person as that of another. *Hartzler v. Goshen Churn & Ladder Co.*, 104 N.E. 34, 37 (Ind. Ct. App. 1914). But it is not limited to any one particular type of unfair conduct. *Keaton & Keaton v. Keaton*, 842 N.E.2d 816, 820 (Ind. 2006) (explaining that the tort of unfair competition is broad, is not limited to passing off, and does not require intentional wrongdoing). Here, the defendants launched Canopy 5 as essentially a parasitic organization within Pure Development, Inc., using Pure Development, Inc.'s confidential business information, offices, computer systems, and employees to grow before purporting to break off as an independent company—though it continues to advertise Pure Development, Inc.'s past projects and employees as its own while attempting to divert Pure Development, Inc.'s business opportunities to Canopy 5 and other Chris Seger-related entities. Whatever else one would call this, "unfair competition" certainly fits.

## 2.3    Duty of loyalty and breach of contract

As employees of Pure Development, Inc., Chris Seger, Adam Seger, and Brian Palmer each owed Pure Development, Inc. a fiduciary duty of loyalty. *Kopka, Landau & Pinkus v. Hansen*, 874 N.E.2d 1065, 1070 (Ind. Ct. App. 2007). Before leaving Pure Development, Inc.'s employ, each of them was required to "refrain from actively and directly competing with [Pure Development, Inc.] for customers and employees" and to "continue to exert his best efforts on behalf of [Pure Development, Inc.]." *Id.* (quoting *Potts v. Review Bd. of the Ind. Emp. Sec. Div.*, 475 N.E.2d 708, 712 (Ind. Ct. App. 1985)).

And none could permissibly "use confidential information peculiar to [Pure Development, Inc.] before he [left] his employ." *Id.*

Apart from their common law duties, both Adam Seger and Brian Palmer had express employment contracts prohibiting their use of Pure Development, Inc.'s business information for outside purposes. Both have also been prohibited by their contracts to contact Pure Development, Inc.'s current or prospective customers. And neither has been permitted to solicit Pure Development, Inc. employees to leave Pure Development, Inc.'s employ.

By their conduct, defendants Chris Seger, Adam Seger, and Brian Palmer have indisputably violated—and continue to violate—their common law and contractual obligations.

### 3. Likelihood of irreparable harm

Irreparable harm is harm that cannot be repaired and for which money compensation is inadequate. *Orr v. Schicker*, 953 F.3d 490, 502 (7th Cir. 2020). A damages remedy can be inadequate for any of four reasons: (1) "The damage award may come too late to save the plaintiff's business"; (2) "The plaintiff may not be able to finance his lawsuit against the defendant without the revenues from his business that the defendant is threatening to destroy"; (3) "Damages may be unobtainable from the defendant because he may become insolvent before a final judgment can be entered and collected"; or (4) "The nature of the plaintiff's loss may make damages very difficult to

calculate." *Roland Mach. Co. v. Dresser Indus., Inc.*, 749 F.2d 380, 386 (7th Cir. 1984). Not only is irreparable harm to Pure Development, Inc. likely in the absence of an injunction, it is the very point of the defendants' actions.

What defendants hope to do is leave Pure Development, Inc. an empty husk that cannot compete in the face of Chris Seger, Adam Seger, Brian Palmer, and Canopy 5's efforts to usurp Pure Development, Inc.'s office, confidential information, assets, business pipeline, and employees for themselves while essentially passing themselves off as just a different version of Pure Development, Inc. without Drew Sanders (the same plan the state court called "inequitable"). The defendants have done so in the face of statutes, common law, and contracts intended to prevent that very outcome. And, without a preliminary injunction, it will be incredibly difficult to ascertain the entirety of the harm to Pure Development's business, its customer and employee relationships, and its goodwill. *See, e.g.*, *Life Spine, Inc. v. Aegis Spine, Inc.*, 8 F.4th 531, 546 (7th Cir. 2021) (explaining that "it is well established that the loss of goodwill and reputation, if proven, can constitute irreparable harm"); *Turnell v. CentiMark Corp.*, 796 F.3d 656, 666 (7th Cir. 2015) (holding harm from ex-employee's violation of restrictive covenants "is a canonical form of irreparable harm"); *Hess Newmark Owens Wolf, Inc. v. Owens*, 415 F.3d 630, 632 (7th Cir. 2005) (explaining that "it is precisely the difficulty of pinning down what business has been or will be lost that makes and injury 'irreparable'").

**4. Balance of harms and public interest**

Although perhaps not to this degree, this Court has previously addressed claims by similar wrongdoers that the balance of harms weighed against an injunction. In one such case, this Court soundly rejected that notion. *Badger Daylighting Corp. v. Palmer*, No. 1:19-cv-02106-SEB-MJD, 2019 WL 4572798, at *12 (S.D. Ind. Sept. 20, 2019). In *Badger*, this Court explained that "[u]ntil we can be more confident than we are now, upon a proper evidentiary showing, that Mr. Palmer no longer possesses or has access to Badger's confidential information and trade secrets, the harm Badger faces due to an actual or threatened misappropriation of these materials greatly outweighs any harm Mr. Palmer may suffer." *Id.*; *see also BioConvergence LLC v. Attariwala*, No. 1:19-cv-01745-SEB-TAB, 2019 WL 6893704, at *12 (S.D. Ind. Dec. 18, 2019).

Here, the sheer breadth of the defendants' wrongdoing leaves no doubt that the balance of harms weighs in favor of injunctive relief. This wasn't just a lone employee slipping out the door with the company's playbook. This was a concerted effort by company executives to launch a competing company *within their current employer's four walls*, retaining access to and utilizing all of Pure Development, Inc.'s computer systems, confidential information, and employees. Nor could any legitimate argument be made that injunctive relief under such circumstances would disserve the public interest.

**5.     No bond should be required.**

Finally, although Rule 65(c) conditions preliminary injunctions on the posting of a bond, the Seventh Circuit has explained that "[u]nder appropriate circumstances bond may be excused, notwithstanding the literal language of Rule 65(c)." *Wayne Chem. Inc. v. Columbus Agency Serv. Corp.*, 567 F.2d 692, 701 (7th Cir. 1977) (citations omitted). A movant need not post security, for example, if it is a corporation in good standing and makes a strong showing that it will likely succeed on the merits, or where a substantial security exceeds the movant's financial capacity. *See CDW LLC v. NETech Corp.*, 722 F. Supp. 2d 1052, 1066 (S.D. Ind. 2010) ("Considering that CDW is a corporation in good standing and has made a strong showing that it is likely to succeed on the merits of its trademark infringement claim, we find that their posting of security is unnecessary in this case."); *Habitat Educ. Ctr. v. U.S. Forest Serv.*, 607 F.3d 453, 456 (7th Cir. 2010) ("There is however an exception for a case in which the bond is both higher than necessary and beyond the plaintiff's financial capacity, and thus inflicts irreparable harm without justification.").

The defendants here cannot plausibly claim monetary harm *to them* from having to forfeit the fruits of their wrongful conduct and the concomitant requirement that they conduct any new business in compliance with their statutory, fiduciary, and contractual obligations. The non-existent risk of harm to defendants combined with Pure Development, Inc.'s strong likelihood of success on the merits favors an injunction not

conditioned on a bond. Therefore, this Court should grant the requested injunction without requiring a bond from Pure Development, Inc.

## CONCLUSION

For these reasons, plaintiff Pure Development, Inc. respectfully requests that the Court enjoin defendants Canopy 5, LLC, Chris Seger, Adam Seger, and Brian Palmer—and those acting in concert with them—from:

(1)  soliciting any Pure Development, Inc. employee to leave Pure Development, Inc.;

(2)  employing any person who was employed by Pure Development, Inc. as of May 15, 2025, in any capacity, whether as an employee or contractor;

(3)  marketing Pure Development, Inc.'s employees as their own;

(4)  marketing Pure Development, Inc.'s projects as Canopy 5 projects;

(5)  soliciting or contacting any current or prospective client of Pure Development, Inc.;

(6)  retaining or using any Pure Development, Inc. confidential business information or trade secret;

(7)  retaining, using, or accessing any Pure Development, Inc. property;

(8)  retaining, using, or accessing any Pure Development, Inc. computerized files or data; and

(9)  entering Pure Development, Inc.'s office or claiming that Pure Development, Inc.'s office is theirs.

Pure Development, Inc. also respectfully requests that the Court order defendants Canopy 5, LLC, Chris Seger, Adam Seger, and Brian Palmer to provide an immediate

accounting of all of their business activities since May 15, 2025, and that they be

required to account for and reimburse Pure Development, Inc. for the operational costs

(*e.g.,* salaries, overhead, office costs) incurred by Pure Development, Inc. but used for

the benefit of Canopy 5 since May 15, 2025.

Respectfully submitted,

*/s/ B. (Too) Keller*
B. (Too) Keller
Keller Macaluso LLC
760 3rd Avenue SW, Suite 210
Carmel, IN 46032
317-660-3402
too@kellermacaluso.com

*Counsel for Pure Holdings, Inc.*
*and Pure Development, Inc.*