**EXHIBIT 27**

CONFIDENTIAL

**PURCHASE AND SALE CONTRACT** ("**Contract**")

This Contract is entered into by **Emerald City Empire, LLC**, and/or its assigns ("**Seller**"), and **Pure Development, Inc.**, an Indiana corporation, and/or its assigns ("**Purchaser**").

**W I T N E S S E T H:**

IN CONSIDERATION of the promises and mutual covenants herein set forth, Seller and Purchaser agree to the purchase and sale of the Property (defined below), in accordance with the following terms and conditions:

1.    Property.  The property will be comprised of the following:

Land totaling approximately 43.72 acres of land located in the Tahoe Reno Industrial Center  known as Assessor Parcel Number ("APN") 005-101-71(Parcel Map ID  2023-16) in McCarran, Nevada, (the "**Land**"), as more particularly identified on **Exhibit "A"**, together with any and all improvements situated on the Land (the "**Improvements**"); and all right, title and interest of Seller, if any, in and to any and all appurtenances, strips or gores, roads, easements, streets, alleys, drainage facilities and rights-of-way bounding the Land; all utility capacity, utilities, water rights, licenses, permits, entitlements, and bonds, if any, and all other rights and benefits attributable to the Land; and all rights of ingress and egress thereto (collectively, the "**Additional Interests**") all transferable consents, authorizations, variances or waivers, licenses, permits and approvals from any governmental or quasi-governmental entity in connection with the Land or the Improvements held by or granted to Seller, its predecessors in title, and/or the agents thereof with respect to the Land or the Improvements (collectively, the "**Permit**s"); and all right, title and interest of Seller in and to all site plans, surveys, soil and substratus studies, and engineering and architectural drawings, plans and specifications, in Seller's possession or control, relating to the Land.  (collectively the "**Plans**").

The Land and other items described in the preceding paragraph together constitute the "**Property**."

Purchaser, in Section 17 below, is being granted a right of first offer to purchase Seller's adjacent 62.564 acres currently under contract with a third party and more specifically known as APNs 005-101-66 (32.60 acres), 005-101-67 (1.594 acres), and 005-101-70 (28.34 acres) (collectively, "**ROFO Property**"). The Land and the ROFO Property are collectively referred to as the "**Parent Parcel**".

2.    Purchase Price.  The purchase price will be an amount equal to $5.75 multiplied by the total square footage of the Land, which, as of the Effective Date, is approximately $10,950,548.00, subject to any prorations set forth in Section 11(a) below ("**Purchase Price**"). In the event Purchaser exercises the Extension Period, the Purchase Price will increase to an amount equal to $6.00 multiplied by the total square footage of the Land. The final square footage of the Land will be based on the Survey. The Purchase Price will be payable to Seller in cash or by wire transfer of good funds to the Title Company for payment to Seller at Closing.

3.    Earnest Money and Independent Consideration.

(a)    Earnest Money.  Within ten (10) business days after the Effective Date, Purchaser will deposit with Stewart Title Company, Las Vegas, Nevada, Attn: Tami Haworth ("**Title Company**"), the sum of Two Hundred Thousand and NO/100s Dollars ($200,000.00) as earnest money hereunder (the "**Earnest Money**").  The entire Earnest Money will be applied towards the Purchase Price at Closing or will be otherwise held and disbursed as herein provided.

(b)    Independent Consideration.  As independent consideration for the rights granted to Purchaser, Purchaser has paid to Seller the sum of One Hundred and NO/100s Dollars ($100.00), the receipt

1

**EXHIBIT 27**

**EXHIBIT 27**

CONFIDENTIAL

and sufficiency of which are hereby acknowledged (the "**Independent Consideration**").  The Independent Consideration is non-refundable and will be applied against the Purchase Price at Closing.

4.    Due Diligence Documents.  The following documents will be delivered to Purchaser:

(a)    Title Commitment.  Within seven (7) days after the Effective Date, Seller shall cause the Title Company to provide a current commitment from the Title Company for an ALTA owner's policy of title insurance to the Purchaser, together with legible copies of all listed title exceptions (the "**Title Commitment**").

(b)    Survey.  Within seven (7) days after the Effective Date, Seller will deliver to Purchaser, Purchaser's legal counsel, and the Title Company a true and correct copy of Seller's most recent survey of the Property, if any. Purchaser may have prepared a current survey of the Property, at its own cost and expense, certified by a registered land surveyor, that complies with the 2021 "Minimum Standard Detail Requirements of ALTA/NSPS Land Title Surveys", and including Table "A" items 1 (monuments), 2, 3, 4, 6(a) and (b)(zoning), 7(a) (if applicable), 7(b)(1) (if applicable), 7(b)(2), 7(c) (if applicable), 8, 9, 11, 13, 14, 16, 17, 18, 19, and 20, or in such other form acceptable to Purchaser (the "**Survey**").  The Survey will be certified to Seller, Purchaser and Title Company and will show the total number of acres comprising the Land.  The Survey will also contain a "Survey Notes" list on the face of the survey confirming the following:

"Note 1: The subject property has access to public utilities from the public streets adjacent to the subject property. Note 2: The subject property abuts, without gaps gores or strips, and has vehicular and pedestrian ingress to and egress from Denmark Drive, which is/are completed, dedicated and accepted public right(s) of way. and/or The subject property has indirect access to Denmark Drive, a dedicated public street or highway, by way of the access easement recorded in Storey County, Nevada. Note 3: Except as shown and noted on this Survey, based on a careful physical inspection of the subject property, a zoning report or letter provided by the client, and matters of record or provided by the title company or client, there are no visible: (i) height or bulk restrictions, setback lines, parking requirements, party walls, encroachments or overhangs of any improvements upon any easement, right-of-way or adjacent land or encroachment of the improvements located on adjacent land onto the subject property, other than as noted on the Encroachment Table; or (ii) easements, rights-of-way, party walls, or building structures or other improvements, billboards, conflicts, officially designated 100 year flood plans or flood prone areas, springs, streams, creeks, rivers, ponds, lakes cemeteries or burial grounds; Note 4: [Except as shown on the survey,] the subject property does not serve any adjoining property for utilities, drainage, structural support or ingress or egress; Note 5: The legal description on and depiction of the subject property contained in the survey describe and depict the same property described in the legal description contained in that certain Title Commitment/Preliminary Report issued by Stewart Title Insurance Company on _____ under File No. _____; Note 6: The record description of the subject property forms a mathematically closed figure; Note 7:  There is no observed evidence of the site being used as a solid waste dump, sump or sanitary landfill; and Note 8: The survey reflects the location of wetlands on the subject property based on the wetland delineation provided by the client."

For purposes of the property description to be included in the Deed, Title Policy and other documents to be delivered pursuant to Section 9, the field notes prepared by the surveyor on the Survey will control any conflicts or inconsistencies and will be incorporated upon completion and included as the property description in the Deed and the Title Policy.

(c)    Documents.  The Land is unimproved real property which has not been developed. Seller is not a developer nor has Seller undertaken development of the Land. Within seven (7) days after the Effective Date, Seller will deliver to Purchaser copies, if any, of all documents in Seller's possession pertaining to the

2

**EXHIBIT 27**

**EXHIBIT 27**

CONFIDENTIAL

development, ownership, or operation of the Property, including, without limitation, any leases, licenses or other agreements permitting any party to possess, occupy or enter into all or any portion of the Property; service contracts; any existing survey of the Property; existing title commitments and/or policies; cost estimates; drawings; complete plans and specifications; soils reports; feasibility studies; environmental reports, studies, assessments, and notices; any documentation regarding water, sanitary sewer, gas and other utilities serving the Property which are not available online on the Tahoe Reno Industrial Center webpage https://tahoereno.com/resources/; utility bills for the last 3 years (collectively, the "**Documents**").; and engineering studies;  Limited property tax information is available online on the Storey County, Nevada Assessor's webpage https://storeynv.devnetwedge.com/parcel/view/00510171/2024.

(d)    Review of Title, Survey and Documents.  Purchaser will have until the expiration of the Inspection Period (as defined below), to review and approve the matters reflected in the Title Commitment, Survey and Documents.  If Purchaser determines that the Title Commitment, Survey and/or Documents reflect or disclose any defect, exception or other matter affecting the Property unacceptable to Purchaser in its sole discretion, then Purchaser will notify Seller of Purchaser's objections not less than fifteen (15) days prior to the expiration of the Inspection Period ("**Objection Notice**").  If the Seller fails to cure Purchaser's objections within ten (10) days after Seller's receipt of the Objection Notice (the "**Seller's Cure Period**"), Purchaser may, as its sole and exclusive remedy, terminate this Contract by providing written notice of termination to Seller, whereupon this Contract will be terminated, Seller will retain the Independent Consideration and the Earnest Money will be refunded to Purchaser, and thereafter neither Seller nor Purchaser will have any continuing liability, rights or obligations other than Purchaser's indemnity of Seller as provided in Section 5. If Purchaser fails to terminate this Contract within the Inspection Period, Purchaser will be deemed to have approved and waived any objection to the matters contained in the Title Commitment, Survey and Documents.  If the Title Company issues a supplement or amendment to the Title Commitment showing additional title exceptions (each, an "**Amended Report**"), Purchaser will have ten (10) business days from the date of receipt of each Amended Report and a copy of each document referred to in the Amended Report in which to give written notice (each, a "**Supplemental Title Notice**") to Seller of its objection to any additional matter affecting the Property that is unacceptable to Purchaser, in Purchaser's sole discretion, shown in such Amended Report. If Seller fails to cure Purchaser's objections within five (5) business days after Seller's receipt of the Supplemental Title Notice (the "**Seller's Supplemental Cure Period**"), Purchaser may, as its sole and exclusive remedy, terminate this Contract by providing written notice of termination to Seller, whereupon this Contract will be terminated, Seller will retain the Independent Consideration and the Earnest Money will be refunded to Purchaser, and thereafter neither Seller nor Purchaser will have any continuing liability, rights or obligations other than Purchaser's indemnity of Seller as provided in Section 5.

All matters shown under Schedule B – Section II of the Title Commitment, Amended Report, and by the Survey to which Purchaser has not objected or Purchaser has waived as provided herein will be considered to be "**Permitted Exceptions**."  Notwithstanding the foregoing, under no circumstances will Purchaser be required to object to any monetary liens, any existing liens reflected in the Title Commitment, Amended Report, or other matters shown on Schedule "B – Section I" thereto, all of which (except for the lien or liens for taxes not yet due and payable) will be released or satisfied by Seller at its expense prior to Closing.

5.    Feasibility Contingency.  The obligations of Purchaser under this Contract and consummation of Closing are, at Purchaser's discretion, subject to Purchaser performing due diligence, including, without limitation, the review of Documents produced by Seller pursuant to Section 4(c), completing an inspection of the Property, and determining, in Purchaser's sole discretion, that it is feasible for Purchaser to own and operate the Property in a manner and upon terms and conditions satisfactory to Purchaser (collectively, "**Due Diligence Activities**").  Purchaser will have until 11:59 p.m., Eastern Standard Time, on that date which is sixty (60) days after the Effective Date (the "**Inspection Period**"), to inspect the condition of the Property and to perform the Due Diligence Activities and such other investigations as Purchaser may desire in its sole discretion, including, without limitation, invasive testing, such as soil borings, installation of groundwater monitoring wells and collection of soil and groundwater samples in connection with a Phase II environmental

3

**EXHIBIT 27**

**EXHIBIT 27**

CONFIDENTIAL

assessment. During the Inspection Period, Purchaser may file applications with applicable governing authorities to plat or replat the Property for its planned development, and to obtain all development commitments, entitlements, permits and approvals, all as may be deemed necessary by Purchaser in connection with its contemplated use and development of the Property (collectively, all of the foregoing commitments, entitlements, permits, and approvals are the "**Approvals**") and Seller agrees to cooperate with Purchaser and execute such documents reasonably required in connection with the Approvals.  Such Approvals will not impose any burden or be binding upon the Property prior to Closing, nor impose any cost or liability on Seller, except to the extent consented to by Seller, which consent will not be unreasonably withheld, conditioned, or delayed. Notwithstanding anything contained herein to the contrary, Closing will not be extended due to a delay in obtaining any Approval without the written consent of both Seller and Purchaser.

Purchaser may extend the Inspection Period for one (1) additional period of thirty (30) days (the "**Extension Period**") by (i) delivering to Seller and the Title Company written notice of Purchaser's election to extend the Inspection Period, prior to the expiration of the Inspection Period, and (ii) depositing with Title Company the sum of One Hundred Thousand and 00/100s Dollars ($100,000.00) ("**Extension Fee**"), within five (5) business days after the expiration of the Inspection Period.  The Extension Fee (and interest on such Extension Fee) will constitute additional Earnest Money and will be applied against the Purchase Price at Closing. To the extent the Purchaser terminates this Agreement during the Extension Period, the Earnest Money (including the Extension Fee) will be refunded to Purchaser.

During the Inspection Period and, if applicable, the Extension Period, Seller, if requested, will use commercially reasonable efforts to assist Purchaser and other purchasers of the remaining Parent Parcel in planning mass grading for the entire Parent Parcel, including, without limitation, assisting in obtaining all grading easements.

Purchaser and its duly authorized agents or representatives may enter upon the Property at all reasonable times during the term of the Contract to conduct engineering, environmental, and geotechnical studies, or any other inspections or tests.  Purchaser will indemnify and hold Seller harmless from and against any and all losses or costs incurred by Seller due to any injuries to persons or damage to the Land or Improvements resulting from such studies, inspections and/or tests, and if Purchaser fails to close its acquisition of the Property pursuant to this Contract, Purchaser will restore any material damage to the Land or Improvements caused by Purchaser, its agents or representatives to a reasonable equivalent of its pre-inspection condition; provided, however, that Purchaser shall not be obligated to indemnify or hold Seller harmless from any losses or costs arising out of or relating to (i) acts or omissions of Seller, its agents, or representatives; (ii) Hazardous Materials not first placed on the Property by Purchaser, its agents, or representatives; or (iii) mere discovery of conditions, facts or circumstances that adversely affect (or may adversely affect) the value of the Property.

Seller will terminate all agreements and contracts for services at the Property, if any, effective at or prior to Closing.

Seller will cooperate with Purchaser in executing any applications or other materials prepared by Purchaser for submission to government authorities in connection with Purchaser's development plans.

If Purchaser elects to proceed with Closing, then Purchaser will notify Seller and Title Company in writing (the "**Approval Notice**") prior to the expiration of the Inspection Period or the Extension Period, as applicable.  Unless the Approval Notice is previously delivered to Seller, upon the expiration of the Inspection Period or Extension Period, as applicable, Title Company will promptly return the Earnest Money (including the Extension Fee if applicable) to Purchaser and all obligations of the parties under this Contract will terminate, excepting those obligations that expressly survive termination.  In addition, if Purchaser notifies Seller during the Inspection Period or Extension Period, as applicable, that it does not intend to proceed with the acquisition of the Property (for any reason or no reason), then Title Company will promptly

4

**EXHIBIT 27**

**EXHIBIT 27**

CONFIDENTIAL

return the Earnest Money (including the Extension Fee, if applicable) to Purchaser and all obligations of the parties under this Contract will terminate, except for those obligations that expressly survive termination.

6.      Representations, Warranties and Covenants of Seller.  Seller represents and warrants to Purchaser that Seller presently has and will have at Closing record title to the Property, and that, at Closing, such title will be free and clear of all liens, encumbrances, covenants, restrictions, rights-of-way, easements, leases and other matters affecting title, except for the Permitted Exceptions.  Seller further represents and warrants to Purchaser that the Property will be transferred to Purchaser free and clear of any management, service or other contractual obligations, other than those disclosed to and approved in writing by Purchaser.

Seller further covenants and agrees with Purchaser that, from the Effective Date until Closing, Seller will not sell, assign or convey any right, title or interest whatsoever in or to the Property, or create or permit to exist any lien, security interest, easement, encumbrance, charge or condition affecting the Property (other than the Permitted Exceptions) without promptly discharging the same prior to Closing.

Seller hereby further represents, warrants and covenants to Purchaser as follows:

(a)      No Actions.  There are no actions, suits or proceedings pending or, to the best of Seller's knowledge, threatened against Seller or otherwise affecting any portion of the Property, at law or in equity, or before or by any federal, state, municipal or other governmental court, department, commission, board, bureau, agency or instrumentality, domestic or foreign. Until the Closing Date or sooner termination of this Contract, Seller will not seek any zoning changes for the Property without the prior approval of Purchaser.

(b)      Formation; Authority. The execution by Seller of this Contract and the consummation by Seller of the sale contemplated hereby do not, and, at the Closing Date, will not, result in a breach of any of the terms or conditions of, or constitute a default under any indenture, agreement, instrument or obligation to which Seller is a party or by which any portion of the Property is bound. No consent of any lender or any other party is required for Seller to enter into this Contract.

(c)      Continued Maintenance.  From the Effective Date through the Closing Date, Seller will: (i) continue to maintain the Property in its present condition; (ii) not make any alterations or improvements to the Property or on the Land, nor demolish any of the Property, without the prior approval of Purchaser, and (iii) maintain its existing insurance policies, if any, for the Property.

(d)      Leases.  From the Effective Date through the Closing Date, Seller will not enter into any lease, occupancy agreement, license or other agreements or rights with respect to the use or occupancy of any portion of the Property without Purchaser's prior written consent, and no leases affect the Property as of the Effective Date.

(e)      No Agreements.  From the Effective Date through the Closing Date, Seller will not enter into or amend any oral or written agreements affecting the Property which might become binding on Purchaser or the Property at or after Closing without Purchaser's written consent.

(f)      Compliance with Laws.  The Property, to the best of Seller's knowledge, complies with all applicable laws and ordinances, and the present maintenance, operation and use of the Property does not violate any environmental, zoning, subdivision, building or similar law, ordinance, code, regulation or governmental permit affecting the Property. There are no unsatisfied requests for repairs, restorations or improvements from any person, entity or authority, including any tenant, lender, insurance carrier or government authority.

(g)      Environmental.

5

**EXHIBIT 27**

**EXHIBIT 27**

CONFIDENTIAL

(1)      "**Environmental Requirements**" means any and all existing or future federal, state, regional, local ordinances, codes, rules, regulations, common law, or other requirements of any governmental entities or legislative authorities relating to the protection of human health or the environment or natural resources or exposure to Hazardous Materials, including but not limited to the Comprehensive Environmental Response, Compensation and Liability Act, 42 U.S.C. § 9601 *et seq.*; the Resource Conservation and Recovery Act, 42 U.S.C. § 6901 *et seq.*; the federal Water Pollution Control Act, as amended, 33 U.S.C. § 1251 *et seq.*; the federal Clean Air Act, 42 U.S.C. § 7401 *et seq.*; the federal Emergency Planning and Community Right-To-Know Act, 42 U.S.C. § 11001 *et seq.*; the federal Hazardous Materials Transportation Act, 49 U.S.C. § 5101 *et seq.*; the federal Oil Pollution Act, 33 U.S.C. § 2701 *et seq.*; the federal Insecticide, Fungicide, and Rodenticide Act, Federal Pesticide Act, 7 U.S.C. § 136 *et seq.*; the Federal Endangered Species Act, 16 U.S.C. § 1531, *et seq.*; the federal Toxic Substances Control Act, 15 U.S.C. § 2601 *et seq.*; the Federal Safe Drinking Water Act, 42 U.S.C. § 300f *et seq.*; and the Occupational Safety and Health Act 29 U.S.C. § 651 *et seq.*; all state and local counterparts thereto; and any regulations, policies, permits, or approvals promulgated or issued thereunder, as these laws, rules and regulations were in the past or are currently in effect at the relevant time period. "**Hazardous Materials**" means any hazardous or toxic substance, material, waste, pollutant, or contaminant, whether in solid, semisolid, liquid or gaseous form, including without limitation, asbestos, polychlorinated biphenyls, petroleum, petroleum distillate, petroleum by-products, lead-based paint, mold, mycotoxin, fungus, and any material or substance listed or defined as "hazardous substance," "hazardous waste," "hazardous material," "toxic waste," or "toxic substance" under any Environmental Requirements.

(2)      To the best knowledge of Seller, during the period that Seller has owned the Property, there is not now nor has there been any storage, production, transportation, disposal, recycling, treatment or release of any Hazardous Materials on or in the Property.  Seller has complied with all Environmental Requirements.  To the best knowledge of Seller, there are no wells, sumps, clarifiers, underground storage tanks, covered surface impoundments, or other sources of Hazardous Materials or contaminants on the Property, or previously located on the Property and subsequently removed.

(3)      To the best knowledge of Seller, prior to Seller's acquisition of the Property there was no storage, production, transportation, disposal, treatment or release of any Hazardous Materials on or in the Property, including but not limited to any underground storage tank, surface impoundment, lagoon or other containment facility for the storage of Hazardous Materials, or sumps, clarifiers, or on-site wells.

(4)      To the best knowledge of Seller, there have been no Hazardous Materials on or in neighboring properties which, through soil or groundwater migration, could have moved to the Property.

(5)      The Seller is not the subject of any outstanding order with or from any governmental authority respecting (i) Environmental Requirements, (ii) Remedial Action or (iii) any release or threatened release of a Hazardous Material. "**Remedial Action**" means all actions undertaken pursuant to or in accordance with Environmental Requirements to (w) clean up, remove, remediate, treat or in any other way address any Hazardous Material, (x) prevent the release of any Hazardous Material so it does not endanger or threaten to endanger public health or welfare or the indoor or outdoor environment, (y) perform pre-remedial studies and investigations or post-remedial monitoring and care and (z) respond to or correct a condition of noncompliance with Environmental Requirements.

(6)      Seller has not received any written or oral communication alleging that, with respect to the Property, Seller is in violation of any Environmental Requirement or is otherwise subject to liability under any Environmental Requirement.

(7)      Seller has provided to Purchaser all documents in its possession, including audits, assessments, studies, reports, analyses, results of investigations or other information related to health, safety or the environment with respect to the Property that have been performed during Seller's ownership of the

6

**EXHIBIT 27**

**EXHIBIT 27**

CONFIDENTIAL

Property, or which relate to periods prior to Seller's ownership of the Property and have been provided to Seller.

(8)     Seller will indemnify, defend and hold Purchaser harmless from any claims, damages, and liability of every kind, including all expenses of litigation and attorneys' fees, arising from (i) breach of any Seller representation or warranty; (ii) breach or default under any covenants or agreements set forth in this Contract; or (iii) incurred under Environmental Requirements to address any release of Hazardous Materials for which Remedial Action is required by Environmental Requirements or any violation of Environmental Requirements.

(h)     <u>Condemnation</u>.  There is no pending or threatened condemnation or similar proceedings affecting the Property.

(i)     <u>OFAC Compliance</u>.  It has not been and will not be a person or entity described by Sec. 1 of the Executive Order (No. 13,224) Blocking Property and Prohibiting Transactions With Persons Who Commit, Threaten to Commit, or Support Terrorism, 66 Fed. Reg. 49,079 (Sept. 24, 2001) and has not been and will not be a person or entity with whom a citizen of the United States is prohibited from engaging in transactions by any trade embargo, economic sanction, or other prohibition of United States law, regulation, or executive order of the President of the United States, and to its knowledge, has not and will not engage in any dealings or transactions, at any time otherwise associate, with any such persons or entities.

(j)     <u>Condition of Property</u>. There are no material physical defects in any part of the Property.

(k)     <u>Personal Property</u>. There is no material personal property owned by Seller and used or associated with the Land.

(l)     <u>Documents</u>. To the best knowledge of Seller, the Documents are true, correct and complete in all material respects.

(m)     <u>Untrue Statement</u>. None of the representations, warranties or covenants made by Seller under this Contract contains any untrue statements of material fact or omits a material fact necessary in order to make the statements not misleading.

(n)     <u>Service Contracts and Leases</u>. There are no contracts for services or any leases binding upon the Property.

(o)     <u>Potential Conflicts of Interest</u>.  Seller represents and warrants that Seller has disclosed to Purchaser if any of its principals or their immediate family members are employed by (i) governmental agencies with jurisdiction over the Property, or (ii) Purchaser or a Purchaser affiliate.

All of the representations and warranties contained in this Section are made by Seller both as of the Effective Date and as of the Closing Date, and will survive Closing for a period of 12 months thereafter except as otherwise provided above.

7.     <u>Closing Conditions</u>: Purchaser's purchase of the Property is subject to satisfaction of the following conditions prior to Closing (collectively, the "**Closing Conditions**"):

(a)     <u>Representations and Warranties</u>. All representations and warranties of Seller contained herein will be true, accurate and complete in all material respects at the time of Closing as if made again at such time.

**EXHIBIT 27**

**EXHIBIT 27**

CONFIDENTIAL

(b)    <u>Seller Obligations</u>. Seller will have performed all obligations to be performed by it hereunder on or before Closing (or, if earlier, on or before the date set forth in this Contract for such performance).

(c)    <u>Condition of Property</u>. At Closing, title to the Property will be in the condition required by this Contract and the Title Company will deliver the Title Policy, or Title Company's irrevocable commitment to issue the Title Policy, to Purchaser.

(d)    <u>Suits or Proceedings</u>. No action, suit or proceeding will be pending or threatened before any court, administrative agency or arbitrator wherein an unfavorable injunction, order, decree, ruling or charge would: (i) prevent consummation of this Contract; (ii) cause this Contract to be rescinded following consummation; or (iii) adversely affect the right of Purchaser after the Closing Date to own and control the Property.

If Purchaser determines, in Purchaser's sole direction, that any of the above Closing Conditions cannot be met to Purchaser's satisfaction prior to Closing (as defined in <u>Section 8</u>), then Purchaser may terminate this Contract by written notice to Seller, whereupon this Contract will be terminated, Seller will retain the Independent Consideration and the Earnest Money will be refunded to Purchaser, and thereafter neither Seller nor Purchaser will have any continuing rights or obligations hereunder other than Purchaser's indemnity of Seller as provided in <u>Section 5</u>.

Seller will join with Purchaser in executing any applications, plats, or related documents necessary to satisfy the Closing Conditions set forth in this Section, including without limitation, requests for zoning changes or other matters related to Purchaser's use of the Property; provided, however, that Purchaser will pay all fees and expenses incurred by Purchaser in attempting to satisfy said Closing Conditions.

8.    <u>Closing</u>.  The closing ("**Closing**") will take place at the offices of the Title Company on a date ("**Closing Date**") selected by Purchaser which shall be on or before the thirtieth (30th) day following the expiration of the Inspection Period, unless Purchaser terminates this Contract prior to such date in accordance with this Contract. Seller and Purchaser shall use commercially reasonable efforts to minimize any delays or other adverse effects of the COVID-19 pandemic and related disruptions on the Closing, including, without limitation, providing assurances and acknowledgements to Title Company concerning the potential "gap" between Title Company's most recent title insurance examination and the actual recording of the Deed (which may be after the Closing) as may be reasonably requested by Title Company.

9.    <u>Seller's Obligations at Closing</u>.  At the Closing, Seller will furnish or deliver to Purchaser, at Seller's expense, the following:

(a)    <u>Deed</u>.  Grant, bargain, sell deed covering the Property (the "**Deed**"), duly signed and acknowledged by Seller, which Deed will be in form acceptable to Purchaser, and will convey to Purchaser, its designee and/or its assigns good and indefeasible fee simple title to the Property free and clear of all liens, rights-of-way, easements, leases, and other matters affecting title to the Property, except for the Permitted Exceptions accompanied by a State of Nevada Declaration of Value Form executed by Seller as Grantor.

(b)    <u>Title Policy</u>.  An ALTA Owner's Policy of Title Insurance (with extended coverage) (the "**Title Policy**") issued by the Title Company, insuring good and marketable fee simple title to the Property in the Purchaser, in the amount of the Purchase Price, subject only to the Permitted Exceptions and the standard printed exceptions, except:

(i)    Seller will comply with all Schedule B General Requirements (and equivalents) and such requirements will be removed;

8

**EXHIBIT 27**

**EXHIBIT 27**

CONFIDENTIAL

(ii)    All general exceptions will be removed, including, without limitation, any general exceptions and any other exceptions included as a direct or indirect response to the COVID-19 pandemic, which were added to the Title Commitment after the expiration of the Inspection Period, unless otherwise approved by Purchaser in its sole and absolute discretion;

(iii)    The exception relating to standby fees and ad valorem taxes will except only to taxes owing for the current year and subsequent assessments for prior years due to change in Property usage or ownership;

(iii)    There will be no exception for rights of parties in possession or for visible or apparent roadways or easements not shown on the Survey; and

(iv) Purchaser may receive, at its expense, such other endorsements as may be permitted by applicable insurance regulations as Purchaser may desire.

(c)    Non-Foreign Affidavit.  A non-withholding statement that will satisfy the requirements of Section 1445 of the Internal Revenue Code so that Purchaser is not required to withhold any portion of the purchase price for payment to the Internal Revenue Service.

(d)    Evidence of Authority.  Such documents as may be reasonably required by Purchaser or the Title Company evidencing the status and capacity of Seller and the authority of the person or persons who are executing the various documents on behalf of Seller in connection with the sale of the Property.

(e)    Assignment of Additional Interests.  An assignment of the Additional Interests in a form acceptable to Purchaser, free and clear of all liens, encumbrances, easements and other matters other than the Permitted Exceptions.

(f)    Owner's Affidavit.  One (1) original Owner's Affidavit in a form acceptable to Title Company to cause Title Company to issue the Title Policy including any endorsements requested by Purchaser without any exception for any parties in possession and without any exception for any mechanic's liens that may be recorded as a result of any work performed prior to the Closing Date.

(g)    Other Documents.  Such other documents as the Title Company may reasonably require to consummate this transaction.

10.    Purchaser's Obligations at Closing.  At the Closing, Purchaser will deliver to Seller, at Purchaser's expense, the following:

(a)    Purchase Price.  The Purchase Price.

(b)    Evidence of Authority.  Such documents as may be reasonably required by Seller or the Title Company evidencing the status and capacity of Purchaser and the authority of the person or persons who are executing the various documents on behalf of Purchaser in connection with the purchase of the Property.

(c)    Other Documents.  Such other documents as the Title Company may reasonably require to consummate this transaction including a State of Nevada Declaration of value form executed by Purchaser as Grantee.

11.    Costs and Adjustments.

9

**EXHIBIT 27**

**EXHIBIT 27**

CONFIDENTIAL

(a)     Taxes and Closing Costs. All ad valorem taxes levied or assessed against the Property by applicable taxing authorities will be prorated between Purchaser and Seller on the basis of the latest available tax assessments. Seller shall be responsible for the payment of all currently due real estate taxes, liens, and assessments due prior to the Closing. Purchaser shall be responsible for the payment of all real estate taxes due subsequent to the Closing. Current real property taxes shall be deemed payable in advance and will be pro-rated as of the date of Closing on a due date basis of the municipality or taxing unit in which the property is located on a 360 day basis.

Seller and Purchaser will each be responsible for the fees and expenses of their respective attorneys and consultants and one-half of the escrow and closing fees charged by Title Company.  Seller will pay (i) the premium for the Title Policy; provided, however, Purchaser will be responsible for any additional cost for an ALTA extended coverage title policy, (ii) the costs of preparation of the Deed, and (iii) all transfer, recoupment, rollback, or any similar taxes assessed against the Property or to be paid upon the transfer of the Property. Purchaser will pay (i) any endorsements Purchaser desires to obtain to the Title Policy, and (ii) all recording fees.  Any other expenses, charges and fees of Closing not otherwise specifically allocated herein or incurred by a specific party, will be borne by the parties in accordance with the general custom and practice in the Tahoe Reno Industrial Center in McCarran, Nevada, or if no such custom or practice exists, they will be borne equally between the parties, or as otherwise agreed to by the parties.

(b)     Other Income and Expenses.  All other income and ordinary operating expenses for or pertaining to the Property, including, but not limited to, owner's association dues, public utility charges, maintenance and service charges and all other normal operating charges of the Property will be prorated as of the Closing Date; provided that Purchaser will not be obligated for payments under any management, service or other contractual agreements affecting the Property and the same will be terminated prior to Closing unless Purchaser expressly elects to assume the same.

(c)     Adjustments. If any adjustments pursuant to this Section 11 are determined to be erroneous, then the party who is entitled to additional monies will invoice the other party for such additional amounts as may be owing, and such amounts will be paid within 20 days from the receipt of any such invoice; provided that no amounts may be so billed following the expiration of 1 year after the Closing Date, and either party may dispute any such claim.

12.     Indemnification.

(a)     Seller agrees to indemnify, defend and hold Purchaser harmless of and from any and all liabilities, claims, demands and expenses, of any kind or nature, including, but not limited to, court costs and attorneys' fees, arising or attributable to (i) the period prior to the Closing Date and which are in any way related to the ownership, maintenance or operation of the Property, and all expenses related thereto, and (ii) Seller's breach of the representations and warranties set forth in Section 6 of this Contract.

(b)     Purchaser agrees to indemnify, defend and hold Seller harmless of and from any and all liabilities, claims, demands and expenses, of any kind or nature, including, but not limited to, court costs and attorneys' fees, arising or attributable to the period on or subsequent to the Closing Date and which are in any way related to the ownership, maintenance or operation of the Property, including, but not limited to, court costs and attorneys' fees.

13.     Destruction/Condemnation of Property.  If all or any portion of the Property is damaged or destroyed by any casualty or is the subject of a taking or condemnation under eminent domain law after the Effective Date but prior to the Closing Date, Seller will have no obligation to repair or replace any damage or destruction caused by the foregoing, but the following will apply at the Closing: (1) in the event of a casualty, Seller will assign the insurance proceeds to Purchaser; and (2) in the event of a casualty, taking, or condemnation, Seller will assign to Purchaser its rights to any condemnation proceeds resulting from such taking.  Notwithstanding the foregoing, if such casualty, condemnation, or taking is a "Material Event" (as

10

**EXHIBIT 27**

**EXHIBIT 27**

CONFIDENTIAL

defined below), then Purchaser may elect to terminate this Contract by written notice to Seller given on or before the Closing Date, and upon such termination, any Earnest Money will be returned to Purchaser and the parties will have no further liability or obligation hereunder.  As used in this Section, a "**Material Event**" means either of the following: (a) a casualty resulting in damage or destruction to the Property, if the cost to restore the Property to its condition immediately prior to such casualty is reasonably estimated to exceed $100,000.00; or (b) a casualty, taking or condemnation which would impede access to the Property, reduce available parking below that required by laws or any applicable agreements affecting the Property, or otherwise impede Purchaser's planned use of the Property.

14.    Notices.  All notices, demands or other communications of any type given by the Seller to the Purchaser, or by the Purchaser to the Seller, whether required by this Contract or in any way related to the transaction contracted for herein, will be void and of no effect unless given in accordance with this Section. All notices will be in writing and delivered to the person to whom the notice is directed, either in person, by overnight delivery service, electronic mail with confirmed receipt, or by mail as a registered or certified item, return receipt requested.  Notices delivered by mail will be deemed given upon the date when deposited in a post office or other depository under the care or custody of the United States Postal Service, enclosed in a wrapper with proper postage affixed, and notices delivered by other means will be effective when received by the party to whom the same is addressed, and such notices will be addressed as follows:

Seller:              Emerald City Empire, LLC
                     2711 E Sahara Ave
                     Las Vegas, NV 89104
                     Attn: Randy Aleman Sr., Encore CRE
                     Telephone: 702-528-1100
                     Email:

With a copy to:      Randel Aleman
                     7272 S. El Capitan
                     Las Vegas, NV 89148
                     Attn: Erica
                     Telephone: 702-528-1100
                     Email:

Purchaser:           Pure Development, Inc.
                     1351 Roosevelt Ave., Suite 100
                     Indianapolis, Indiana 46202
                     Attn: Adam Seger, Principal
                     Telephone: 317-797-1600
                     Email:

15.    Remedies.  If Seller fails to timely comply with all conditions, covenants and obligations hereunder, or if any of the representations and warranties of Seller contained herein are untrue, such failure or misrepresentation will be an event of default by Seller and Purchaser may (i) terminate this Contract by providing written notice of such termination to Seller, whereupon this Contract will be terminated,  Seller will retain the Independent Consideration, the Earnest Money will be refunded to Purchaser, and thereafter neither Seller nor Purchaser will have any continuing rights or obligations other than Purchaser's indemnity of Seller as provided in Section 5 and/or (ii) exercise any rights or remedies as may be available to Purchaser at law or in equity, including but not limited to enforcing specific performance of this Contract. Notwithstanding anything to the contrary contained herein, an event of default by the Seller will not be deemed to have occurred unless and until Seller has failed to cure within 10 days of receipt of notice from Purchaser of such default, except for Seller's failure to timely close escrow for which no notice of default or right to cure shall apply.

11

**EXHIBIT 27**

**EXHIBIT 27**

CONFIDENTIAL

If Purchaser fails to close the transaction contemplated hereunder, except due to a default by Seller, such failure will be an event of default by Purchaser ("**Purchaser Default**") and Seller, as its sole and exclusive remedy, may terminate this Contract, retain the Independent Consideration, and receive from the Title Company the Earnest Money deposited with the Title Company as liquidated damages. Notwithstanding anything to the contrary contained herein, a Purchaser Default will not be deemed to have occurred unless and until Purchaser has failed to cure within 10 days of receipt of notice from Seller of such default, except for Purchaser's failure to timely close escrow for which no notice of default or right to cure shall apply. The Earnest Money is agreed upon by and between the Seller and Purchaser as liquidated damages due to the difficulty and inconvenience of ascertaining and measuring actual damages, and the uncertainty thereof, and no other damages, rights or remedies will in any case be collectible, enforceable or available to the Seller against Purchaser, and the Seller will accept the Earnest Money as the Seller's total damages and relief, Seller hereby waiving any other rights or remedies to which it may otherwise be entitled. The foregoing limitations will not apply to Purchaser's indemnities pursuant to Section 5.

16.     Miscellaneous.

(a)     Interpretation and Applicable Law. This Contract will be construed and interpreted in accordance with the laws of the state where the Property is located and the jurisdiction and venue with respect to any disputes arising hereunder will be proper only in the city or county in which the Property is located. Where required for proper interpretation, words in the singular will include the plural; the masculine gender will include the neuter and the feminine, and vice versa. The terms "successors and assigns" will include the heirs, administrators, executors, successors and permitted assigns, as applicable, of any party hereto. Time is of the essence in this Contract in all respects.

(b)     Amendment. This Contract may not be modified or amended, except by an agreement in writing signed by the Seller and the Purchaser. Each party may waive any of the Contract's conditions or obligations of the other party, but any such waiver will be effective only if in writing and signed by the party waiving such conditions and obligations.

(c)     Attorneys' Fees. If it becomes necessary for either party to file a suit to enforce this Contract or any terms contained herein, the prevailing party may recover, in addition to all other remedies or damages, reasonable attorneys' fees and costs of court incurred in such suit.

(d)     Descriptive Headings. The descriptive headings of the several sections contained in this Contract are inserted for convenience only and will not control or affect the meaning or construction of any of the terms hereof.

(e)     Entire Agreement. This Contract (and the items to be furnished in accordance herewith) constitutes the entire agreement between the parties pertaining to the subject matter hereof and supersedes all prior and contemporaneous agreements and understandings of the parties in connection therewith. No representation, warranty, covenant, agreement or condition not expressed in this Contract will be binding upon the parties hereto or will affect or be effective to interpret, change or restrict this Contract.

(f)     Multiple Originals and Counterparts; Electronic Documents. This Contract may be executed in any number of copies and counterparts, each of which will be deemed an original and all of which counterparts together will constitute one agreement with the same effect as if the parties had signed the same signature page. This Contract and related documents may be executed by electronic copy, including DocuSign, unless otherwise specifically provided for herein or if an original is required by local custom or law.

(g)     Real Estate Commission. Except for Street Commercial Real Estate, LLC ("**Purchaser's Broker**") and Encore Commercial Inc. ("**Seller's Broker**") to whom Seller will pay a commission pursuant to separate written agreements (the "**Commission**"), including, without limitation, an amount equal to 2%

12

**EXHIBIT 27**

**EXHIBIT 27**

CONFIDENTIAL

of the Purchase Price to Purchaser's Broker at Closing, each party represents and warrants to the other that no broker or finder is connected with or has been engaged by it in connection with any of the transactions contemplated by this Contract.  Seller will be obligated to pay any and all commissions or fees which may be due to the Purchaser's Broker and Seller's Broker in connection with the transactions contemplated herein. In the event of a claim for any other broker's or finder's fee or commissions in connection herewith, each party will indemnify the other against any such claims made based upon any act, statement, or agreement alleged to have been made by the indemnifying party.

(h)      Confidentiality. Seller will not, without the prior written consent of Purchaser, make any public announcement about the purchase and sale transaction contemplated hereby or of any of the terms or conditions hereof, including without limitation, the Purchase Price, or the results of any inspection, test, survey, or study conducted by Purchaser pursuant to this Contract. Seller will not transmit any of the information contained in this Contract or any document obtained by Seller or Purchaser in connection with this Contract to any third party except Seller's counsel, consultants, lenders, and other advisors engaged to help in connection with the sale of the Property pursuant to this Contract (collectively, the "**Permitted Parties**"), on a need-to-know basis, provided such Permitted Parties are advised of the confidentiality and nondisclosure obligations and agree to be bound thereby.  Seller agrees to indemnify and hold Purchaser harmless from and against any loss, injury, damage, claim, lien, cost or expenses, including attorneys' fees, arising from a breach of the foregoing confidentiality agreement.  The covenants set forth in this Section will survive the termination of this Contract or Closing. The covenants set forth in this Section will survive the termination of this Contract or Closing.

(i)      Exclusivity.  Between the Effective Date and the Closing Date (or earlier termination of this Contract as provided herein), Seller will not negotiate, or enter into, any agreement pertaining to the sale, exchange, lease or transfer of all or any portion of the Property to any person or entity other than Purchaser or its assigns other than a back-up offer.

(j)      Assignment. Purchaser may, at its option and at any time during this Contract, assign this Contract to an affiliate without the consent of, but with written notice to, Seller prior to Closing.

(k)      Effective Date.  All references in this Contract to the "**Effective Date**" will mean the later of the dates upon which Seller and Purchaser execute this Contract as set forth on the signature page below.

(l)      Legal Holidays.  Notwithstanding anything herein to the contrary, if the final date of any period, any date of performance or any deadline date which is set forth in this Contract falls on a Saturday, Sunday or federal legal holiday, then such date will be extended to the next following date which is not a Saturday, Sunday or federal legal holiday.

(m)      Binding Effect.  This Contract will be binding upon and will inure to the benefit of the parties hereto and their successors and assigns.

(n)      Waiver of Consequential Damages.  Notwithstanding any provision in this Contract to the contrary, neither party will be liable to the other party for consequential damages, such as lost profits or interruption of the other party's business, except that this sentence will not apply to Seller's breach of its confidentiality obligations under this Contract.

(o)      Waiver of Jury Trial.  TO THE EXTENT PERMITTED UNDER APPLICABLE LAW, EACH OF SELLER AND PURCHASER WAIVE ANY RIGHT TO TRIAL BY JURY OR TO HAVE A JURY PARTICIPATE IN RESOLVING ANY DISPUTE, WHETHER SOUNDING IN CONTRACT, TORT, OR OTHERWISE, BETWEEN SELLER AND PURCHASER ARISING OUT OF THIS CONTRACT OR ANY OTHER INSTRUMENT, DOCUMENT, OR AGREEMENT EXECUTED OR DELIVERED IN CONNECTION HEREWITH OR THE TRANSACTIONS RELATED HERETO.

**EXHIBIT 27**

**EXHIBIT 27**

CONFIDENTIAL

       (p)     <u>Anti-Corruption</u>.  Seller will not knowingly permit anyone to pay bribes to anyone for any reason, whether in dealings with governments or the private sector, or otherwise violate any applicable anti-corruption laws in performing under this Contract.  Seller will maintain true, accurate and complete books and records concerning any payments made to another party by Seller under this Contract, including on behalf of Purchaser.

       (q)     <u>Joint and Several Liability</u>. If and when included within the term "Seller," there is more than one person, firm, or corporation, each will be jointly and severally liable for the obligations of Seller.

17.     <u>Right of First Offer</u>. As of the Effective Date, Seller is under contract ("**Existing Contract**") to sell the ROFO Property. Seller hereby grants Purchaser a right of first offer to purchase the entire ROFO Property ("**ROFO Right**") that may only be exercised on the entire ROFO Property and not on individual parcels and only in the event the Existing Contract is terminated. Seller will provide written notice of any such termination to Purchaser within two (2) business days after termination of the Existing Contract ("**ROFO Notice**"). Purchaser will have ten (10) business days after receipt of such notice to provide Seller with written notice that Purchaser is exercising the ROFO Right. Seller agrees that it will not market the ROFO Property for sale unless and until such ten (10) business day period has expired and will not market the ROFO Property for sale if Purchaser exercises its ROFO Right. In the event Purchaser exercises the ROFO Right, Seller's obligation to sell, and Purchaser's obligation to purchase, all of the ROFO Property is subject to Seller and Purchaser executing a separate purchase and sale contract on the terms and conditions of this Agreement, except for the price which Seller will include in its ROFO Notice.

[Signature Page to Follow]

14

**EXHIBIT 27**

**EXHIBIT 27**

CONFIDENTIAL

EXECUTED to be effective as of the Effective Date.

<u>SELLER:</u>

EMERALD CITY EMPIRE, LLC

By:  Desert Oasis Management, Inc
Its: Manager


By: _____
Name:  Randel W Aleman
Title:    President
Date Signed:_____

Signature Page to Purchase and Sale Contract

**EXHIBIT 27**

**EXHIBIT 27**

CONFIDENTIAL

**PURCHASER**:

PURE DEVELOPMENT, INC.

By: _____

Name:  Adam Seger

Title:    Principal

Date Signed:    10/7/24_____

Signature Page to Purchase and Sale Contract

**EXHIBIT 27**

**EXHIBIT 27**

CONFIDENTIAL

## EXHIBIT A

### The Land

All that certain parcel situate within a portion of the Northeast One-Quarter (NE1/4) of Section 2 (2), Township Nineteen (19) North, Range Twenty-Two-(22) East, Mount, Diablo Meridian, Storey County, Nevada, being a portion of Parcel 2018-4, as shown on Record of Survey Map, file No. 127128, in the Official Records of Storey County, Nevada, a portion of Parcel 2008-26, as shown on Record of Survey Map, File No. 109143, in the Official Records of Storey County, Nevada, and a portion of Parcel 2023-14, as shown on Record of Survey Map File No. 138372, in the Official Records of Storey County, Nevada, said parcel being more particularly described as follows;

Beginning at the Northeast corner of said Parcel 2023-14, from which the Northeast corner of said Section 2, bears North 56°36'47" East, 1209.45 feet;

Thence along the Easterly line of said Parcel 2023-14, and the prolongation thereof, South 00°01'57" East, 1679.18 feet to the Southerly line of Parcel 2018-4;

Thence along said Southerly line, South 59°05'24" West, 628.40 feet;

Thence leaving said Southerly line, South 00°01'57" East 285.54 feet tot the Southerly line of said Parcel 2008-26, said point being on the Northerly right-of-way line of Denmark Drive per Document No. 107607, in the Official Records of Storey County, Nevada.;

Thence along said Southerly parcel line, being coincident with said Northerly right-pf-way line, South 82°38'48" West, 164.71 feet to the Southwest corner of said Parcel 2008-26;

Thence along the Westerly line of said Parcel 2008-26 and the prolongation thereof, being on the Southerly line of said Parcel 2018-4, North 14°47'30" West, 598.89 feet;

Thence continuing along said Southerly line, North 76°36'34" West, 309.56 feet to the Southwest corner of said Parcel 2018-4;

Thence along the Westerly line of said Parcel 2018-4, the following nine (9) courses and distances:

1) North 27°52'22" East, 69.99 feet;

2) North 36°22'33" East, 133.70 feet, to the beginning of a curve to the left;

3) 121.66 feet along the arc of a 170.00 foot radius curve, through a central angle of 41°00'19" to a point of a reverse curvature;

4) 483.67 feet along the arc of a 1980.00 foot radius curve to the right, through a central angle of 13°59'46" to a point of reverse curvature;

5) 402.79 feet along the arc of a 5020.00 foot radius curve to the left, through a central angel of 04°35'50";

6) North 04°46'09° East, 330.06 feet to the beginning of a curve to the right;

7) 85.11 feet along the arc of a 1020.00 foot radius curve, through a central angle of 04°46"51;

8) North 00°00'42" West 115.02 feet to the beginning of a curve to the left and;

9) 77.22 feet along the arc of a 170.00 foot radius curve, through a central angle of 26D01'34" to the Northwest corner of said Parcel 2018-4;

Exhibit A to Purchase and Sale Contract

**EXHIBIT 27**

**EXHIBIT 27**

CONFIDENTIAL

Thence along the Northerly line of said Parcel 2019-4, South 46°33'45" East, 162.70 feet to the Northwest corner of said Parcel 2023-14;

Thence along the Northerly line of said Parcel 2023-14, North 89°58'03" East, 809.53 feet to the Point of Beginning.

Reference is hereby made of record to Parcel 2023-16, of the Record of Survey Map recorded October 3, 2023, as Document No. 138375, of Official Records.

The above legal description appeared previously in that certain Record of Survey Deed recorded October 3, 2023, as Document No. 138374, of Official Records, pursuant to NRS Section 6.111.312.

APN: 005-101-71

Exhibit A to Purchase and Sale Contract

**EXHIBIT 27**