**EXHIBIT 32**

CONFIDENTIAL

**LEASE**

**BY AND BETWEEN**

**Magic TRIC I, LLC**

**("LANDLORD")**

**AND**

**TESLA, INC. dba TESLA MOTORS, INC.**

**("TENANT")**

FOR REAL PROPERTY LOCATED AT: 455 Denmark Drive, Sparks, NV 89434

TRT #456363

**EXHIBIT 32**



**EXHIBIT 32**

CONFIDENTIAL

## BASIC LEASE PROVISIONS

| | |
|---|---|
| **Effective Date:** | The "Effective Date" of this Lease shall be the date this Lease is fully executed by Landlord and Tenant as set forth in the signature page. |
| **Landlord:** | Magic TRIC I, LLC |
| **Tenant:** | TESLA, INC. dba TESLA MOTORS, INC. |
| **Building:** | The "Building" is that certain building located on the Land and comprised of approximately 649,240 square feet of gross leasable area ("GLA"), which shall be substantially similar to that depicted on Exhibit A-2 but in in any event inclusive of the Building Outline Specifications included in Exhibit B-1. The Building is located at 455 Denmark Drive, City of Sparks, County of Storey, State of Nevada. |
| **Land:** | The "Land" is the parcel(s) of land upon which the Premises is located, the legal description of which is as set forth on Exhibit A-1. |
| **Parking:** | Tenant shall have the sole and exclusive use of the entire parking area associated with the Premises (the "Parking Area"), which may be used by Tenant's agents, employees, contractors, licensees and customers. The Parking Area is comprised of approximately 136 trailer parking spaces and 175 employee/standard automobile parking spaces and    is more particularly described and depicted on Exhibit A-3. Subject to compliance with Legal Requirements (as defined in Section 3.2.3), Subject to Legal Requirements, Tenant shall have the right to maximize the amount of parking spaces located within the Parking Area (including but not limited to the right to re-stripe the Parking Area at Tenant's discretion) and to install a security enclosure on the Premises around the Parking Area; provided, however, Tenant will restore the Parking Area to its original condition upon the end of the Term or termination of this Lease. |
| **Premises:** | The "Premises" is comprised of the entirety of the Building, and the following improvements now or hereafter located on the Land: (i) the Parking Area; (ii) driveways and drive aisles; (iii) related access easements; (iv) landscaped areas and irrigation; and (v) exterior lighting. The Premises is as shown on Exhibit A. Landlord shall have no right to reconfigure or relocate the Premises. |
| **Base Term:** | The initial term of this Lease (the "Base Term") shall be sixty-two (62) months, plus any partial month from the Rent Commencement Date (as defined herein) until the first day of the next full calendar month during the Term, subject to Tenant's rights to extend or terminate as provided herein this Lease. |

1

**TESLA**

**EXHIBIT 32**

**EXHIBIT 32**

CONFIDENTIAL

| | |
|---|---|
| **Renewal Option(s):** | Tenant shall have two (2) options to renew the Term each for a period of sixty (60) months (each, a "Renewal Option" and collectively the "Renewal Options"). |
| **Commencement Date:** | The "Commencement Date" shall be the date Landlord delivers possession of the Premises to Tenant in the Delivery Condition. |
| **Delivery Condition:** | Landlord shall deliver possession of the Premises on or before the Delivery Date with: (i) the Premises free of any prior tenancy or occupants, broom clean free of all personal property, furnishings and debris; (ii) existing open permits relating to the Premises satisfied and/or closed as the case may be, to the extent the same would delay or prohibit Tenant from obtaining the permits necessary for construction of Tenant's Work (as defined in Section 1.7), if any; (iii) the Premises and the Land free and clear of all Hazardous Materials (as defined in Section 4.3); (iv) the Building in a dry, watertight, leak-free and structurally sound condition; (v) the Building and Exterior Areas in good working condition and in compliance with all Legal Requirements; and (vi) the Landlord's Work (as defined in Exhibit B) complete and the Premises in accordance with the requirements and conditions set forth in Exhibit B (collectively, the "Delivery Condition"). |
| **Rent Commencement Date:** | The "Rent Commencement Date" shall be the Commencement Date; provided, however, the Rent Commencement Date shall be delayed one day for each day that Tenant's performance of Tenant's Work (as defined in Section 1.8) is delayed due to (a) Landlord Delay (defined below) occurring following the Commencement Date, and (b) events of Force Majeure (as defined in Section 20.9). As used herein, a "Landlord Delay" means a delay in performance of Tenant's Work resulting from the acts or omissions of Landlord or any of Landlord's agents, employees or contractors (including failure to act within the periods provided in this Lease or any other interference with Tenant's Work by Landlord or any of Landlord's agents, employees or contractors). |
| **Delivery Date:** | The "Delivery Date" shall be January 20, 2026. |
| **Expiration Date:** | The "Expiration Date" shall be the last day of the sixty-second (62nd) full calendar month following the Commencement Date, subject to Tenant's rights to extend or terminate as provided herein. |

TRT #456363

TESLA

**EXHIBIT 32**

**EXHIBIT 32**

CONFIDENTIAL

**Base Rent Schedule:**

| Period of Lease Term | Base Rent /Building SF /Year | Monthly Base Rent | Annual Base Rent |
|---|---|---|---|
| *Base Term* | | | |
| Months 1-6 | $0.00 | $0.00 | $0.00 |
| Months 7-12 | $7.68 | $259,942.40° | $3,119,308.80*° |
| Months 13-24 | $7.91 | $427,979.01 | $5,135,748.10 |
| Months 25-36 | $8.15 | $440,818.38 | $5,289,820.54 |
| Months 37-48 | $8.39 | $454,042.93 | $5,448,515.16 |
| Months 49-60 | $8.64 | $467,664.22 | $5,611,970.61 |
| Months 61-62 | $8.90 | $481,694.14 | $5,611,970.61 |
| *First Renewal Period* | | | |
| Months 63-122 | Fair Market Rent | | |
| *Second Renewal Period* | | | |
| Months 123-182 | Fair Market Rent | | |

*partial year
°calculated based on 406,160 square feet

**Lease Year:** The first "<u>Lease Year</u>" of the Term shall begin on the Commencement Date and shall expire on the last day of the month, twelve (12) full calendar months next following the Commencement Date, except that, if the Commencement Date occurs on the first day of the calendar month, then the first Lease Year shall end on the day immediately preceding the first anniversary of the Commencement Date. Subsequent Lease Years, if applicable, shall be each consecutive twelve (12) calendar month period until the Expiration Date.

**Real Property Taxes, Common Area Maintenance and Property Insurance:**

Operating Expenses (as further set forth in <u>Section 2.3</u> hereof) shall be paid pursuant to the schedule below. The "Monthly Cost" set forth below are estimates and may not reflect the actual Operating Expenses owed by Tenant under this Lease.

| <u>Operating Expenses</u> | <u>Monthly Cost</u> |
|---|---|
| Common Area Maintenance ("<u>CAM</u>") | N/A. Tenant will self-maintain the Premises pursuant to the terms and conditions of this Lease |
| Real Property Taxes (estimate based on 202 6 value for APN #005-101-71 | $36,249 per month ($0.67/sf /year) |
| Landlord's Property Insurance (estimate based on 202 6 rate) | $9,739 per month ($0.18/sf /year) |


2 ACS

2 ACS

3



**EXHIBIT 32**

**EXHIBIT 32**

CONFIDENTIAL

**Tenant's Proportionate Share**:

That amount, expressed as a percentage that is represented as a fraction, the numerator of which is the GLA of the Premises and the denominator of which is the GLA of the Building, as such GLA may be changed from time to time, which the parties agree for purposes of this Lease is one hundred percent (100%) ("Tenant's Proportionate Share").

**Security Deposit:**

None. Tenant shall not be obligated to pay Landlord a security deposit.

**Tenant Improvement Allowance:**

Landlord shall provide a total Tenant Improvement Allowance of (i) $1.00 per rentable square foot; and (ii) a $700,000.00 crane allowance to be used toward the purchase and installation of an overhead crane of Tenant's choosing to be installed in the Building (the "Tenant Improvement Allowance"). The Tenant Improvement Allowance will be payable as set forth in this Lease.

**Permitted Use:**

Tenant shall have the right to use the Premises, at Tenant's sole discretion and subject to Legal Requirements, for general warehouse, office, industrial and manufacturing, research and development, homologation and validation of all vehicle, solar and energy products, storing, displaying, assembling, shipping, distributing and preparing Tenant products; parking, storage and use (including driving into and through the Building for loading and unloading and parking inside of the Building) of automobiles, trucks, machinery, and trailers, including outdoor loading and unloading; ancillary and related uses for any of the foregoing so long as the Tenant is the Tenant named herein or an Affiliate (as defined in Section 13.1) of such entity  for any lawful purpose (the "Permitted Use").

Landlord represents and warrants that as of the Effective Date the Premises are zoned I-2.  Landlord covenants not to take any action after the Effective Date that would make the foregoing representation untrue if such representation were made as of such later date.

**Charging Stations:**

Tenant at Tenant's discretion shall have the right to install electric vehicle chargers at any time during the Term in the Parking Area and otherwise in accordance with the terms of this Lease.

**Notices**:

| To Landlord: | To Tenant: |
|---|---|
| Magic TRIC I, LLC<br>1351 Roosevelt Ave., Suite 100<br>Indianapolis, IN 46202 | All notices (including invoices):<br><br>Tesla, Inc.<br>1 Tesla Rd. |

4

TRT #456363

**T E S L A**

**EXHIBIT 32**

**EXHIBIT 32**

CONFIDENTIAL

| Attn: Adam Seger<br>Email:<br>aseger@puredevelopment.com | Austin, TX 78725<br>Attn:  Legal/ Lease Administration<br>      TRT No. 456363<br><br>With a copy of all notices (excluding invoices):<br><br>Tesla, Inc.<br>1 Tesla Rd.<br>Austin, TX 78725<br>Attn:  Legal/Lease Administration<br>      TRT No. 456363<br><br>PDF copy of all notices (including invoices) to: leaseadmin@tesla.com |

**Brokers**:    Landlord shall pay the brokerage commission fees to CBRE Inc. ("Broker") pursuant to a separate agreement between Broker and Landlord.

**Exhibits:**    Exhibit A: Site Plan of the Premises
Exhibit A-1: Legal Description of the Land
Exhibit A-2: Site Plan of the Building
Exhibit A-3: Parking Area
Exhibit B: Delivery Condition
Exhibit B-1: Building Outline Specifications
Exhibit C: Commencement Date Agreement
Exhibit D: Form of SNDA
Exhibit E: Form of Estoppel Certificate
Exhibit F: Tax Parcel

All Exhibits are attached to this Lease and incorporated by reference.

**[REMAINDER OF THIS PAGE INTENTIONALLY LEFT BLANK]**

5



**EXHIBIT 32**

**EXHIBIT 32**

CONFIDENTIAL

## LEASE

THIS LEASE (this "Lease") is made and entered into as of the Effective Date set forth in the Basic Lease Provisions, by and between the Landlord and Tenant identified in the Basic Lease Provisions.

## 1    PREMISES/TERM OF LEASE

1.1    Premises. Subject to the acquisition contingency set forth in Section 1.13, Landlord hereby leases demises and rents to Tenant and Tenant hereby leases and rents from Landlord the Premises, to have and hold for the Term, subject to the covenants, terms, and conditions of this Lease.  Further, upon delivery of possession of the Premises to Tenant, Tenant shall be entitled to the non-exclusive use of all improvements such as access easements, access and perimeter roads, pedestrian sidewalks, driveways and drive aisles, drainage, backflow devices that are not located on the Land, but that now or hereafter serve or benefit the Land.  Tenant shall have access to and the right to use the Premises, 24 hours a day, Monday – Sunday, every day of the year including all holidays.

1.2    Landlord Deliverables. Landlord has provided to Tenant, or shall provide prior to the Effective Date, the following documentation regarding the Premises: (i) parcel maps and current 'title commitment (dated within three months of the date of this Lease) including legible copies of all exception documents referenced therein; (ii) a current ALTA survey of the Land (dated within one year of the Effective Date); (iii) plans for the Building, showing both the interior and exterior layout; (iv) all information in Landlord's possession regarding utilities to the Premises, including meter numbers and account numbers and conditions report for HVAC and other building systems; (v) site plan of the Premises; (vi) that certain Phase I Environmental Site Assessment, prepared by Western Technologies, Inc. as project no. 21-824274-0, dated November 18, 2024 (the "Environmental Report(s)"); and (vii) a reliance letter from Western Technologies, Inc. authorizing Tenant to rely on the Environmental Report.

1.3    Early Access.  At Tenant's request, Landlord will use commercially reasonable efforts to provide reasonable access to the Premises prior to the Delivery Date, at any time during regular business hours, for Tenant to perform reasonable and customary due diligence.  All the terms, provisions and agreements of this Lease, including, without limitation the insurance requirements of Section 9 below, shall apply to Tenant's early occupancy, except for the obligation to pay Rent.

1.4    Condition of the Premises.  Landlord shall deliver possession of the Premises to Tenant on the Delivery Date in the Delivery Condition, subject to the terms and conditions of this Lease, and Tenant's sole remedies for any failure by Landlord to deliver possession of the Premises on the Delivery Date are set forth in Section 1.5. Landlord represents and warrants to Tenant as of the Effective Date that: (a) there are no leases or other restrictions for which the Landlord will need to obtain consent in order to enter into a lease upon the terms contained herein except for closing on the acquisition of the Land; (b) it has no knowledge of any enacted, pending, proposed or threatened Legal Requirement, condemnation proceeding or litigation that would prevent or limit the use of the Premises by Tenant as contemplated by this Lease; (c) the Premises is zoned I-2; and (d) as of the Purchase Deadline, there will be no encumbrances, liens, agreements, exclusives, easements, restrictions or covenants in effect that would limit Tenant's rights or increase Tenant's obligations hereunder or limit Tenant's ability to perform Tenant's Work or erect signage that is otherwise in compliance with Legal Requirements; and (e) as of the Purcahse Deadline, there will be no covenants, conditions and restrictions, rules, and regulations which bind the Premises or the Land which would prohibit or restrict Tenant's ability to use the Premises and Land for the Permitted Use. Landlord covenants: (i) not to take any future actions that would cause the representations set forth in clauses (c), (d), or (e) of the preceding sentence to be untrue if made at such future time; and (ii) if required as part of Landlord's Work, Landlord will, prior to the date Landlord delivers the Premises to Tenant, obtain all land use, street access/use, and environmental permits and approvals required for construction of

6

TRT #456363



**EXHIBIT 32**

EXHIBIT 32

CONFIDENTIAL

Landlord's Work.  On the Commencement Date, Landlord shall assign to Tenant all applicable warranties for the Premises and Building Systems, including, without limitation, any warranty provided by the general contractor for the Landlord's Work.

If (a) Tenant is prohibited from commencing Tenant's Work or using the Premises for the Permitted Use by any governmental authority, whether based on zoning or other applicable requirements, except to the extent such prohibition is due to Tenant's request for a zoning change for the Premises or Tenant changing the use of the Premises to a use not allowed by the zoning classification for the Premises as of the Effective Date, or (b) the issuance of permits for the Tenant's Work is conditioned upon Tenant paying extraneous "impact" fees, performing extraneous "impact" work or Tenant's complying with other requirements that will materially increase the cost or scope of Tenant's Work, and Tenant estimates the financial impact of such governmental conditions to be in excess of Twenty-Five Thousand Dollars ($25,000), then Tenant shall have the right to terminate this Lease by providing not less than thirty (30) days' prior written notice to Landlord. Notwithstanding the foregoing, Tenant will have no right to terminate this Lease pursuant to this Section 1.4 if any of the Tenant Improvement Allowance has been disbursed to Tenant or a building permit issued by Storey County Community Development for Landlord's Work as detailed in the Building Outline Specifications (Exhibit B-1).  Notwithstanding anything contained in this Lease to the contrary, Landlord represents and warrants that the encumbrances existing as of the Effective Date shall not prohibit or in any way limit Tenant's use of the Premises for the Permitted Use, shall not increase any of Tenant's obligations under this Lease, or diminish any of Tenant's rights under this Lease. Landlord shall indemnify, defend, and hold Tenant harmless from and against any and all costs, expenses, claims, suits, causes of action, liabilities, losses, injuries and damage, including, without limitation, reasonable attorney's fees and cost from the claim arising out of the existing encumbrances.

1.5     Late Delivery.  If Landlord fails to deliver the Premises to Tenant in the Delivery Condition by Saturday, March 21, 2026 (the "Required Delivery Date"), except for Delivery Condition Deficiencies (as defined below), then Tenant shall 1) receive, as liquidated damages, and not as penalties, a credit against the Rent that first accrues after the Rent Commencement Date in an amount equal to two (2) days of Rent for each day of delay (the "Rent Credit").

1.5.1     Notwithstanding anything to the contrary in Section 1.5 or elsewhere in this Lease, if Landlord fails to deliver possession of the Premises to Tenant in the Delivery Condition without Delivery Condition Deficiencies as of May 20, 2026 ("**Late Date**"), Tenant shall have the right to:

1) perform the work necessary and appropriate to complete the any or all of the remaining Landlord's Work (a "Take Over") at Landlord's sole cost and expense, by providing written notice of the Take Over (a "Take Over Notice") within ten (10) days after the Late Date.  If Tenant exercises the Take Over right, Landlord shall reimburse Tenant for the actual costs incurred by Tenant in performing the work necessary to complete any or all of the remaining Landlord's Work, as the case may be, (and removing any mechanics' or materialmens' liens which may have attached to the Premises associated with Landlord's performance of the Landlord's Work) within ten (10) business days after receipt of Tenant's invoice therefor, which invoice shall be accompanied by reasonable supporting documentation.  Tenant shall not request reimbursement by Landlord of any costs incurred by Tenant under this Section 1.5 more often than once in any thirty (30) day period.  If Landlord has not reimbursed Tenant for one hundred percent (100%) of the actual costs incurred by Tenant for the work necessary to complete any or all of the remaining performing the Landlord's Work, as the case may be, (and removing any mechanics' or materialmens' liens) within thirty (30) days after Tenant's completion of the same, Tenant shall be entitled to deduct the unpaid and overdue amount of such costs from Rent otherwise becoming due under this Lease.  If Tenant exercises the Take Over right, Tenant

7

TRT #456363



EXHIBIT 32

EXHIBIT 32

CONFIDENTIAL

may, but shall not be obligated to, assume one or more of Landlord's contracts with any contractors or subcontractors retained by Landlord for such work. Any costs associated with the termination and/or assignment of one or more contractor or subcontractor contracts shall be borne solely by Landlord; or

2) terminate this Lease by delivering written notice to Landlord (with the termination being effective upon delivery of such notice) within ten (10) days after the Late Date, at which time, the Rent Credit shall be due and payable to Tenant, this Lease shall terminate and be of no further force and effect, and the parties shall have no further rights or obligations hereunder except those that expressly survive the expiration or earlier termination of this Lease. However, if Tenant has previously provided Landlord a Take Over Notice and Tenant subsequently terminates the Lease pursuant to this Section 1.5.1, Tenant shall not be entitled to reimbursement of costs related to the Take Over. If Tenant delivers a Take Over Notice to Landlord and Tenant fails to complete the Landlord's Work on or before the ninetieth (90th) day after Landlord's receipt of the Take Over Notice, then either Tenant or Landlord may terminate this Lease by delivering written notice to the other party, at which time this Lease shall terminate and be of no further force and effect, and the parties shall have no further rights or obligations hereunder except those that expressly survive the expiration or earlier termination of this Lease.

1.6     The Rent Credit payment obligations shall survive the termination of this Lease. The parties agree that Tenant's actual damages as a result of Landlord's late delivery would be extremely difficult or impracticable to determine and acknowledge that the Rent Credit has been agreed upon after negotiation, as the parties' best and reasonable estimate of Tenant's damages. The Required Delivery Date shall be delayed one day for each day that Landlord's delivery of the Premises to Tenant is delayed due to Force Majeure or Tenant Delay (defined below). As used herein, "Tenant Delay" means the effect of actual delays in Landlord's performance that are caused by (i) Tenant's failure to comply with specific time periods established by this Lease or (ii) performance of any work or activity in the Premises by Tenant or any of Tenant's agents, employees or contractors. If Landlord contends that a Tenant Delay has occurred, then no Tenant Delay shall have occurred unless and until Landlord has provided Tenant with written notice specifying that a Tenant Delay may result from Tenant's continued actions, and Tenant does not cease such actions or dispute such Tenant Delay within five (5) business days after receipt of such written notice.

1.7     Possession.  Within fifteen (15) days after delivery of possession, Tenant will notify Landlord of any elements of the Premises that are not in the Delivery Condition (such incomplete items being referred to herein as "Delivery Condition Deficiencies"). Landlord shall promptly remedy all Delivery Condition Deficiencies. If any Delivery Condition Deficiency must be completed after Tenant's commencement of Tenant's Work, Landlord shall coordinate with Tenant's contractor to ensure timely completion of the Delivery Condition Deficiencies and prevent any disruption to Tenant's construction schedule. If Landlord fails to promptly and diligently satisfy any Delivery Condition Deficiency, then Tenant shall have the right, but not the obligation, to complete any such Delivery Condition Deficiency at Landlord's cost, in which event Landlord shall reimburse Tenant for the actual costs incurred by Tenant within ten (10) days after receipt of an invoice therefor. If Landlord fails to pay such costs within ten (10) days after receipt of an invoice, Tenant shall be entitled to deduct the unpaid and overdue amount of such costs from the Rent otherwise becoming due hereunder. Tenant may, in its sole discretion, choose to accept possession of the Premises while Delivery Condition Deficiencies exist, in which case, Tenant's acceptance of possession shall not be deemed to be Tenant's waiver of Landlord's obligation to put the Premises in the Delivery Condition.

1.8     Tenant's Work.  The Commencement Date shall not be deemed to have occurred (and Tenant shall not be deemed to have accepted possession of the Premises) until all Delivery Condition

TRT #456363



EXHIBIT 32

**EXHIBIT 32**

CONFIDENTIAL

Deficiencies have been remedied by Landlord.  Except as otherwise provided under this Lease, upon Landlord delivering possession of the Premises to Tenant, the Commencement Date, Rent Commencement Date, and the Expiration Date shall be confirmed in writing by execution of a "Commencement Date Agreement" in the form set forth on Exhibit C attached hereto and made a part hereof.

1.9    Tenant Improvement Allowance.  In consideration for the performance by Tenant of Tenant's construction, alterations, additions, or improvements necessary for its operations in the Premises ("Tenant's Work"), Landlord shall provide to Tenant the Tenant Improvement Allowance payable in accordance with the following:

(i)    Fifty percent (50%) of the Tenant Improvement Allowance shall be due and payable within thirty (30) days after the date that Tenant has submitted to Landlord a written statement requesting such payment along with construction permits (or equivalent); and,

(ii)    The balance of the Tenant Improvement Allowance shall be due and payable within twenty (20) days after the date that Tenant, or Tenant's general contractor provides to Landlord a copy of Tenant's general contractor's final waiver and unconditional release of liens.

If any installment of the Tenant Improvement Allowance is not paid within the time frames set forth above (provided Tenant has satisfied the conditions set forth above for such payment) and remains outstanding for more than ten (10) business days after Landlord's receipt of an Alert Notice (as defined below), Tenant shall have the right then in addition to all other rights and remedies that Tenant may have against Landlord (but without duplication in recovering the amounts due Tenant) to deduct the unpaid amount, from Rent due under this Lease until said unpaid amount is fully paid.  An "Alert Notice" means a notice sent to Landlord in accordance with the notice requirements in the Lease specifying the failure to pay the outstanding installment of Tenant Improvement Allowance.  In the event Landlord fails to deliver any installment of the Tenant Improvement Allowance to Tenant by the required due date, Tenant may elect to continue construction of the Tenant's Work; provided, however, such election shall not be deemed a waiver of any of the payment requirements.

1.10    Government Approvals.  Tenant shall have until the 30th day after the Purchase Deadline (the "Initial Approvals Period") to obtain all (a) local governmental and/or agency approvals, consents and permits Tenant deems necessary or appropriate for the construction of Tenant's improvements, the installation of Tenant's signage, and any and all work Tenant, in its sole and absolute discretion, deems necessary or appropriate for the operation of Tenant's business in the Premises (collectively, the "Improvement Approvals"), (b) necessary zoning modifications or waivers for Tenant's Use at the Premises (collectively, the "Zoning Approvals"), and (c) state governmental and/or agency approvals, consents and permits necessary or appropriate for the operation of Tenant's business and Permitted Use in the Premises, (collectively, the "Licensing Approvals" and, together with the Improvement Approvals and the Zoning Approvals, the "Approvals").  Tenant will use commercially reasonable efforts to obtain all Approvals, and upon Landlord's written request, Tenant shall keep Landlord reasonably informed as to the status of the issuance of the Approvals.  Landlord will reasonably cooperate with Tenant, at no additional cost to Landlord, in obtaining Tenant's Approvals, including, without limitation, executing such documents as may be required by local governmental authorities by virtue Landlord's being the fee owner of the Premises. Tenant shall promptly advise Landlord in writing if Tenant is denied any of its Approvals for any reason. The parties acknowledge and agree that Tenant may elect to extend the Approvals Period for up to two (2) additional periods of thirty (30) days each upon written notice to Landlord (each, an "Extended Approval Period" or collectively the "Extended Approval Periods")".  For the purposes of this Lease, the Initial

9

TRT #456363



**EXHIBIT 32**

EXHIBIT 32

CONFIDENTIAL

Approvals Period and any Extended Approval Periods shall be collectively referred to herein as the "Approvals Period".  Notwithstanding anything to the contrary in this Lease, if Tenant, despite using commercially reasonable efforts, has not obtained its required Approvals by the expiration of the Approvals Period, Tenant shall, within thirty (30) business days thereafter, have the right to terminate this Lease by providing the Landlord with written notice thereof whereupon this Lease shall terminate upon Landlord's receipt of the written termination notice. Notwithstanding the foregoing, Tenant will have no right to terminate this Lease pursuant to this Section 1.10 if any of the Tenant Improvement Allowance has been disbursed to Tenant or a building permit issued by Storey County Community Development for Landlord's Work as detailed in the Building Outline Specifications (Exhibit B-1).

1.11    Renewal Options.  Provided that (a) there is no monetary default beyond any notice and cure period existing at the time of Tenant's exercise, and (b) the Tenant as of the Effective Date, or a transferee in a Permitted Transfer, remains in possession of the Premises, then Tenant shall have the right to extend the Term of the Lease pursuant to the Renewal Option(s) set forth in the Basic Lease Provisions, upon the same terms, covenants and conditions contained in this Lease that were in effect during the Base Term or applicable Renewal Term except that Base Rent and the term of the Lease for each Renewal Term shall be adjusted as set forth in the Basic Lease Provisions and in the Section below and any improvement allowances or other concessions applicable to the Premises under this Lease shall not apply to the Renewal Terms.  Each Renewal Option shall be exercised by Tenant, if at all, by Tenant giving notice (the "Renewal Term Notice") to Landlord no less than six (6) months before the expiration of the then current Term. Tenant's failure to timely provide a Renewal Term Notice shall be deemed a waiver of such Renewal Option and any succeeding option. If Tenant properly exercises a Renewal Option, Landlord and Tenant shall execute an amendment to this Lease reflecting the Base Rent and the extension of the Term of the applicable Renewal Term within thirty (30) days after Tenant's acceptance (or deemed acceptance) of the Base Rent for such Renewal Term. Each exercised Renewal Option shall constitute a "Renewal Term". The Base Term and any Renewal Term shall be collectively known as the "Term".

1.12    Fair Market Rent.  The Base Rent for the first year of each Renewal Term shall be based on one hundred percent (100%) of the then Fair Market Rent of the Premises ("FMR") on the date each applicable Renewal Term begins, to be determined by the process described in detail below.  "Fair Market Rent" shall mean the rate that a willing tenant would pay, and that a willing landlord would accept, at arm's length, as of the commencement of the applicable Renewal Term, for a typical distribution center within the subject Tahoe Reno Industrial Center and Sparks submarket of Reno, Nevada. The FMR for the first year of the applicable Renewal Term shall be determined as follows after Landlord receives from Tenant a valid Renewal Term Notice that shall include Tenant's determination of the FMR for the Renewal Term: Landlord shall provide Tenant with written notice of its acceptance of Tenant's FMR determination or if Landlord disputes Tenant's FMR determination, Landlord's proposed amount for the FMR for the first year of the Renewal Term within fifteen days of receiving Tenant's notice.  Tenant shall have fifteen (15) days ("Tenant's Review Period") after receipt of Landlord's notice within which to accept Landlord's determination of the FMR or to object reasonably thereto in writing. If Tenant objects, Landlord and Tenant shall attempt in good faith to agree on the FMR, using their good faith best efforts.  If Landlord and Tenant fail to reach agreement within fifteen (15) days after Tenant's Review Period ("Outside Agreement Date"), then the following process for determining the FMR for the first year of the Renewal Term shall apply: No later than fourteen (14) days after the Outside Agreement Date, Landlord and Tenant shall each appoint a broker who shall by profession be a licensed real estate broker active in the leasing of commercial space in the Sparks, Nevada area and who shall have not less than ten (10) years of industrial leasing experience in the Reno, Nevada area.  Each of Landlord's broker and Tenant's broker shall have until thirty (30) days after the Outside Agreement Date (the "Determination Period") to present their opinion of the FMR, which shall be in accordance with the definition of "FMR" above, in a written broker's opinion of value letter signed by the broker. If Landlord's and Tenant's brokers' opinions of the FMR are within ten percent (10%) of each other (measured by dividing the difference between the two by the greater of the two), then the

10



EXHIBIT 32

**EXHIBIT 32**

CONFIDENTIAL

FMR shall be determined to be the average of the two. If Landlord's and Tenant's brokers' opinions of the FMR are not within ten percent (10%) of each other (measured by dividing the difference between the two by the greater of the two), then the two brokers shall within fourteen (14) days after the end of the Determination Period agree upon and appoint a third broker who shall be similarly qualified. The third broker shall, within fifteen (15) days after the end of the Determination Period, make an independent determination of the FMR in a written broker's opinion of value letter (the "Final Report"). The third broker's determination of the FMR in the Final Report will be the FMR for the applicable Renewal Term. If either Landlord or Tenant fails to appoint a broker within fourteen (14) days after the Outside Agreement Date, or if either Landlord's broker or Tenant's brokers fails to present its opinion of the FMR in a written broker's opinion of value letter to the other within fifteen (15) days after their appointment, then the broker who is timely appointed by one of them or who timely presents its opinion of the FMR shall determine the result, which shall be binding upon Landlord and Tenant. If the two brokers fail to agree upon and appoint a third broker in a timely manner, then both brokers shall be dismissed and the determination of the FMR shall be forthwith submitted by the Parties to arbitration under the rules of the American Arbitration Association. The arbitration shall be subject to the above definition of "FMR" and Landlord and Tenant shall share the costs of the arbitration equally.

Landlord and Tenant shall each bear the costs of its own broker and shall share equally the cost of the third broker, if necessary. If the process to determine the Base Rent for the first (1st) year of each of the applicable Renewal Terms is not completed by the date the Renewal Term begins, then Tenant shall pay to Landlord as Base Rent during the first year of the Renewal Term period an amount equal to one hundred five percent (105%) of the Base Rent paid by Tenant during the last month of the Term, until the FMR is finally determined, with a rent adjustment made retroactive to the start date of the Renewal Term. Base Rent for each subsequent year after the first year of the applicable Renewal Term shall be increased annually based on fair market escalations determined as part of the Landlord and Tenant determining FMR for the applicable Renewal Term.

1.13    Schedule Updates. The Parties agree time is of the essence regarding the Landlord's Work. Landlord acknowledges that completion of the Premises subject to the terms and conditions of this Lease is material to Tenant's willingness to enter into this Lease. Landlord agrees to provide Tenant with monthly schedule updates on the performance of Landlord's Work. In the event such schedule updates show that completion of the Landlord's Work may not be completed by the Required Delivery Date, then Landlord will submit to Tenant within ten (10) business days of any such schedule update that shows that completion of the Landlord's Work may not be completed by the Required Delivery Date a remedial action plan which describes in detail a reasonable course of action and plan reasonably acceptable to Tenant (including accelerating the Landlord's Work, for example, by using additional shifts, overtime, additional crews or resequencing of the work, as applicable) to achieve the Required Delivery Date.

1.14    Acquisition Contingency.

1.14.1    The Parties acknowledge that Landlord does not own the Land as of the Effective Date, but Landlord has the Land and any improvements located thereon under a contract to purchase from the current owner thereof dated October 9, 2024 (the "Purchase and Sale Agreement"). Landlord covenants and agrees to use its best efforts to consummate the purchase of fee simple title to the Land and any improvements located thereon under the Purchase and Sale Agreement on or before April 15, 2025 (the "Purchase Deadline"). The Purchase Deadline shall not be extended due to Force Majeure. Landlord shall promptly notify Tenant in writing (and with a copy of the recorded vesting deed) when Landlord consummates the purchase of fee simple title to the Land and any improvements located thereon.

1.14.2    Landlord shall perform its obligations under the Purchase and Sale Agreement in good faith, shall use best efforts to consummate the purchase of the Land and any improvements located

11



**EXHIBIT 32**

**EXHIBIT 32**

CONFIDENTIAL

thereon under the Purchase and Sale Agreement, and shall only be permitted not to close on the acquisition thereof if (collectively, the "Termination Events"): (i) this Lease has terminated; or (ii) Seller has defaulted under the Purchase and Sale Agreement.  If Landlord, despite using best efforts, fails to consummate the purchase of fee simple title to the Land and any improvements located thereon by the Purchase Deadline due to a Termination Event, then Landlord shall promptly notify Tenant in writing of its failure to consummate the purchase (the "Acquisition Notice"), and Landlord and Tenant shall, within ten (10) business days after Tenant's receipt of the Acquisition Notice, have the right to terminate this Lease by providing the other party prior written notice thereof whereupon this Lease shall terminate and the parties shall have no further rights or obligations hereunder except those that expressly survive the expiration or earlier termination of this Lease.  If Landlord fails to consummate the purchase of fee simple title to the Land and any improvements located thereon by the Purchase Deadline for any other reason other than a Termination Event, Landlord shall promptly deliver the Acquisition Notice to Tenant, and Tenant shall, within ten (10) business days of Tenant's receipt of the Acquisition Notice have the right to terminate this Lease after which the parties shall have no further rights or obligations hereunder except those that expressly survive the expiration or earlier termination of this Lease.  In the event of termination of the Lease for an event other than a Termination Event pursuant to this Section 1.13, within ten (10) business days following Tenant's written statement requesting such payment, Landlord shall reimburse Tenant for Tenant's actual and reasonable costs incurred and damages sustained in connection with this Lease and Landlord's failure to consummate the purchase of the fee simple Land and any improvements located thereon (including without limitation, design and construction costs and legal fees.  The payment obligations described in the preceding sentence shall survive the termination of this Lease pursuant to this Section 1.13.  As of the termination of the Lease pursuant to this Section 1.13, each of the parties hereto shall be released and discharged from all liability and responsibility hereunder, other than with respect to obligations that expressly survive the expiration or earlier termination of this Lease.

## 2    RENT

2.1    Base Rent. Beginning on the Rent Commencement Date, Tenant agrees to pay to Landlord, as "Base Rent" in monthly installments as provided in the Basic Lease Provisions, without deduction, setoff, prior notice, or demand, except as expressly set forth in this Lease. Except for the first monthly installment of Base Rent, Tenant will pay each installment of Base Rent in advance on the first business day of each calendar month during the Term.  If the Rent Commencement Date shall be any day other than the first day of any month, the first monthly installment of Base Rent to be paid by Tenant shall be prorated based on the actual number of days in such month. All payments to be made by Tenant to Landlord hereunder shall be made to Landlord or its designated agent, at the address set forth in the Basic Lease Provisions, or at such other place or places Landlord may, from time to time, designate by written notice delivered to Tenant. All Rent and other payments required to be made by Tenant shall be paid to Landlord by electronic payment or wire transfer to the order of Landlord in accordance with the bank details provided by Landlord. Landlord acknowledges and agrees that Landlord must create an account in Tenant's vendor portal, including without limitation, uploading vendor portal forms, a W9 tax form, an NDA, and banking information on the Landlord's bank letterhead, in order for Tenant to process payment to Landlord in a timely and secured manner. The due date for any amount required to be paid by Tenant to Landlord under the terms of this Lease shall be extended on a day for day basis until Landlord fully and correctly completes an account in Tenant's vendor portal.  Base Rent for any partial calendar month during the Term shall be prorated based on a calendar year of 365 days (366 days for a leap year), calculated by multiplying the number of days in such partial calendar month by a fraction, the numerator of which is the applicable Base Rent and the denominator of which is 365 (366 for a leap year).

2.2    Additional Rent.  Beginning on the Rent Commencement Date and during the Term, in addition to Base Rent, Tenant shall reimburse Landlord for Tenant's Proportionate Share of those expenses set forth in Section 2.3 and the Real Property Taxes applicable to the Tax Parcel (defined in Section 2.5)

12



**EXHIBIT 32**

**EXHIBIT 32**

CONFIDENTIAL

and Landlord's Property Insurance (defined in Section 2.5 below) (collectively, the "Operating Expenses") as set forth in the Basic Lease Provisions. Operating Expenses and all other sums of money required to be paid pursuant to this Lease (other than Base Rent), shall be deemed to be additional rent ("Additional Rent"). Landlord will not collect or be entitled to collect more than one hundred percent (100%) of the Real Property Taxes and Property Insurance actually paid by Landlord in connection with the operation of the Premises in any year. Base Rent and Additional Rent shall be collectively known as "Rent".

2.3    Expenses.  Tenant as the sole occupant of the Building shall be responsible for the maintenance, repair, and replacement obligations set forth in Article 5 below. Tenant shall also pay Landlord, as part of Operating Expenses, a management fee in an amount equal to 1% of Base Rent.

2.4    Excluded Costs.  Notwithstanding anything to the contrary contained in this Lease, Tenant will not be obligated to pay for, and Landlord shall remain responsible without pass-through to Tenant for: (a) any costs associated with causing the Premises to be in Delivery Condition as of the Commencement Date; (b) any costs set forth in Section 5.2 below; and (c) any costs associated with the removal or remediation of Hazardous Materials in the Premises not caused or introduced by Tenant.

2.5    Real Property Taxes; Property Insurance. Tenant shall also reimburse Landlord monthly as part of the Operating Expenses, from the Rent Commencement Date and during the Term, for Real Property Taxes and Property Insurance in accordance with the terms of this Section 2.5:

2.5.1    Real Property Taxes.  All *ad valorem* real estate taxes (as defined herein below) levied or assessed upon the Tax Parcel (as defined below) by any governmental entity or public authority in the following manner:

2.5.1.1  Tenant's obligation for the monthly payment of any Real Property Taxes during each calendar year shall apply only to taxes which are allocable to the tax year then in progress (plus any previously accrued taxes which Tenant has not yet paid) and Tenant shall not be obligated to make any prepayment of taxes for tax years not yet in progress.

2.5.1.2 The term "Real Property Taxes" shall include, with respect to the Premises, every form of tax (other than as set forth below), charge, levy, assessment, sewer assessment, fee, license fee, service fee (including, without limitation, those based on commercial rentals, energy or environmental grounds), ordinary or extraordinary, imposed by any authority having direct or indirect power to tax against the tax parcel the Premises are located, including, without limitation, any city, county, state or federal government, or any improvement district, against any legal or equitable interest of Landlord in, or against Landlord's right to rent, the Premises or the Building and any such tax, charge, levy, assessment or fee imposed, in addition to or in substitution for any tax previously included within the definition of "Real Property Tax", partially or totally, whether or not foreseeable or now within the contemplation of the parties.

2.5.1.3  Notwithstanding anything to the contrary herein, such Real Property Taxes shall not include and Tenant shall not be obligated to pay: (a) any state, local, federal, personal or corporate income tax measured by the income of Landlord; (b) any estate, succession or inheritance taxes; (c) any transfer or transfer gains taxes unless such transfer taxes or increases thereof are triggered by a purchase of the Premises by Tenant, or any direct or indirect interests in Landlord; (d) penalties, interest, profit taxes, business taxes, gross receipts taxes, capital levy taxes, impact fees or taxes, recordation taxes, gift taxes,

13

TRT #456363



**EXHIBIT 32**

EXHIBIT 32

CONFIDENTIAL

franchise taxes, corporation taxes, documentary stamp taxes, mortgage lien taxes, tax increment financing or recording fees.

2.5.1.4  Tenant's liability to pay Real Property Taxes shall be prorated based on a 365-day year, to account for any fractional portion of a fiscal tax year included in the Term at its commencement and expiration.

2.5.1.5  The term "Tax Parcel" shall mean the tax or assessment parcels owned or controlled by Landlord which includes the Premises and is shown on the tax parcel exhibit attached hereto as Exhibit F.

2.5.2    Property Insurance.  The cost of premiums for property insurance carried by Landlord insuring the Premises pursuant to this Lease, without mark-up or administrative fees; but, specifically excluding any co-insurance penalties or other penalties, fines or fees caused by Landlord's failure to pay such premiums ("Property Insurance").

2.6      Tenant's Right to Audit.  Tenant, (which for the purposes of this Article 2 shall include its accountant and/or its employees) shall have the right to audit the books and records of expenses and any other amounts billed to Tenant under this Article 2; provided, however, that Tenant may only perform such audit once in each calendar year during the Term, and if Tenant's actual billings exceed the amount that Tenant should have been billed, then Landlord shall refund the excess to Tenant within sixty (60) days following Tenant's written demand to Landlord thereof, and if the excess is more than five percent (5%) of the amount Tenant should have paid, then Landlord shall also pay Tenant's reasonable costs associated with performing the audit not to exceed $10,000.00. Tenant may offset the amount of the overcharge against Rent becoming due.

2.7      Late Charge.  If any installment of Rent or other amount due from Tenant is not received by Landlord within ten (10) days after Tenant receives notice from Landlord that the same is past due, Tenant shall pay to Landlord upon demand an additional sum of three percent (3%) of said installment of rent or other amount as a late charge.  The parties agree that this late charge represents a fair and reasonable estimate of the costs that Landlord will incur by reason of late payment by Tenant.  Acceptance of any late charges shall not constitute a waiver of Tenant's default with respect to the overdue amount or prevent Landlord from exercising any of the rights and remedies available to Landlord under this Lease or by law.  Such late charge shall be considered and be due as Additional Rent.

2.8      Statement Reconciliation.  Within ninety (90) days following the end of each calendar year during which this Lease is in effect, Landlord shall reconcile Property Insurance and Real Property Taxes (collectively, "Reconciled Expenses") for the prior calendar year.  In the event that the actual Reconciled Expenses for the applicable calendar year are less than the amount charged Tenant for the Reconciled Expenses for such calendar year, Landlord shall apply any overpayment by Tenant against Rent due or next becoming due; provided, if this Lease expires before the determination of the overpayment, Landlord shall, within thirty (30) days of determination, refund any overpayment to Tenant after first deducting any amount then due hereunder.  In the event that the actual Reconciled Expenses for the applicable calendar year are more than the amount charged Tenant for the Reconciled Expenses for such calendar year, Tenant shall pay Landlord, within thirty (30) days after its receipt of the statement thereof, any underpayment for such calendar year.  The obligations under this Section 2.8 shall survive the expiration or earlier termination of this Lease.

2.9      Sales Taxes.  If applicable, all goods and services taxes, sales taxes, value-added taxes, imposed in respect of the Rent payable by the Tenant under this Lease or in respect of the rental of space under this Lease (collectively, "Sales Taxes") will be paid by Tenant to Landlord. Sales Taxes payable by

14



EXHIBIT 32

EXHIBIT 32

CONFIDENTIAL

the Tenant (i) will be calculated by the Landlord in accordance with the applicable legislation; (ii) will be paid to the Landlord at the same time as the amounts to which the Sales Taxes are payable to the Landlord under this Lease; and (iii) despite anything else in this Lease, will not be considered to be Rent.

**3    USE OF PREMISES**

3.1    <u>Permitted Use</u>.  Landlord acknowledges that Tenant is entering into this Lease in reliance upon its ability to conduct the Permitted Use without any limitation or restriction by reason of any exclusive provision or contractual restriction or limitation granted to any other party or pursuant to any encumbrance, which applies, to the Premises or Tenant's use thereof.

3.2    <u>Compliance with Laws</u>.

3.2.1    Landlord, at its sole cost and expense, will cause the Premises to comply with all Legal Requirements in effect as of the Commencement Date.  Thereafter Landlord, at its sole cost and expense, will perform any modifications to the Premises necessary to comply with all existing and future Legal Requirements, except to the extent that the compliance is Tenant Generated (as defined below).  As used herein, "<u>Tenant Generated</u>" means that the Legal Requirement was triggered by (or loss of a previously "grandfathered" or "legal non-conforming status" was triggered by) any act or work performed by Tenant or by the particular nature of Tenant's use (i.e., "vehicle sales or maintenance", as distinguished from a general use) or by the particular manner in which Tenant conducts its Permitted Use or compliance being necessary for Tenant's continued use of the Premises.

3.2.2    At all times during the Term and any extension thereof, Tenant shall comply at Tenant's sole cost with all laws concerning Tenant's use or occupancy of the Premises; provided, however, Tenant shall only be obligated to make modifications to the Premises in order to comply with Legal Requirements to the extent the same is Tenant Generated.

3.2.3    "<u>Legal Requirements</u>" means all applicable federal, state, county and municipal laws, ordinances, codes, rules, regulations and requirements of public authorities with jurisdiction, applicable to the Premises, including without limitation, Regulatory Requirements (as defined in Section 4.3).

3.3    <u>Quiet Enjoyment</u>.  So long as Tenant is not in default under this Lease beyond any applicable notice and cure periods, Tenant shall quietly enjoy the Premises without disturbance by Landlord, subject to the covenants, agreements, terms, provisions, and conditions of this Lease. In no event shall the occupant of any adjoining premises or building have the right to access or egress through the Premises for any reason. Except as set forth in this Lease, during the Term, Landlord will not enter into, or agree to modify, amend, revise or change any declarations, easements, restrictions, or other similar agreements that are recorded against the Premises, or that otherwise affect the Premises or the rights and obligations of Tenant hereunder, without obtaining the prior written consent of Tenant, which will not be unreasonably withheld, conditioned, or delayed. If Landlord does so modify, amend, revise or change any such declarations, easements, restrictions, or other similar agreements that are recorded against the Premises with Tenant's consent, Landlord shall provide notice of same to Tenant within thirty (30) days of execution and recordation of such modification, amendment, revision, or change.

3.4    <u>Material Interference</u>.  Notwithstanding anything in this Lease to the contrary, (a) if there is a Material Interference (defined below) occurring after the Commencement Date and lasting for more than five (5) consecutive days, Rent will begin abating starting on the sixth (6th) day until the Material Interference has ceased, and (b) if Tenant is prevented from using the Premises for one hundred twenty (120) consecutive days or longer due to a Material Interference, Tenant will have the right to terminate this

TRT #456363



**EXHIBIT 32**

**EXHIBIT 32**

CONFIDENTIAL

Lease by delivering five (5) days prior written notice of the same to Landlord. In the event of the termination of this Lease pursuant to this Section, Landlord shall return to Tenant any prepaid amounts paid or security deposited by Tenant to Landlord, if any, and thereupon there shall be no further liability or obligation upon either party hereto, except for any liabilities that expressly survive the expiration or earlier termination of this Lease. "Material Interference" means any of the following that materially impairs Tenant's ability to use the Premises: (i) an interruption of or interference with utilities (including, without limitation, water, power, gas, or telecommunications) caused by the act, omission, or negligence of Landlord or any of Landlord's agents, employees, or contractors; (ii) interference with access to the Premises that is not caused by Tenant's negligence, breach of this Lease or willful act or intentional misconduct, but was caused by Landlord's act, omission, or negligence; (iii) the presence of Hazardous Materials not caused by Tenant, or (iv) any title issues. In the event that Tenant terminates this Lease as provided in this Section, Tenant shall have thirty (30) days thereafter to re-enter the Premises following the cessation of the Material Interference to remove Tenant's personal property and Tenant's termination shall not be deemed an abandonment of Tenant's personal property and trade fixtures. Tenant will indemnify and reimburse Landlord for the cost of any damage caused to the Premises by Tenant's removal of its personal property.

## 4    HAZARDOUS MATERIALS

4.1    <u>Tenant's Obligations</u>. Except for materials associated with Tenant's Permitted Use in compliance with Regulatory Requirements and, Hazardous Materials used in connection with (a) the sale, service, maintenance, repair, charging and storage of new and used Tesla electric vehicles, energy products and related parts and accessories and (b) general cleaning, each in compliance with Legal Requirements and Regulatory Requirements, Tenant will not itself, nor will Tenant permit any of Tenant's employees, agents or contractors to bring, use, generate or emit or dispose on or from the Premises any Hazardous Materials. Tenant will at its cost and expense remove or remediate any Hazardous Materials at the Premises or Land in violation of any Legal Requirements and Regulatory Requirements, to the extent caused by Tenant or Tenant's employees, agents or contractors. Tenant will indemnify, defend, and hold Landlord harmless from and against any and all losses, claims, demands, actions, suits, fines, penalties, liabilities, damages, remedial costs and expenses (including investigation, remediation, removal, repair, corrective action, or cleanup expenses), and costs (including actual and reasonable attorneys' fees, consultant fees or expert witness fees) which are brought or recoverable against, or suffered or incurred by Landlord arising from the presence of any Hazardous Materials at the Premises or Land in violation of any Regulatory Requirements to the extent caused by Tenant. However, Tenant will not be liable for, and Landlord releases Tenant from, any claims for speculative, indirect or consequential damages, including any lost sales or profits of Landlord.

4.2    <u>Landlord's Obligations</u>. To the best of Landlord's knowledge and belief, as of the Effective Date there are no Hazardous Materials affecting the Premises or Land in violation of Regulatory Requirements. Landlord has delivered to Tenant the Environment Report(s) prior to the Effective Date, and in doing so, Landlord has delivered to Tenant all reports that identify the existence and extent, or lack thereof, of Hazardous Material at the Premises or Land as of the Effective Date. Landlord has not received notice from any applicable governmental authority of any violation or potential violation of the Regulatory Requirements at the Premises or Land. Landlord will, at Landlord's own cost and expense, comply with, and cause the Premises to comply with, all Regulatory Requirements during the Term, except to the extent Tenant is required to do so under this Lease. Landlord shall cause, and shall be responsible for, at Landlord's sole cost and expense, remediation and/or abatement of any Hazardous Materials existing as of the Commencement Date and/or not introduced to the Premises or Land by Tenant. Landlord shall provide to Tenant a reduction in Rent payable under the Lease proportionate to the portion of floor area that Tenant determines is unusable including a total abatement of Rent if Tenant determines in the exercise of its reasonable business judgment that it cannot operate at the Premises during the course of such work.

16



**EXHIBIT 32**

**EXHIBIT 32**

CONFIDENTIAL

Landlord will indemnify, defend and hold Tenant harmless from and against any and all losses, claims, demands, actions, suits, fines, penalties, liabilities, damages, remedial costs and expenses (including investigation, remediation, removal, repair, corrective action, or cleanup expenses) and costs (including reasonable attorneys' fees, consultant fees or expert witness fees) which are brought or recoverable against, or suffered or incurred by Tenant arising from the presence of any Hazardous Materials in, under, on or from the Premises or Land in violation of any Regulatory Requirements, except to the extent caused by Tenant. However, Landlord will not be liable for, and Tenant releases Landlord from, any claims for speculative, indirect or consequential damages, including any lost sales or profits of Tenant.

       4.3     "Hazardous Materials" means and includes any substance, material, waste, pollutant, or contaminant listed or defined as hazardous or toxic, or regulated by reason of its impact or potential impact on humans, animals and/or the environment under any Regulatory Requirements, mold, asbestos and petroleum, including crude oil or any fraction thereof, natural gas liquids, liquefied natural gas, or synthetic gas usable for fuel (or mixtures of natural gas and such synthetic gas). As used herein, the term "Regulatory Requirements" means all applicable present and future statutes, regulations, ordinances, rules, codes, judgments, orders or other similar enactments of any governmental authorities regulating or relating to health, safety, or environmental conditions on, under, or about the Premises, or the environment, including without limitation, the following: the Comprehensive Environmental Response, Compensation and Liability Act; the Resource Conservation and Recovery Act; 29 CFR 1910, 1025 and Subpart Z of the Occupational Safety and Health Administration regulations, and all state and local counterparts thereto, and any regulations or policies promulgated or issued thereunder.

## 5   MAINTENANCE AND REPAIR

       5.1     Tenant's Maintenance and Repair Obligations. Landlord covenants that the Premises shall be delivered to Tenant on or before the Delivery Date in the Delivery Condition and Tenant's sole remedies for any failure by Landlord to deliver the Premises on the Delivery Date are set forth in Section 1.5. Subject to Landlord's obligations under Section 5.1.1 and 5.2 below, as of the Commencement Date, Tenant shall at its sole cost and expense, repair and maintain the Premises and every part thereof (other than those parts of the Premises to be maintained, repaired or replaced by Landlord pursuant to the provisions of this Lease) in good and tenantable condition (ordinary wear and tear and damage by casualty or condemnation excepted), including, but not limited to, roof maintenance, roof replacement in the event Tenant has installed any Equipment (as defined below) on the roof and replacement is required due to such Equipment on the roof, basic routine maintenance of the HVAC system, fire suppression and sprinkler systems, lighting systems, electrical systems, plumbing and septic systems and other mechanical and building systems (collectively, the "Building Systems"), provided such Building Systems are delivered to Tenant fully functional and in good condition and working order, are within the Premises, and exclusively serving the Premises. Tenant shall maintain, repair and replace all of Tenant's trade fixtures and other Tenant equipment in the Premises, all utility lines from the property line to the point of entry to the Premises, all locks and closing devices, and all window sashes, casements or frames, security grilles or similar enclosures, interior doors and door frames, all of Tenant's signage (both interior and exterior) and all other facilities and equipment of Tenant located at the Premises. Furthermore, Tenant shall be responsible for: (x) repairing, replacing and maintaining in good working order and condition, the exterior lighting located on or otherwise serving the Parking Area; (y) performing any repairs, improvements and replacements necessary to keep the Parking Area in good working order and condition, including resurfacing, repaving and/or restriping the Parking Area; and (z) maintaining the outside areas of the Premises and Parking Area and any access driveways, including, without limitation, mowing, trimming, and snow removal. Notwithstanding anything to the contrary in the foregoing, Tenant shall not be required to pay for or reimburse Landlord for any costs for the repair, maintenance, or replacement of: (i) the Building Structure (as defined herein); (ii) the roof (including the roof membrane) except Tenant will be responsible for roof replacement in the event Tenant has installed any Equipment (as defined below) on the roof (and

TRT #456363



**EXHIBIT 32**

**EXHIBIT 32**

CONFIDENTIAL

replacement is required due to such Equipment on the roof) and responsible for roof maintenance; (iii) the floor slab except to the extent any damage is caused by Tenant's misuse, misconduct, or failure to perform commercially reasonable maintenance; (iv) replacement of the Building Systems except in the event Tenant has failed to perform commercially reasonable maintenance on such Building Systems; (v) utilities to the point of entry of the Premises or sub grade or above grade; and (vi) Hazardous Materials (as defined herein) contamination not caused by Tenant or costs associated with matters running with the land that remain Landlord's responsibility.

5.1.1    Anything herein to the contrary notwithstanding, certain maintenance or repairs of the Premises that would otherwise be the responsibility of Tenant pursuant to Section 5.1 above (and replacement of items for which Tenant is responsible for repair and maintenance under Section 5.1 above) that are Capital Expenses shall be subject to the following requirements. As used herein "Capital Expenses" shall mean any maintenance, repair or replacement that would be capitalized under generally accepted accounting principles ("GAAP") or the guidelines or requirements of the Internal Revenue Code ("IRC Guidelines") or exceeds $15,000. All such Capital Expenses shall be: (i) performed by Landlord; (ii) amortized on a straight line basis without interest over the greater of (a) the useful life thereof (determined in accordance with GAAP or IRC Guidelines or if no such guidelines exist, over a ten (10) year period), or (b) the remaining Term hereunder; and (iii) reimbursed to Landlord by Tenant monthly as Additional Rent in accordance with the terms and conditions of this Section 5.1.1. Tenant will bear the cost attributable to the remainder of the Term and Landlord will bear the cost attributable to the period after the Term. In no event shall the entire cost of such item be included in any single calendar year. Notwithstanding anything to the contrary set forth herein, the terms of this Section 5.1.1 shall not apply to any of Tenant's trade fixtures, interior or exterior signage, or equipment.

5.2    Landlord's Obligations. As of the Commencement Date and continuing through the Term, Landlord shall, at Landlord's sole cost and expense without pass through to Tenant, be responsible for: (A) repairs, maintenance and replacement of the Building Structure (as defined below); and (B) the correction of any latent defects in the Building Structure; provided, however, Landlord is not responsible for maintenance of the roof, replacement of the roof in the event Tenant has installed any Equipment (as defined below) on the roof and replacement is required due to such Equipment on the roof, the floor slab to the extent any damage is caused by Tenant's misuse, misconduct, or failure to perform commercially reasonable maintenance of the floor slab, or replacement of any Building Systems in the event Tenant has failed to perform commercially reasonable maintenance on such Building Systems. Notwithstanding anything to the contrary contained in this Lease, Landlord shall not be liable to Tenant for failure to make repairs or replacements as herein specifically required unless (a) Landlord has actual knowledge of the need for such repairs or replacements or (b) Tenant has previously notified Landlord, in writing, of the need for such repairs or replacements and Landlord has failed to commence said repairs or replacements within five (5) days following receipt of Tenant's written notification or thereafter fails to diligently pursue same to completion. Tenant may perform repairs, maintenance or replacements that are otherwise Landlord's responsibility hereunder (x) in the case of Emergency (provided Tenant promptly notifies Landlord after such actions have been taken), or (y) if Landlord fails to perform its obligations as required hereunder, and Landlord shall reimburse Tenant for the costs so incurred within thirty (30) days after notice, which notice shall be accompanied by paid receipts. If Landlord fails to timely reimburse Tenant, then in addition to any other rights or remedies available to Tenant, Tenant may offset the amount against subsequent installments of Rent. "Building Structure" shall mean the Building's roof structures, supports, the Building foundation, footings, structural supports, exterior and load bearing walls, support beams and columns, floor slab (whether or not such floor slab is structural, but not floor coverings). "Emergency" means the threat of immediate injury, health hazard, or damage to persons or property or the immediate imposition of a civil or criminal fine or penalty. Notwithstanding anything contained in this Lease to the contrary, in the event the roof is required to be replaced and the Tenant has installed Equipment on the roof, Landlord is not

18

TRT #456363



**EXHIBIT 32**

EXHIBIT 32

CONFIDENTIAL

responsible for the cost of removing or replacement any Equipment required to be removed or replaced to accommodate such roof replacement.

## 6    ALTERATIONS, FIXTURES AND SIGNS

6.1    Alterations.    Tenant may at any time during the Term, at its own expense, perform alterations that are nonstructural (including Tenant's right to install utility connections, electrical outlets or conduits, and/or charging attachments on exterior walls which the parties agree are nonstructural) or aesthetic in nature, that do not involve building penetrations that materially and adversely affect the Building Structure, and that cost less than One Hundred Thousand and 00/100 Dollars ($100,000.00) in the aggregate per calendar year upon or to the Premises, in either case, without Landlord's consent but with prior written notification to Landlord, provided that all such work shall be done in a workmanlike manner and in conformity with applicable Legal Requirements.  Tenant at Tenant's discretion shall have the right to install one (1) or more electric vehicle chargers at any time during the Term in the Parking Area and otherwise in accordance with the terms of the Lease.

6.2    Mechanic's Liens.    Tenant shall keep the Premises free from any liens arising out of any work performed, materials furnished, or obligations incurred by Tenant; provided that if Tenant, in good faith, elects to contest such lien, Tenant shall furnish a bond or other security reasonably acceptable to Landlord and Tenant shall not then be deemed in default under this Lease.  Tenant shall cause any such lien imposed to be released of record by payment or posting of a proper bond reasonably acceptable to Landlord before the expiration of the applicable statutory lien's filing deadline after written request by Landlord. Landlord hereby represents and warrants that as of the Effective Date, there are no outstanding mechanics' liens impacting the Premises.  Landlord hereby covenants that, from and after the Commencement Date, there shall be no outstanding mechanics' liens impacting the Premises, exclusive of any mechanics' liens created by Tenant.

6.3    Trade Fixtures.    Tenant shall have the right at any time, and from time to time during the Term, at Tenant's sole cost and expense, to install in or on the Premises such items, herein called "trade fixtures," for use in Tenant's trade or business as Tenant may, in its sole discretion, deem advisable.  Any and all such trade fixtures shall remain the property of Tenant and may be removed by Tenant at any time or times prior to the expiration or sooner termination of this Lease.

6.4    Removal. Any trade fixtures described in this Article 6 that are not removed from the Premises by Tenant after Tenant has vacated upon the expiration or earlier termination, regardless of cause, of this Lease, shall be deemed abandoned by Tenant and shall automatically become the property of Landlord. Tenant shall have no obligation to remove any mechanical, electrical or plumbing system installed by Tenant.

6.5    Signs.    During the Term, Tenant shall have the exclusive right to all signage located on the Building and the Exterior Areas and may install additional signage in Tenant's sole discretion. Tenant shall have the right to install the maximum signage allowable by law using Tenant's corporate colors and logos, including painting of the Premises. Tenant shall be allowed to maximize any outside signage and remove any landscaping, bushes or trees to enhance Tenant's visibility and presence (i.e., pylon or monument sign, façade signage etc.).

6.6    Antenna, Solar Equipment or Panels.    Tenant shall have the right to install antennas, solar panels, solar packs and related equipment and hardware (collectively, the "Equipment") on the roof directly above the Premises or on the Premises in compliance with all Legal Requirements, and subject to Landlord's advance written approval as to the placement and method of installation.  The cost of installation and maintenance thereof, and the cost of any repairs to the roof, which are necessitated by the installation

19

TRT #456363



EXHIBIT 32

**EXHIBIT 32**

CONFIDENTIAL

or repair of the Equipment, shall be borne solely by Tenant.  Such Equipment shall remain Tenant's property and Tenant agrees to remove all Equipment from the Premises at the expiration of the Term. Tenant agrees that the Equipment will be promptly removed at the expiration of the Term, and all affected areas restored and any alterations made to the roof will be restored and repaired in order to restore the original warranty, all at Tenant's sole cost.  Landlord agrees to cooperate with Tenant, at no cost or expense to Landlord, in obtaining any consent, permits or other authorizations from local utility companies and/or municipalities necessary for the installation of the Equipment.

**7    UTILITIES AND SERVICES**

7.1    <u>Tenant to Provide</u>. Tenant shall make all arrangements for installation, hook-up, delivery, and repair of all utilities and services whatsoever supplied to or consumed by Tenant on the Premises and shall pay directly to the utility provider of its choice for all utilities consumed on the Premises. Landlord shall not be liable in damages or otherwise for any failure or interruption of any utility service and no such failure or interruption shall entitle Tenant to terminate this Lease or withhold sums due hereunder, except as otherwise stated in this Lease.

**8    INDEMNITY AND EXCULPATION**

8.1    <u>Indemnity</u>.

8.1.1    <u>Tenant's Indemnification</u>.  To the extent permitted by applicable law and subject to Sections 8.2 and 10.1, Tenant shall indemnify and hold Landlord and Landlord's Indemnitees (as defined below) harmless from and against any Claims (as defined below) arising out of or alleged to be on account of or arising out of injury to person (including death) or damage to property of whatever nature, to the extent caused by (a) the negligence or willful misconduct of Tenant, or any of Tenant's Indemnitees, or (b) any material breach or default in the performance of any obligation on Tenant's part to be performed hereunder, or (c) any of the Tenant's Work.  The foregoing obligation of Tenant does not include any Claims to the extent caused by the negligence or willful misconduct of Landlord or any Landlord's Indemnitees.

8.1.2    <u>Landlord's Indemnification</u>.  To the extent permitted by applicable law and subject to Sections 8.2 and 10.1, Landlord shall indemnify, defend and hold Tenant and Tenant's Indemnitees harmless from Claims arising out of or alleged to be on account of or arising out of  injury to person (including death) or damage to property, of whatever nature (specifically including, without limitation, injury to the person or property of any Tenant's Indemnitees) to the extent caused by (a) the negligence or willful misconduct of Landlord or any of Landlord's Indemnitees, (b) any failure of the Premises to be in compliance with the terms of this Lease (including, without limitation with regard to Legal Requirements and Regulatory Requirements) when possession was delivered to Tenant, or (c) any material breach or default in the performance of any obligation on Landlord's part to be performed hereunder. The foregoing

TRT #456363



**EXHIBIT 32**

**EXHIBIT 32**

CONFIDENTIAL

obligation of Landlord does not include any Claims to the extent caused by the negligence or willful misconduct of Tenant or any Tenant's Indemnitees.

8.1.3    "Claims" means any and all third-party claims for causes of action, suits, liability, obligation, loss, injuries, damages, or costs, (including all costs and reasonable attorneys' fees incurred in defending against claims of same) arising during the Term.

8.1.4    "Indemnitees" means the officers, directors, managers, members, employees, agents, contractors, subcontractors and licensees acting on behalf of such party.

8.2    Release and Waiver.  Notwithstanding any other provision of this Lease to the contrary, each party hereby releases and relieves the other party, and waives their entire right to recover damages against the other party or such party's Indemnitees, for loss or damage to such property caused by any peril normally covered under the policies of property insurance as set forth in Article 9 (whether or not such party actually carries such insurance policies). This release and waiver shall not be affected or limited by the amount of insurance proceeds available to the waiving party, regardless of the reason for such deficiency in proceeds.

## 9    INSURANCE

9.1    Tenant's Insurance.

9.1.1    Commercial General Liability Insurance.  Tenant, at its cost, shall either maintain commercial general liability insurance for bodily injury, or property damage in or about the Premises or in compliance with Section 9.2 below maintain the equivalent level of self-insurance with a combined liability limit  of One Million Dollars ($1,000,000.00) per occurrence, with a general aggregate of Three Million Dollars ($3,000,000.00), and which insurance shall include coverage for liability assumed under this Lease as an "insured contract" for the performance of Tenant's indemnity obligations as set forth in Section 8.1.1. These limits can be met through a combination of primary and excess policies of insurance or self-insurance. Landlord (and, if Landlord requests in writing, its mortgagee of whom Tenant has written notice) shall be included as additional insured(s) in respect to liabilities assumed by Tenant under this Lease.

9.1.2    Tenant's Personal Property Insurance.  Tenant, at its sole cost shall maintain insurance or self-insure for Tenant's non-structural improvements to the Premises and Tenant's trade fixtures and Tenant's personal property at the Premises to the extent of one hundred percent (100%) of their full replacement value.

9.1.3    Worker's Compensation Insurance. Tenant, at its sole cost, shall maintain Worker's Compensation insurance in the amounts and as required by the state in which the Premises is located. This requirement may be waived if Tenant is a qualified self-insured where the Premises is located.

9.2    General Requirements.  Tenant shall have the right to self-insure (self-assume for property) for any of the insurance required to be carried by Tenant under this Lease subject to the following: (i) Tenant remains the tenant named in this Lease or an Affiliate, and (ii) Tenant or Tenant's parent or other affiliated entity maintains a tangible net worth of at least $100,000,000.00 determined in accordance with generally accepted accounting principles.

9.3    Landlord's Insurance.

9.3.1    Landlord's Property Insurance. Landlord, at the expense of Tenant, shall maintain insurance on the Building including the Premises and other real property improvements related to the

TRT #456363



**EXHIBIT 32**

**EXHIBIT 32**

CONFIDENTIAL

Premises covering such property on an "All Risk" basis to the extent of one hundred percent (100%) of full replacement value.

9.3.2    Commercial General Liability Insurance.  Landlord, at its sole cost, shall maintain Commercial General Liability Insurance with a limit of liability in the amount of One Million Dollars ($1,000,000) per occurrence or per claim and Three Million Dollars ($3,000,000) in aggregate and which insurance shall include coverage for liability assumed under this Lease as an "insured contract" for the performance of Landlord's indemnity obligations as set forth in Section 8.1.2. These limits can be met through a combination of primary and excess policies of insurance.  Tenant shall be included as an additional insured, in respect to liabilities assumed by Landlord under this Lease.

9.4    Certificate of Insurance. Upon reasonable written request, either party shall furnish a certificate of insurance evidencing any such insurance required herein where insurance is maintained. In the event Tenant is self-insured and/or insurance is provided by Tenant's parent or another affiliated entity of Tenant, Tenant shall provide Landlord with evidence that Tenant is able to fulfill the insurance requirements set forth in this Lease.

## 10    WAIVER OF SUBROGATION

10.1    Waiver of Subrogation. Each party agrees to waive and shall cause their respective property insurance carriers (to the extent there is a third-party insurer) to waive any right of subrogation against the other and such party's Indemnitees in connection with any loss or damage to the Premises and any contents thereof.   If one party prohibits waiver of subrogation, then each party's release and waiver shall become null and void as each waiver is given in consideration for the other.

## 11    DESTRUCTION

11.1    Landlord and Tenant Termination Rights.  If, during the Term, the Premises or the Building is totally or partially destroyed, Landlord shall notify Tenant within thirty (30) days after such event as to the amount of time Landlord reasonably estimates it will take to restore the Premises. If (x) Landlord fails to deliver the Landlord notice to Tenant within sixty (60) days of the casualty event, (y) Landlord estimates that it will take more than one hundred eighty (180) days to restore the Premises and any such destruction was not due to Tenant's gross negligence or willful misconduct, or (z) the event occurs during the last year of the Term and Landlord estimates that it will take more than one (1) month to restore the Premises, then, in either case Tenant may, at its option, terminate this Lease, in each case by giving written notice not more than thirty (30) days after Landlord's notice. If the Premises or the Building is destroyed to the extent of thirty-three and one-third percent (33-1/3%) or more of the replacement cost thereof or if there is destruction of ten percent (10%) or more during the last year of the Term, Landlord and Tenant may elect to terminate this Lease by giving written notice to the other no more than thirty (30) days after the casualty. Determination of the extent of damage shall be made by Landlord based upon written appraisals and insurance adjustment reports and shall be final and binding on the parties; provided, however, Tenant shall have the right to contest the Landlord's determination by the introduction of its own expert evidence and/or testimony. Upon termination of the Lease under any of the provisions of this Article 11, the parties shall be released thereby from any further obligations hereunder except for obligations, which, prior to the date of such termination, had already accrued.

11.2    Reconstruction.  If neither Landlord nor Tenant elects to terminate this Lease, then Landlord will, at its sole cost and expense, promptly restore the Premises to the Delivery Condition, as well as any Tenant Alterations that are treated as owned by the Landlord for federal income tax purposes.  If Landlord does not complete the restoration within thirty (30) days after the end of Landlord's estimated repair period (subject to extension for Force Majeure for up to thirty (30) days, and for delays caused by

TRT #456363



**EXHIBIT 32**

EXHIBIT 32

CONFIDENTIAL

Tenant), Tenant may, at its option, terminate this Lease on thirty (30) days' prior written notice to Landlord. However, if Landlord completes the restoration within the thirty (30) day notice period, then Tenant's termination will be void and the Lease will remain in full force and effect in accordance with its terms.

11.3    Abatement.  Rent will abate commencing on the date of the casualty and continuing while Landlord restores the Premises in the proportion that the area of the Premises, if any, affected by the casualty or related restoration work bears to the total area of the Premises, it being acknowledged that if a casualty or related restoration work impacts the Premises (or access to the Premises) in a manner such that Tenant, in its reasonable discretion, determinates that it is not feasible to operate in the Premises, Tenant shall be entitled to a full abatement of Rent notwithstanding the fact that the entire Premises may not have been directly impacted by the casualty.  Tenant shall resume payment of full Rent ninety (90) days after possession of the restored Premises has been delivered to Tenant; provided, however, such ninety (90) day period shall be extended a day for each day that Tenant's performance of its restoration work is delayed due to Landlord Delay or events of Force Majeure.

## 12    CONDEMNATION

12.1    Definitions.

12.1.1    "Condemnation" means (a) the exercise of any governmental power, whether by legal proceedings or otherwise, by a Condemnor and (b) a voluntary sale or transfer by Landlord to any Condemnor, either under threat of condemnation or while legal proceedings for condemnation are pending.

12.1.2    "Date of Taking" means the date the Condemnor has the right to possession of the property being condemned.

12.1.3    "Award" means all compensation, sums, or anything of value awarded, paid, or received on a total or partial Condemnation.

12.1.4    "Condemnor" means any public or quasi-public authority, or private corporation or individual, having the power of condemnation.

12.2    Parties' Rights and Obligations to Be Governed by Lease.  Landlord will promptly notify Tenant of any threatened Condemnation known to Landlord and will allow Tenant to participate in negotiations with the Condemnor using counsel of Tenant's choice.  If, during the Term or during the period between the execution of this Lease and the date the Term commences, there is any Condemnation of all or any part of the Premises, or any interest in this Lease by Condemnation, the rights and obligations of the parties shall be determined pursuant to this Article 12.

12.3    Total Taking. If the Premises are totally taken by Condemnation, this Lease shall terminate on the Date of Taking.

12.4    Partial Taking. In the event of a Condemnation of less than the entire Premises (a "Partial Condemnation") this Lease shall continue in full force and effect and the Base Rent shall be reduced pursuant to Section 12.5.  Notwithstanding the foregoing: (A) either Landlord or Tenant may terminate this Lease in the event that: (i) the Partial Condemnation is of more than ten percent (10%) of the rentable square footage of the Building or (ii) the Date of Taking is during the final year of the Term; and (B) Tenant may terminate this Lease in the event that the Partial Taking relates to a portion of the Premises that would

23

TRT #456363



EXHIBIT 32

EXHIBIT 32

CONFIDENTIAL

materially impair or reduce Tenant's ability to operate in the normal course of its business in the Premises. Any termination pursuant to this Section 12.4 shall be effective as of the Date of the Taking.

12.5    Effect on Rent. In the event of a Partial Condemnation in which this Lease remains in full force and effect, on the Date of Taking the Base Rent shall be reduced by an amount that reflects the degree to which the Partial Condemnation disrupts or interferes with Tenant's conduct of its business at the Premises in the ordinary course, as reasonably determined by Tenant.

12.6    Restoration of Premises.  If there is a Partial Condemnation and this Lease remains in full force and effect, Landlord, at its sole cost and expense, shall accomplish all necessary restoration.

12.7    Award.  Each party shall be entitled to receive from the entire Award made with respect to the Condemnation that portion thereof allowed by Legal Requirements for its respective property interest appropriated as well as any damages suffered thereby.  Notwithstanding the foregoing, if this Lease is not terminated, Tenant shall in all events be entitled to receive out of the entire Award an amount equal to the replacement cost of the nonstructural improvements installed by Tenant for rebuilding purposes pursuant to this Article.  If this Lease is terminated, Tenant shall have no interest in that portion of the Award applicable to the improvements installed by Tenant.

## 13    ASSIGNMENT, SUBLETTING, & ENCUMBRANCE

13.1    No Consent Required. Tenant may without Landlord's consent, assign the Lease or sublet all or a portion of the Premises (a) to an "Affiliate", which means an entity that controls, is controlled by, or is under common control with Tenant (including but not limited to a subsidiary, a parent or a subsidiary of a parent of Tenant, or (b) to a successor to Tenant by merger, consolidation or acquisition of all or substantially all of the assets or stock of Tenant or all or substantially all of Tenant's real estate holdings (such transfers are defined herein and referred to hereinafter as "Permitted Transfers"). If Tenant's assignee or any subsequent assignee has a net worth of at least Two Hundred Fifty Million and 00/100 Dollars ($250,000,000.00), determined as of the end of the most recent fiscal year of such assignment prior to such intended release (unless more current figures are available), and an investment-grade rating, then Tenant shall be released and discharged from any further liability under the lease.  Provided Tenant or any controlling corporate entity of Tenant is a publicly traded corporation, the sale, issuance or transfer of any stock (including voting capital stock) of Tenant or any corporate entity which directly or indirectly controls Tenant shall not be subject to, or considered a violation of, this Article 13.

13.2    Failure to Comply. Any assignment or sublease, except for a Permitted Transfer, which is attempted or created without Landlord's prior written consent shall be voidable by Landlord and shall constitute a default and material breach of this Lease.

## 14    DEFAULT

14.1    Default Described. The occurrence of any of the following shall constitute a material breach of this Lease and a default by Tenant ("Tenant Default"):

14.1.1    Failure to pay Rent when due that continues for at least five (5) days after Tenant's receipt of written notice from Landlord;

14.1.2    Tenant's failure to perform or to start performing timely any other provision of this Lease if the failure is not cured within thirty (30) days after written notice to Tenant, provided that if such default cannot reasonably be cured within thirty (30) days, Tenant shall be allowed additional time if Tenant

TRT #456363



EXHIBIT 32

EXHIBIT 32

CONFIDENTIAL

commences to cure the default promptly upon receipt of notice from Landlord to do so and continuously, diligently, and in good faith accomplishes such cure within a reasonable time thereafter; or

14.1.3   The making by Tenant of any general assignment or general arrangement for the benefit of creditors, or the filing by or against Tenant of a petition to have Tenant adjudged a bankrupt, or a petition of reorganization or arrangement under any law relating to bankruptcy (unless in the case of a petition filed against Tenant, the same is dismissed within sixty (60) days), or the appointment of a trustee or a receiver to take possession of substantially all of Tenant's assets located at the Premises or of Tenant's interest in this Lease, where possession is not restored to Tenant within thirty (30) days, or the attachment, execution or other judicial seizure of substantially all of Tenant's assets located at the Premises or of Tenant's interest in this Lease, where such seizure is not discharged within thirty (30) days.

14.2   <u>Landlord's Remedies</u>.  If a Tenant Default occurs, Landlord shall have the following rights and remedies:

14.2.1   Landlord, without any obligation to do so, may elect to cure the default on behalf of Tenant, in which event Tenant shall reimburse Landlord upon demand for any actual and reasonable sums paid or costs incurred by Landlord in curing the default, which sums and costs shall be deemed Additional Rent;

14.2.2   Landlord may elect to terminate Tenant's right to possession, in which case this Lease shall continue in effect whether or not Tenant shall have abandoned the Premises, and, to the extent permitted by law, enter and repossess the Premises, by breaking open locked doors if necessary, and remove all persons and all or any property, by action at law or otherwise, without being liable for prosecution or damages.  Landlord shall use commercially reasonable efforts to relet the premises and may, at Landlord's option, make alterations and repairs in order to relet the Premises and relet all or any part(s) of the Premises for Tenant's account.  Tenant agrees to pay to Landlord on demand any deficiency that may arise because of such reletting.  In the event of reletting without termination of this Lease, Landlord may at any time thereafter elect to terminate this Lease for such previous breach;

14.2.3   To terminate this Lease and the Term without any right on the part of Tenant to save the forfeiture by payment of any sum due or by other performance of any condition, term or covenant broken unless specifically agreed to by Landlord and Tenant.

14.2.4   Whether or not this Lease or Tenant's right to possession is terminated by Landlord or by any provision of law or court decree, Tenant shall have no obligation to pay any Rent until the date it would otherwise have become due in the absence of any Event of Default.  In the event Landlord terminates this Lease, Tenant's liability for future Rent (as well as any damages specifically in lieu of or representing such future Rent) shall cease except to the extent and manner provided in this Article.

14.2.5   Notwithstanding anything to the contrary contained in this Lease, Landlord shall use reasonable efforts to mitigate its damages following a Tenant Default.

14.3   <u>Tenant's Property</u>.  Any personal property of Tenant or of any subtenant or occupant or other person which shall remain in, on, or about the Premises after the expiration or termination of the Term and Tenant's removal from the Premises shall be deemed to have been abandoned by Tenant (provided Landlord shall have given Tenant at least ten (10) days prior written notice before exercising any remedies hereunder and Tenant shall have failed to remove such property within such ten (10) day notice period) and either may be retained by Landlord as its property or may be disposed of in such manner as Landlord may see fit.  If such personal property or any part thereof shall be sold, Landlord may receive and retain the

25

TRT #456363



EXHIBIT 32

EXHIBIT 32

CONFIDENTIAL

proceeds of such sale and apply the same, at its option, against the expenses of the sale, the cost of moving and storage, any arrears of rent or other sums payable hereunder.

14.4    Landlord Default. For purposes of this Lease, Landlord shall not be deemed in default hereunder unless and until Tenant shall first deliver to Landlord prior written notice of such default, and Landlord shall fail to cure said default within (i) the ten (10) business day period after receipt of such notice in the case of monetary obligations owed by Landlord to Tenant; or (ii) the thirty (30) day period after receipt of such notice in the case of non-monetary obligations (or in the event Landlord shall reasonably require in excess of thirty (30) days to cure said non-monetary default, if Landlord fails to commence to cure with the thirty (30) day period after receipt of such notice, or thereafter diligently prosecute the same to completion) (each of which is a "Landlord Default").  In the event of a Landlord Default the rights and remedies set forth in this Section 14.4 shall be in addition to, not in limitation of, any other rights and remedies available to Tenant under this Lease, at law, or in equity.  If there is a Landlord Default under this Lease, and such default can be cured by Tenant, Tenant, shall have the right to take commercially reasonable actions to cure such Landlord Default, in which event, Landlord shall, within thirty (30) days after Tenant's written demand therefor (together with back up invoices), reimburse Tenant for the reasonable, actual and documented costs and expenses incurred by Tenant in curing such Landlord Default, including actual and reasonable attorneys' fees and interest on all sums advanced by Tenant under this Section.  In the event that Landlord fails to timely reimburse Tenant for the same, then Tenant may deliver a written notice ("Tenant's Offset Notice") to Landlord stating its intent to exercise an offset right as provided in this Section, and Tenant may offset such sums against Rent due hereunder.  If a Landlord Default is not of a nature that is able to be cured by Tenant, Tenant may, fifteen (15) days after Tenant sends a second written notice to Landlord identifying the uncured Landlord Default, abate Rent, and/or proceed with legal proceedings against Landlord until such Landlord Default is fully and finally cured; provided, however, except as set forth elsewhere in this Lease, Tenant shall not be entitled to terminate this Lease due to a Landlord Default.

## 15    LANDLORD'S ENTRY ON PREMISES

15.1    Right of Entry. Subject to the terms and conditions of this Lease, Landlord reserves the right at all reasonable times and upon at least twenty-four (24) hours' prior written notice to Tenant, to enter the Premises with a representative of Tenant and to exhibit the Premises to prospective purchasers and mortgagees, and during the last six (6) months of the Term for the purpose of exhibiting the Premises to prospective tenants (but Landlord shall have no right to install signage on the Premises stating that the Premises or Land is for let or otherwise available). Landlord also reserves the right at all reasonable times and upon at least twenty-four (24) hours' prior written notice to Tenant, to inspect the Premises and every part thereof and to perform such maintenance, repairs, construction and alterations to the Premises as are necessary for the management of the Premises. Landlord may, however, with email notice to leaseadmin@tesla.com, make emergency repairs or upon five (5) days' written notice make such required repairs as Tenant has failed to make after appropriate notice and cure period, according to Tenant's repair obligations under this Lease.

15.2    Conditions.

15.2.1    Landlord, at any time, and for any reason, that Landlord shall enter the Premises agrees to use its good faith and diligent efforts to minimize interruption of Tenant's business and to use commercially reasonable care in the treatment of the Premises and any and all property (personal or real) located in or on the Premises.  Landlord's right of entry shall require at least twenty-four (24) hours' prior

TRT #456363



EXHIBIT 32