## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF INDIANA
## INDIANAPOLIS DIVISION

PURE DEVELOPMENT, INC.,
PURE HOLDINGS, INC.,
and DREW SANDERS,

        Plaintiffs,

    v.

CANOPY 5, LLC, CHRIS SEGER,
ADAM SEGER, BRIAN PALMER,
MAGIC TRIC I, LLC,
MAGIC ATX I, LLC, JENNAB, LLC,
and JENNA BARNETT,

        Defendants.

Case No. 1:25-cv-1301-SEB-TAB

## PURE DEVELOPMENT, INC. AND DREW SANDERS'S BRIEF
## IN SUPPORT OF THEIR MOTION FOR PRELIMINARY INJUNCTION
### (REDACTED)

**TABLE OF CONTENTS**

INTRODUCTION ......................................................................................................................... 3

STATEMENT OF FACTS............................................................................................................... 4

    1.   Pure Development, Inc.'s origin ................................................................................... 4

    2.   The Reno (Nest) opportunity ...................................................................................... 5

    3.   The dissolution action .................................................................................................. 6

    4.   Defendants' conduct after the dissolution order but before their resignations...... 8

    5.   Defendants' conduct post-resignation....................................................................... 14

    6.   Defendants' misappropriation of Pure Development, Inc. trade secrets.............. 15

ARGUMENT.................................................................................................................................. 21

    1.   Decisional standard ..................................................................................................... 21

    2.   Likelihood of success on the merits........................................................................... 21

        2.1   Claims regarding Defendants' unlawful computer access ............................ 21

        2.2   Trade secrets ....................................................................................................... 23

        2.3   Indiana Corrupt Business Influence Act......................................................... 23

        2.4   Lanham Act and common law unfair competition........................................ 25

        2.5   Breaches of fiduciary duties, constructive fraud, unjust enrichment,
             and breach of contract ...................................................................................... 27

    3.   Irreparable harm .......................................................................................................... 28

    4.   Balance of harms and public interest ........................................................................ 29

    5.   No bond should be required ....................................................................................... 30

CONCLUSION.............................................................................................................................. 31

# INTRODUCTION

The story of this case is simple: Chris Seger didn't want to share. In early 2025, he sought an order from the Indiana Commercial Court that would dissolve Pure Holdings, Inc. (Pure Development, Inc.'s parent holding company) and hand him the keys to Pure Development, Inc.'s business, which he and Drew Sanders had spent more than a decade building together. Seger proposed to subsume the entirety of Pure Development, Inc.'s business into a new company called Canopy 5. When the Indiana Commercial Court rejected Seger's proposal as "inequitable," he did it anyway.

In a matter of days following the Commercial Court's May 12, 2025 order dissolving the Pure companies (which the Indiana Court of Appeals later stayed), Chris Seger had organized Canopy 5, LLC and begun operating it out of Pure Development, Inc.'s office. Joined by Pure Development, Inc.'s senior management (his brother Adam Seger and Brian Palmer), Chris Seger solicited Pure Development, Inc. employees to work for Canopy 5, to use Pure Development, Inc.'s computer systems and business information for Canopy 5 purposes, and to encourage Pure Development, Inc. clients to transfer their business to Canopy 5.

He convinced Pure Development, Inc. employee Jenna Barnett to transfer ownership of a Pure Development, Inc. cloud-based information storage service to an entity she owned (JennaB, LLC) before then transferring that account to Canopy 5. He had Pure Development, Inc. employees and its IT vendor ▮▮▮▮▮▮▮▮▮▮

██████████████████████████████████████████. And he began marketing Canopy 5 by touting Pure Development employees as Canopy 5 employees and Pure Development projects as Canopy 5 projects. All of this, he did while still employed by (and an indirect owner of) Pure Development, Inc., all the while having Pure Development, Inc. foot the bill. Similar inequitable conduct continued even after the defendants resigned.[1]

In sum, the defendants in this case—all at Chris Seger's behest—have engaged in a series of brazen violations of federal statutes, state statutes, state common law, and contract obligations. Plaintiffs Pure Development, Inc. and Drew Sanders respectfully request that this Court grant them preliminary equitable relief that begins to address the irreparable harm the defendants have caused.

**STATEMENT OF FACTS**

**1.      Pure Development, Inc.'s origin**

In 2012, Chris Seger and Drew Sanders went into business together to form Pure Development, Inc., a real estate development company located in Indianapolis. [Sanders Decl. ¶2] On July 1, 2019, Seger and Sanders formed Pure Holdings, Inc., with each of them owning 50 percent of the company. [*Id.* ¶3] At that time, they transferred their ownership interests in Pure Development, Inc. to Pure Holdings, Inc., and Pure

---

[1] The facts in this submission reflect only the information currently available to the plaintiffs. Plaintiffs will present their full evidentiary presentation at the hearing.

Development, Inc. became a wholly owned subsidiary of Pure Holdings, Inc. [*Id.*] Pure

Development, Inc. then grew into a multimillion-dollar company, with more than 20

employees, completing more than 30 projects throughout the United States. [*Id.* ¶4]

**2.      The Reno (Nest) opportunity**

In about September 2023, Pure Development, Inc. identified the Reno (Nest) site in

Nevada as an industrial speculative site. [*Id.* ¶5] On September 13, 2024, a Pure

Development, Inc. client sent Pure Development a letter of intent to lease a building at

the Reno (Nest) site. [*Id.* ¶5 & Ex. 1] Until late March 2025, Sanders understood that all

activities related to the Reno (Nest) site were in connection with Pure Development,

Inc.'s business. [*Id.* ¶5]

On October 7, 2024, Adam Seger signed, on behalf of Pure Development, Inc., █

███████████████████████████████████████████████████

████████████████████████████████████ [*Id.* ¶6 & Ex. 2]

However, at 9:06 p.m. on October 7, 2024, Chris Seger formed a new Indiana limited

liability company: Magic TRIC I, LLC. [*Id.* ¶7 & Ex. 3]

Two days later, on October 9, 2024, Adam Seger signed another purchase and sale

agreement for the same Reno (Nest) parcel—███████████████████

███████████████████████████████████████████████████

████████████ [*Id.* ¶8 & Ex. 4] ███████████████████████████. [*Id.*]

Nevertheless, on October 11, 2024, Pure Development, Inc. paid a $200,000 deposit to

the title company to secure the land under contract. [*Id.* ¶9] Pure Development, Inc. also made two transfers to the title company on January 13, 2025, totaling an additional $125,000. [*Id.*] On February 12, 2025, ████████████████████████████ ████████████████ [*Id.* ¶10 & Ex. 5] On March 4, 2025, Magic TRIC I, LLC acquired the parcel. [*Id.* ¶11& Ex. 6]

With respect to similar opportunities, Chris Seger and Sanders would do one of two things: (a) leave the opportunity inside Pure Development, Inc. or (b) create a separate special purpose entity for the purpose of jointly owning the opportunity. [*Id.* ¶12] At no time did Chris Seger or Adam Seger inform Sanders of their intention and actions to transfer the Reno (Nest) opportunity to Magic TRIC I, LLC. [*Id.*]

**3.     The dissolution action**

On April 8, 2024, Chris Seger presented Sanders a buyout offer that would have removed Sanders as an owner of the Pure companies. [*Id.* ¶13] After Sanders declined the offer, Seger filed an action in Indiana state court (the "Dissolution Case") to dissolve Pure Holdings, Inc. and Pure Development Capital, Inc. (an entity that Chris Seger and Sanders formed to hold capital and guaranty loans). [*Id.* ¶14] As part of a "Remedy Plan" that he presented to the court in the Dissolution Case, Chris Seger asked permission to start a new company called Canopy 5 that would assume control of Pure Development, Inc.'s assets, customers, business pipeline, and employees. [*Id.* ¶15]

On May 12, 2025, the Indiana Commercial Court ███████████████████████

████████████████████████████████████████████. [*Id.* ¶16, Ex. 7] But the

court ████████████████████████████████████████████████ [*Id.* ¶16,

Ex. 7 at 46] As the court put it, "█████████████████████████████████

████████████████████████████████████████████." [*Id.* ¶16, Ex. 7

at 30 (¶191)] The court added:



[*Id.* ¶16, Ex. 7 at 45]

In its dissolution order, the court stated ████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████ [*Id.* ¶16, Ex. 7 at 44] The court reasoned that █████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

[*Id.* ¶16, Ex. 7 at 46] As of May 12, 2025, when the court entered its dissolution order,

Pure Development, Inc. was working on dozens of projects. [*Id.* ¶17]

On June 23, 2025, the Indiana Court of Appeals stayed the trial court's dissolution order, and no receiver has been appointed. [*Id.* ¶18 & Ex. 8] Pure Holdings, Inc., Pure Development, Inc., and Pure Development Capital, Inc. remain active and existing as Indiana corporations with the Indiana Secretary of State's office. [*Id.* ¶19]

**4.      Defendants' conduct after the dissolution order but before their resignations**

On May 15, 2025—three days after the state court rejected Chris Seger's Canopy 5 "Remedy Plan"—Chris Seger, his brother Adam, and their fellow Pure Development, Inc. employee Brian Palmer, founded Canopy 5, LLC. [*Id.* ¶20 & Ex. 9] However, Chris Seger, Adam Seger, and Brian Palmer did not terminate their employment with Pure Development, Inc. at that time. [*Id.* ¶20] Rather, while still affiliated with Pure Development, Inc., Chris Seger, Adam Seger, Brian Palmer:

a.  operated Canopy 5, LLC out of Pure Development, Inc.'s office [*id.* ¶21];

b.  used Pure Development, Inc. office equipment to conduct Canopy 5, LLC business [*id.*];

c.  caused Pure Development, Inc. employee Jenna Barnett to transfer ownership of Pure Development, Inc.'s account with HubSpot (a cloud-based business management application) to an entity owned by Jenna Barnett called JennaB, LLC, before then transferring ownership of the account to Canopy 5, LLC [*id.* & Ex. 10-A & 10-B];

d.  solicited and engaged Pure Development, Inc. employees to work for Canopy 5, LLC while those employees were still employed and being paid by Pure Development, Inc. [*id.* ¶21 & Ex. 11];

e.  along with others at their direction, accessed Pure Development, Inc.'s computer systems and cloud-based services hosting Pure Development, Inc. business information to conduct Canopy 5, LLC business [*id.* ¶21];

f.  described themselves as Canopy 5's leadership team [*id.* ¶21 & Exs. 12, 13, 16];

g.  stated that Canopy 5 intended to take over Pure Development, Inc.'s business [*id.* ¶21 & Ex. 13];

h.  stated that Pure Development, Inc.'s office address was Canopy 5's office address [*id.* ¶21 & Ex. 17-A];

i.  represented then-current Pure Development, Inc. employees as Canopy 5's "team" [*id.* ¶21 & Ex. 17-E];

j.  represented Pure Development, Inc.'s projects as Canopy 5's projects [*id.* ¶21 & Ex. 17-B, 17-C, 17-D];

k.  stated that Pure Development, Inc.'s entire workforce (just without Drew Sanders) would be leaving Pure Development, Inc. for Canopy 5 [*id.* ¶21 & Ex. 18]; and

l.  had Pure Development, Inc. pay an "executive coach" at least $45,000 for consulting service provided for Canopy 5's benefit [*id.* ¶21].

On May 13, 2025, Pure Development, Inc. employee Kendra Brooks contacted Pure

Development, Inc.'s information technology vendor, Bionic Cat, ███████████

████████████████████████████████████████████ [*Id.* ¶22 & Ex. 19]

███████████████████████████████████████████████

█████████████████████████████████████████████

██████████ " [*Id.*, Ex. 20] On May 20, 2025, ████████████████████

████████████████████████████████████. [*Id.*] ██████████

███████████████████████████████████████████████

███████████████████████████████████████████████

██████████████ [*Id.*] ██████████████████████████

██████████████████████████████████████ [*Id.*] In her May 20

email, ████████████████████████████████████ [*Id.*] On June 18,

2025, Chris Seger caused Bionic Cat to "wipe" a laptop computer he had been using.

[Cranfill Decl. ¶¶32–39]

Enlisting Pure Development, Inc. employees to help them, Chris Seger, Adam Seger,

Brian Palmer, and Jenna Barnett—again, while still employed by Pure Development,

Inc.—also engaged in efforts to transition Pure Development, Inc. projects to Canopy 5,

LLC (including projects the state court's dissolution order said should be completed by

Pure Development, Inc. and not Canopy 5). [Sanders Decl. ¶23] For example:

- **New Albany, Ohio.** ████████████████████████████



████████████████████ [*Id.* ¶23(a) & Ex. 21] ████████████

██████████████████████████████████

███████████████████████████. [*Id.*] ████████████

██████████████████████████████████████

██████████████████████████████████████

████████████ [*Id.*] ████████████████████

██████████████████ [*Id.*]

- **LEAP.** Pure Development, Inc. served as the master developer for the Indiana Economic Development Corporation on the development of the LEAP Lebanon Innovation District in Lebanon, Indiana. [*Id.* ¶23(b)] In order to extract the LEAP business from Pure Development, Inc., Chris Seger induced the IEDC to: (a) demand that Sanders consent to an assignment of Pure Development, Inc.'s LEAP contracts to Canopy 5; and (b) once Sanders opposed the assignment, terminate its contracts with Pure Development, Inc. and reissue them to Canopy 5. [*Id.* ¶23(b) & Exs. 22-24]

- **Bloomington Hotel.** Effective December 1, 2024, Pure Development, Inc. and Alluinn IU Trades District Hotel, LLC executed a Real Estate Conveyance and Project Agreement with the City of Bloomington Redevelopment Commission to acquire land and develop a hotel in Bloomington, Indiana. [*Id.* ¶23(c)] On May 22, 2025, in response to a stakeholder's concerns about what the state court's dissolution order "means as to the Trades District hotel project," ███████████████████████████ ████████████████████ [*Id.* ¶23(c) & Ex. 25] On June 4, 2025, Adam Seger contacted Pure Development, Inc.'s outside counsel to tell him that he would "like [to] set up a JV entity between Canopy5 and Allu[inn] that is called Trades Hotel I, LLC OZ," but to keep it on the "back burner" for now. [*Id.* ¶23(c) & Ex. 26] On June 16, 2025, the Bloomington Redevelopment Commission announced that the agreement with Pure Development, Inc. had expired because Pure Development, Inc. failed to close. [*Id.* ¶23(c)]

- **Amazon.** Since 2020, Amazon has awarded Pure Development, Inc. eight development projects across the United States. [*Id.* ¶23(d)] As of May 12, 2025, the following Amazon projects were in progress: DGF1 (Akron, Ohio); WKN2 (Fort Smith, Arkansas); WKN3 (Texarkana, Arkansas); WKN4 (Batesville, Arkansas); WOR3 (Klamath Falls, Oregon); and WCO7 (Hayden, CO). [*Id.*] ███████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

██████████. [*Id.* ¶16, Ex. 7 at 11] Yet, on May 15, 2025, Chris Seger proposed that Sanders consent to transfer the Amazon master services agreement and the DGF1, WKN2, WKN3, WKN4, WOR3, and WCO7 projects to Canopy 5, LLC. [*Id.* ¶23(d)] Sanders rejected that proposal. [*Id.*]

On May 28, 2025, Pure Development, Inc. employee Justin Lawhorn sent Amazon a letter stating ██████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████

██████████. [*Id.* ¶23(d) & Ex. 27, ¶16, Ex. 7 at 11][2]

On May 30, 2025, Jenna Barnett ████████████████████████████

████████████████████. [*Id.* ¶23(d) & Ex. 28] ████████████████

---

[2] The WCO7 project was not specifically referenced in the dissolution order because the list of "current" projects then available to the court was as of February 18, 2025, and the WCO7 work order was executed in March 2025. [Sanders Decl. ¶16, Ex. 7 at 11, ¶23(d)]



. [*Id.*] In advance of the June 3, 2025 call, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮. [*Id.* ¶23(d) & Ex. 29] On June 5, 2025, Justin Lawhorn sent a follow-up email ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮. [*Id.* ¶23(d) & Ex. 30] On June 17, 2025, Chris Seger informed Sanders that Amazon had canceled the WKN2, WKN4, and WCO7 work orders with Pure Development, Inc. [*Id.* ¶23(d)]

- **Saint Gobain.** As of May 12, 2025, Pure Development, Inc. had an active project for Saint Gobain in Worcester, Massachusetts. [*Id.* ¶23(e)] On June 4, 2025, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮. [*Id.* ¶23(e) & Ex. 31] Oesterreich responded ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ [*Id.*] Pure Development, Inc. employee Kendra Brooks ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮. [*Id.* ¶23(e) & Ex. 32] ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮. [*Id.*] In later discussions with Saint Gobain, Drew Sanders learned that the defendants had encouraged Saint Gobain to end

its relationship with Pure Development, Inc. and move its business to Canopy 5. [*Id.* ¶23(e)]

- **Austin, Texas.** On March 14, 2025, a Pure Development, Inc. client awarded the company a build-to-suit project located in Austin, Texas. [*Id.* ¶23(f)] On the same day, ██████████████████████████████████████████████████████████ ██████████████████████████████████. [*Id.* ¶23(f) & Ex. 33] ██████████████ ████████████████████████████████ [*Id.*] On May 9, 2025, Adam Seger ██████████████████████████████████████████████████████████ ████. [*Id.* ¶23(f) & Ex. 34] ████████████████████████████████████████ ████████ [*Id.* ¶23(f) & Ex. 35] On July 1, 2025, Chris Seger formed defendant Magic ATX I, LLC. [*Id.* ¶23(f) & Ex. 36]

## 5. Defendants' conduct post-resignation

On June 25, 2025, Chris Seger emailed Sanders a notice ██████████████ ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ ████████████████████████ [*Id.* ¶24 & Ex. 37] Chris Seger also ██████████████ ████████████████████████████████████████████████████████ ████████████████████████████████ [*Id.*] Seger claimed ██████████████ ████████████████████████████████████████████████████████ ██████████████████████████████████████████████████████████ [*Id.*] After his

resignation, ██████████████████████████████████████████

██████ [Cranfill Decl., Ex. A]

Adam Seger resigned from Pure Development, Inc. on June 26, 2025. [Sanders Decl. ¶25 & Ex. 38] After his resignation, ████████████████████████████████████

████████████████████ [Cranfill Decl., Ex. B] Brian Palmer also resigned from Pure Development, Inc. on June 26, 2025. [Sanders Decl. ¶25, Ex. 39] After his resignation, ██████████████████████████████████████████████████████. [Cranfill Decl., Ex. C] On July 11, 2025, Pure Development, Inc. received a flash drive from Brian Palmer that included 3,337 files Palmer apparently downloaded from Pure Development, Inc. and took for himself. [Sanders Decl. ¶25]

On June 29, 2025, Jenna Barnett resigned from Pure Development, Inc. [*Id.* ¶26] Other Pure Development, Inc. employees have also resigned or been terminated and, ████████████████████████████████████████████████: Michael Watts (separated June 30, 2025), Justin Lawhorn (August 15, 2025), Jody Sharp (August 15, 2025), Jesse Sadowy (September 30, 2025), and Chase Willis (September 30, 2025). [*Id.* ¶26 & Exs. H, I, K, L]

**6. Defendants' misappropriation of Pure Development, Inc. trade secrets**

In the operation of its business, Pure Development, Inc. utilizes certain trade-secret information. [*Id.* ¶27] Pure Development, Inc. employs reasonable efforts to keep that information secret because companies engaged in the same business could use that

information to adopt Pure Development, Inc.'s business strategies, to compete for clients, and to avoid costs associated with developing similar information. [*Id.*]

In connection with the launch of Canopy 5, Chris Seger, Adam Seger, Brian Palmer, Jenna Barnett, JennaB, LLC, and Canopy 5, LLC have misused or taken the following Pure Development, Inc. trade secrets:

**Pure Development, Inc.'s compilations of active, prospective, & historical project data.** Historically, Pure Development, Inc. compiled data relating to its active and prospective projects in an excel spreadsheet called the "dashboard." [*Id.* ¶28] The dashboard included details on the company's active and prospective projects—*e.g.*, deal stage, deal type, location, deal size, total project cost, and broker—and was used to track the company's requests for proposals. [*Id.*] In 2025, Pure Development, Inc. transferred this compilation of data into HubSpot and used HubSpot for the same purpose until the defendants denied the company access to its account and took it for themselves. [*Id.*]

Pure Development, Inc. also compiles data relating to its historical projects. [*Id.* ¶29] Those compilations include the deal name, deal stage, associated company, product type, location, deal size, total project cost, deal description, deal type, close date, profit, broker details, price per square foot, rent constant, exit rate, yield rate, rent per square foot, land cost, vertical cost, site work cost, and duration. [*Id.*]

Further, Pure Development, Inc. compiles summaries of data relating specifically to the build-to-suit projects that it has pursued. [*Id.* ¶30] The various summaries and

compilations include details on the build-to-suit pursuits such as the tenant, location, deal type, status, total project cost, Pure Development, Inc.'s development fee, gain on sale, the gain on sale to total project cost ratio, the annual historical returns, whether the project was won or lost, and an analysis on why the project was won or lost. [*Id.*]

Finally, for the first quarter of 2025, Pure Development, Inc. prepared a review of its speculative line of business. [*Id.* ¶31] The review compiled Pure's active and prospective speculative projects, established goals and actions items relating to the speculative projects and pursuits, and analyzed Pure's speculative business performance. [*Id.*]

Together, these compilations of information reflect the time, resources, and effort that Pure Development, Inc. has invested to place itself in the best possible position to generate business. [*Id.* ¶32] This information has allowed Pure Development, Inc. to be more efficient, and the company uses the information to strategically determine what opportunities to target and on what terms. [*Id.*]

Pure Development, Inc. has identified the following categories of evidence[3] of defendants' misuse or taking of these data compilations:

- information in Pure Development, Inc.'s HubSpot account that was taken by defendants [PURE_FED_00002593; PURE_FED_00002599; PURE_FED_00002659; PURE_FED_00002660; PURE_FED_00002661; PURE_FED_00002738; PURE_FED_00002770; D-1301-00022749; D-1301-00022753];

---

[3] Documents in this section that are identified by Bates number have been produced in this litigation. Pure Development, Inc. intends to tender its trade secrets to the Court at the hearing, unless the Court prefers an earlier submission.

- documents demonstrating that Jenna Barnett took a copy of the dashboard after her resignation [PURE_FED_00234933; PURE_FED_0007527];

- documents among the more than 3,000 Pure Development, Inc. files that Brian Palmer took in connection with his resignation, as well as documents Palmer accessed on Pure Development, Inc.'s computers after his resignation [PURE_FED_00180112; PURE_FED_00234984; PURE_FED_00235241; PURE_FED_00328776; Cranfill Decl., Ex. C]; and

- documents Adam Seger accessed on Pure Development, Inc.'s computer systems after his resignation [PURE_FED_00129183; PURE_FED_00129184; PURE_FED_00181454; PURE_FED_00181586; Cranfill Decl., Ex. B].

**Pure Development, Inc.'s financial information.** Pure Development, Inc. prepares financial statements, including profit and loss statements, revenue projections, reconciliations, and other financial forecasts in order to track its financial metrics and inform company decisions. [Sanders Decl. ¶33] Pure Development, Inc. also creates project pro formas that forecast financial information relating to the project such as the project costs, gain on sale, rent, and Pure Development, Inc.'s fees. [*Id.*]

Pure Development, Inc. has identified the following categories of documents evidencing the defendants' misuse or taking of this data:

- documents evidencing Jesse Sadowy's imaging the information and using it in a Canopy 5 quarterly business review [PURE_FED_00075739];

- documents evidencing Jesse Sadowy's sending financial information to his personal email account and forwarding it to Brian Palmer's Canopy 5 email address [D-1301-00019439-40]; and

- documents Brian Palmer accessed on Pure Development, Inc.'s computer systems after his resignation [PURE_FED_00235269; PURE_FED_00234998; Cranfill Decl., Ex. C].

**Pure Development, Inc.'s processes.** Pure Development, Inc. created a speculative project process, which sets forth the stages of a speculative deal and details action items its employees should undertake in each stage. [Sanders Decl. ¶34] Pure Development, Inc. has identified the following as evidencing the defendants' misuse or taking of such information:

- documents among the more than 3,000 Pure Development, Inc. files that Brian Palmer took in connection with his resignation [PURE_FED_00175026; PURE_FED_00234984].

**Pure Development, Inc.'s responses to requests for proposal.** In many instances, to win a project, Pure Development, Inc., is required to prepare a response to a request for proposal. [Sanders Decl. ¶35] The responses include the company's proposal for different aspects of the project such as the site plan, renderings, building specifications, preliminary construction schedule, land acquisition, lease and occupancy, design and construction plan, credit enhancement, rental rates, annual increases, project management fees, development fees, and budget and rent calculations. [*Id.*] Pure Development, Inc. has identified the following as evidencing the defendants' misuse or taking of such information:

- Defendants' document productions in this case, which include Pure Development, Inc.**'s** confidential RFP responses [D-1301-00021411; D-1301-00021426; D-1301-00024147].

**Pure Development, Inc.'s client contact list.** Pure Development, Inc. compiles a list of the names and contact information for its clients and partners, which it uses to

communicate with clients and partners on active projects and to pursue new business

opportunities. [Sanders Decl. ¶36] Pure Development, Inc. has identified the following

as evidencing the defendants' misuse or taking of such information:

- information in Pure Development, Inc.'s HubSpot account that was taken by defendants [D-1301-00022725].

Pure Development, Inc. implements several reasonable measures to keep its

business information secret, including:

- maintaining all of its business information, including its trade secrets, on computer systems that only credentialed users may access [Sanders Decl. ¶37];

- maintaining the company's financial information so that it is accessible to only those requiring access to that specific information [*id.*];

- limiting physical access to its office space to those with proper credentials [*id.*];

- entering into contracts that require information provided to it by clients to be kept confidential [*id.*];

- entering into nondisclosure and confidentiality agreements with third parties when necessary [*id.*];

- entering into employment agreements with Adam Seger and Brian Palmer ██████████████████████████████████████████ ████████ [*id.* ¶37 & Exs. 40 & 41]; and

- recently, seeking and obtaining protective orders from the Indiana Commercial Court that required Pure Development, Inc.'s business information submitted to that court be under seal [*id.* ¶¶37, 38 & Ex. 42].

**ARGUMENT**

**1. Decisional standard**

"A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). "The two most important considerations are likelihood of success on the merits and irreparable harm." *Bevis v. City of Naperville, Ill.*, 85 F.4th 1175, 1188 (7th Cir. 2023).

**2. Likelihood of success on the merits**

An application for a preliminary injunction "need not show that [the movant] definitely will win the case. . . . But it normally includes a demonstration of how the applicant proposes to prove the key elements of its case." *Ill. Republican Party v. Pritzker*, 973 F.3d 760, 763 (7th Cir. 2020). By their conduct, the defendants have violated multiple federal and state statutes, state common law, and contracts.

**2.1 Claims regarding Defendants' unlawful computer access**

"Whoever intentionally accesses a computer without authorization or exceeds authorized access, and thereby obtains information from any protected computer," or conspires to do so, violates the Computer Fraud and Abuse Act ("CFAA"). 18 U.S.C. § 1030(a)(2)(C), (b). A "protected computer" is one that "is used in or affecting interstate or foreign commerce or communication." *Id.* § 1030(e)(2). The term includes servers that facilitate cloud computing. *ACW Flex Pack LLC v. Wrobel*, Case No. 22-cv-6858, 2023 WL

4762596, at *7 (N.D. Ill. July 26, 2023). A person "exceeds authorized access" to a computer if they "access a computer with authorization and … use[s] such access to obtain or alter information in the computer that the accesser is not entitled so to obtain or alter." 18 U.S.C. § 1030(e)(6).[4] Without authorization, and in concert with Chris Seger, Adam Seger, and Brian Palmer, JennaB, LLC (acting through Jenna Barnett) accessed a protected computer to obtain the Pure Development, Inc. information stored in HubSpot. JennaB, LLC then transferred that information to Canopy 5, LLC. In addition, after their resignations from Pure Development, Inc., Chris Seger, Adam Seger, Brian Palmer, and others acting at their direction accessed (without authorization) Pure Development, Inc.'s computer systems for the purpose of obtaining information.

The actions of Chris Seger, Adam Seger, Brian Palmer, Jenna Barnett, and JennaB, LLC's similarly violated several state statutes prohibiting: the knowing or intentional access of a computer system, computer network, or any part of either without consent (Ind. Code § 35-43-2-3); the knowing or intentional exertion of unauthorized control over another's property with the intent to deprive the other person of its use, such as Pure Development, Inc.'s HubSpot account (*id.* § 35-43-4-2, criminal theft); and the knowing or intentional exertion of unauthorized control over another person's property

---

[4] The CFAA provides a private right of action for damages and "injunctive relief or other equitable relief" to any person "who suffers damage or loss" aggregating at least $5,000 in value. 18 U.S.C. § 1030(c)(4)(A)(i)(I), (g). The term "loss" means "any reasonable cost to any victim, including the cost of responding to an offense." *Id.* § 1030(e)(11).

(*id.* § 35-43-4-3, criminal conversion). Indiana affords a private right of action for the violation of all three criminal statutes. *See Id.* § 34-24-3-1.

**2.2     Trade secrets**

The Defend Trade Secrets Act, 18 U.S.C. § 1836(b), and Indiana Uniform Trade Secrets Act, Ind. Code § 24-2-3-1 *et seq.*, work to prevent the actual or threatened misappropriation of a company's trade secrets. 18 U.S.C. § 1836(b)(3)(A)(i); I.C. § 24-2-3-3(a). Under both the DTSA and Indiana's UTSA, a protectable trade secret consists of information that (1) derives independent economic value, actual or potential, from not being generally known to and not being readily ascertainable by proper means by others who can obtain economic value from its disclosure or use; and (2) is the subject of reasonable efforts to maintain its secrecy. 18 U.S.C. § 1839(3); I.C. § 24-2-3-2.  Although discovery is ongoing, as set forth above, Pure Development, Inc. has already identified a number of trade secrets that were misappropriated by Canopy 5, LLC, Chris Seger, Adam Seger, Brian Palmer, Jenna Barnett, and JennaB, LLC. *See* 18 U.S.C. § 1839(5) (defining "misappropriation"); I.C. § 24-2-3-2 (defining "misappropriation").

**2.3     Indiana Corrupt Business Influence Act**

Indiana's version of RICO prohibits any person, "through a pattern of racketeering activity," from "knowingly or intentionally acquir[ing] or maintain[ing], either directly or indirectly, an interest in or control of property." I.C. § 35-45-6-2(2). It also prohibits any person "who is employed by or associated with an enterprise" from "knowingly or

intentionally conduct[ing] or otherwise participat[ing] in the activities of that enterprise through a pattern of racketeering activity." *Id.* § 35-45-6-2(3). A victim of such activity is entitled to injunctive relief upon a "showing of immediate danger of significant loss or damage to the aggrieved person." *Id.* § 34-24-2-6(a).

Applying the Indiana RICO Act, the Indiana Court of Appeals in *AGS Capital Corp. v. Product Action Int'l, LLC*, 884 N.E.2d 294, 310–311 (Ind. Ct. App. 2008), affirmed a trial court's grant of injunctive relief against a company that stole its competitor's business information by, *inter alia*, hiring away its competitor's employees and using information those employees had wrongfully taken with them from their former employer in furtherance of its business. The trial court issued an injunction that, *inter alia*, prohibited the use or retention of the stolen information, prohibited the defendants from soliciting or accepting new business from certain customers, prohibited the defendants (for two years) from working for the defendant company, and appointed an expert to expunge data from the defendants' computers. *Id.* at 304–05. The Court of Appeals affirmed, explaining that the defendant company

> had taken possession of almost a blue print of their competitor's methods, processes, customer base, and marketing strategy. Such a treasure trove of business information in the hands of a company without the expense of developing the knowledge would put its competitor at a severe disadvantage. As noted by the trial court, the defendants' use of this stolen information threatened [the plaintiff company's] continued growth as a business.

*Id.* at 311.[5]

A "pattern of racketeering activity" means "engaging in at least two (2) incidents of racketeering activity that have the same or similar intent, result, accomplice, victim, or method of commission, or that are otherwise interrelated by distinguishing characteristics that are not isolated incidents." I.C. § 35-45-6-1(d). "Racketeering activity" means "to commit, to attempt to commit, to conspire to commit a violation of, or aiding and abetting in a violation of" enumerated criminal activities—relevant here, the theft of Pure Development, Inc.'s tangible property, the theft of Pure Development, Inc.'s HubSpot account, the fraudulent statement to HubSpot that defendants were authorized to transfer ownership of Pure Development, Inc.'s HubSpot account, and the theft of Pure Development, Inc.'s business information and trade secrets. *Id.* § 35-45-6-1(e)(14) ("racketeering activity" includes "theft" under I.C. § 35-43-4-2); *id.* § 35-45-6-1(e)(17) ("racketeering activity" includes "fraud" under I.C. § 35-43-5-4).

### 2.4 Lanham Act and common law unfair competition

The Lanham Act prohibits persons, in connection with any services, from using in commerce any "false or misleading description of fact, or false or misleading representation of fact" that is "likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another

---

[5] *AGS Capital Corp.* also held that a civil claim under Indiana's RICO statute is not preempted by Indiana's Uniform Trade Secrets Act. *AGS Capital Corp.*, 884 N.E.2d at 306–309.

person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person." 15 U.S.C. § 1125(a)(1)(A). The Act similarly prohibits such statements or representations from appearing in "commercial advertising or promotion" that "misrepresents the nature, characteristics, qualities, or geographic origin" of a person's services or commercial activities. *Id.* § 1125(a)(1)(B). In launching their new company, defendants Canopy 5, LLC, Chris Seger, Adam Seger, and Brian Palmer (a) misrepresented Pure Development, Inc.'s office as Canopy 5's office, (b) misrepresented Pure Development, Inc.'s employees as Canopy 5's employees, and (c) misrepresented Pure Development, Inc.'s past projects as Canopy 5's past projects.

Indiana common law likewise prohibits unfair competition. *Felsher v. Univ. of Evansville*, 755 N.E.2d 589, 598 (Ind. 2001). It encompasses efforts to pass off the business of one person as that of another. *Hartzler v. Goshen Churn & Ladder Co.*, 104 N.E. 34, 37 (Ind. Ct. App. 1914). But it is not limited to any one particular type of unfair conduct. *Keaton & Keaton v. Keaton*, 842 N.E.2d 816, 820 (Ind. 2006) (explaining that the tort of unfair competition is broad, is not limited to passing off, and does not require intentional wrongdoing). Here, the defendants launched Canopy 5 as essentially a parasitic organization within Pure Development, Inc., using Pure Development, Inc.'s confidential business information, offices, computer systems, and employees to grow

before breaking off as an independent competitor. Whatever else one would call this, "unfair competition" certainly fits.

### 2.5 Breaches of fiduciary duties, constructive fraud, unjust enrichment, and breach of contract

As an owner of a closely held corporation (Pure Holdings, Inc., which in turn owned Pure Development, Inc.), Chris Seger owed both the corporation and his co-owner Drew Sanders an obligation to "deal fairly, honestly, and openly." *Barth v. Barth*, 659 N.E.2d 559, 561 (Ind. 1995). For example, Seger could not engage in acts of self-dealing such as siphoning off (or attempting to) Pure Development, Inc. business for his own benefit or for the benefit of his other companies (including but not limited to Reno (Nest), New Albany, LEAP, Austin, Bloomington Hotel, Saint Gobain, and Amazon projects). *Purcell v. S. Hills Invs., LLC*, 847 N.E.2d 991, 997–98 (Ind. Ct. App. 2006).

As employees of Pure Development, Inc., Chris Seger, Adam Seger, Brian Palmer, and Jenna Barnett also owed Pure Development, Inc. a fiduciary duty of loyalty. *Kopka, Landau & Pinkus v. Hansen*, 874 N.E.2d 1065, 1070 (Ind. Ct. App. 2007). Before leaving Pure Development, Inc.'s employ, each of them was required to "refrain from actively and directly competing with [Pure Development, Inc.] for customers and employees" and to "continue to exert his best efforts on behalf of [Pure Development, Inc.]." *Id.* (quoting *Potts v. Review Bd. of the Ind. Emp. Sec. Div.*, 475 N.E.2d 708, 712 (Ind. Ct. App. 1985)). And none could permissibly "use confidential information peculiar to [Pure Development, Inc.] before he [left] his employ." *Id.*

Apart from their common law duties, both Adam Seger and Brian Palmer also had express employment contracts prohibiting their use of Pure Development, Inc.'s business information for non-company purposes. [Sanders Decl. ¶38, Exs. 40 & 41 (§ 6)] Those contracts also prohibited Adam Seger and Brian Palmer from contacting Pure Development, Inc.'s current or prospective customers and from soliciting Pure Development, Inc. employees. [*Id.* (§ 9)]

**3.     Irreparable harm**

Irreparable harm is harm that cannot be repaired and for which money compensation is inadequate. *Orr v. Schicker*, 953 F.3d 490, 502 (7th Cir. 2020). A damages remedy can be inadequate for any of four reasons: (1) "The damage award may come too late to save the plaintiff's business"; (2) "The plaintiff may not be able to finance his lawsuit against the defendant without the revenues from his business that the defendant is threatening to destroy"; (3) "Damages may be unobtainable from the defendant because he may become insolvent before a final judgment can be entered and collected"; or (4) "The nature of the plaintiff's loss may make damages very difficult to calculate." *Roland Mach. Co. v. Dresser Indus., Inc.*, 749 F.2d 380, 386 (7th Cir. 1984). Causing irreparable harm to Pure Development, Inc. and Drew Sanders has been the very purpose of defendants' actions.

**4. Balance of harms and public interest**

Although perhaps not to this degree, this Court has previously addressed claims by similar wrongdoers that the balance of harms weighed against an injunction. In one such case, this Court soundly rejected that notion. *Badger Daylighting Corp. v. Palmer*, No. 1:19-cv-02106-SEB-MJD, 2019 WL 4572798, at \*12 (S.D. Ind. Sept. 20, 2019). In *Badger*, this Court explained that "[u]ntil we can be more confident than we are now, upon a proper evidentiary showing, that Mr. Palmer no longer possesses or has access to Badger's confidential information and trade secrets, the harm Badger faces due to an actual or threatened misappropriation of these materials greatly outweighs any harm Mr. Palmer may suffer." *Id.*; *see also BioConvergence LLC v. Attariwala*, No. 1:19-cv-01745-SEB-TAB, 2019 WL 6893704, at \*12 (S.D. Ind. Dec. 18, 2019).

Here, the sheer breadth of the defendants' wrongdoing leaves no doubt that the balance of harms weighs in favor of injunctive relief. Chris Seger sought to enrich himself at the expense of Pure Development, Inc. and Sanders by siphoning off projects without disclosing his actions. He then solicited other company employees to launch a competing business within Pure Development, Inc.'s four walls without ever resigning. Even after resigning, the defendants continued to improperly access Pure Development, Inc. files and to wrongfully solicit Pure Development, Inc. customers and employees. There is no legitimate argument that injunctive relief under such circumstances would disserve the public interest.

**5.      No bond should be required**

Finally, although Rule 65(c) conditions preliminary injunctions on the posting of a bond, the Seventh Circuit has explained that "[u]nder appropriate circumstances bond may be excused, notwithstanding the literal language of Rule 65(c)." *Wayne Chem. Inc. v. Columbus Agency Serv. Corp.*, 567 F.2d 692, 701 (7th Cir. 1977) (citations omitted). A movant need not post security, for example, if it is a corporation in good standing and makes a strong showing that it will likely succeed on the merits, or where a substantial security exceeds the movant's financial capacity. *See CDW LLC v. NETech Corp.*, 722 F. Supp. 2d 1052, 1066 (S.D. Ind. 2010) ("Considering that CDW is a corporation in good standing and has made a strong showing that it is likely to succeed on the merits of its trademark infringement claim, we find that their posting of security is unnecessary in this case."); *Habitat Educ. Ctr. v. U.S. Forest Serv.*, 607 F.3d 453, 456 (7th Cir. 2010) ("There is however an exception for a case in which the bond is both higher than necessary and beyond the plaintiff's financial capacity, and thus inflicts irreparable harm without justification.").

The defendants here cannot plausibly claim monetary harm *to them* from having to forfeit the fruits of their wrongful conduct and the concomitant requirement that they conduct any new business in compliance with their statutory, fiduciary, and contractual obligations. The non-existent risk of harm to defendants combined with Pure Development, Inc. and Drew Sanders's strong likelihood of success on the merits favors

an injunction not conditioned on a bond. Therefore, this Court should grant the

requested injunction without requiring a bond.

## CONCLUSION

For these reasons, Pure Development, Inc. and Drew Sanders respectfully request

that the Court enter an order granting them relief that returns the parties to the status

quo prior to the defendants' egregious conduct. Such an order would do the following:

1. require the immediate return of all Pure Development, Inc. property, tangible and intangible;

2. prohibit the defendants from using any business information copied or taken from Pure Development, Inc.;

3. require the defendants to identify, under oath, all information copied or taken from Pure Development, Inc.'s computers and cloud-based storage services and to certify, also under oath, that defendants have returned all said information and retained no copies;

4. appoint an independent expert, at defendants' expense, to confirm the defendants' representations and (if necessary) to expunge all Pure Development, Inc. information from Canopy 5's computer systems;

5. appoint an independent expert, at defendants' expense, to perform an accounting of any proceeds received by defendants (a) in relation to projects that originated from Pure Development, Inc., (b) in relation to any information wrongfully taken from Pure Development, Inc., or (c) in relation to any clients wrongfully solicited in violation of Adam Seger or Brian Palmer's employment agreements, and require defendants to deposit those proceeds into Court;

6. appoint an independent expert, at defendants' expense, to perform an accounting of all operational costs incurred by Pure Development, Inc. for the benefit of Canopy 5's business, and require defendants to deposit those proceeds into Court;

7.	enjoin Adam Seger and Brian Palmer from violating the terms of their employment agreements.

8.	enjoin the defendants from soliciting or accepting new business from clients that originated from Pure Development, Inc.;

9.	enjoin Canopy 5, LLC from making false statements to the marketplace; and

10.	award all other relief appropriate under the circumstances.

Respectfully submitted,

/s/ *B. Too Keller*
B. Too Keller
Keller Macaluso LLC
760 3rd Avenue SW, Suite 210
Carmel, IN 46032
317-660-3402
too@kellermacaluso.com

*Counsel for Pure Holdings, Inc.*
*and Pure Development, Inc.*

/s/ *Michael R. Limrick*
Andrew W. Hull
Michael R. Limrick
Christopher D. Wagner
Megan M. Riley
Hoover Hull Turner LLP
111 Monument Circle, Suite 4400
Indianapolis, IN 46204
317-822-4400
awhull@hooverhullturner.com
mlimrick@hooverhullturner.com
cwagner@hooverhullturner.com
mriley@hooverhullturner.com

*Counsel for Drew Sanders, Pure Holdings,*
*Inc., and Pure Development, Inc.*